# *Ambassade de France aux Etats-Unis*

<u>Réf :</u> Demande d'extradition de M. Brendan LAUTISSIER
N° 2020-0071114

L/LEI

2020 FEB -6 P 3 04

DEPARTMENT OF STATE

L'Ambassade de France présente ses compliments au Département d'Etat et a l'honneur de lui faire parvenir sous ce pli, avec les pièces de justice et leur traduction (le tout en double exemplaire), une demande d'extradition formée auprès du Gouvernement américain contre le nommé Brendan LAUTISSIER, né le 7 janvier 1992 à Woodland, Californie, de nationalité française et américaine. L'intéressé fait l'objet d'un mandat d'arrêt, délivré le 3 août 2018, par Mme Virginie VAN GEYTE, vice-présidente chargée de l'instruction au tribunal de grande instance de Paris pour des faits de tentative d'homicide sur un ascendant commis le 20 août 2010, et de tentative d'assassinat commis le 17 février 2015 au préjudice de Grégoire LAUTISSIER et de Frédérique LAUTISSIER, épouse VARENNES.

Cette demande accompagnée de sa traduction en langue anglaise, est transmise en application du traité d'extradition du 23 avril 1996, entre la France et les Etats-Unis d'Amérique, et notamment de l'article 10. Ce traité d'extradition a été amendé par le traité d'extradition entre les Etats-Unis et l'Union Européenne du 30 septembre 2004.

L'Ambassade de France remercie le Département d'Etat de bien vouloir saisir de cette demande les autorités judiciaires américaines et lui faire connaître la suite qu'elles lui auront réservée.

L'Ambassade de France prie, en outre, le Département d'Etat, de bien vouloir inviter les autorités judiciaires américaines à préciser au moment de la remise de l'intéressé la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé.

L'Ambassade de France saisit cette occasion pour renouveler au Département d'Etat les assurances de sa très haute considération./.

Washington, le 05 février 2020

**Département d'Etat**
**Office of The Legal Advisor**
**Law Enforcement & Intelligence**
**Mme Amber Kluesener**

**Département de la Justice**
**Bureau des Affaires Internationales**
**M. Thomas Burrows**



GOVERNMENT
EXHIBIT
1

EXT-LAUTISSIER-00001

# *Ambassade de France aux Etats-Unis*

## UNOFFICIAL TRANSLATION

### Re: Request for an extradition of Mr. Brendan LAUTISSIER

The Embassy of France presents its compliments to the Department of State and has the honor to transmit, together with court documents and their translation (all in duplicate), a request to the American government for the extradition of Mr. Brendan LAUTISSIER, born on January 7th, 1992, in Woodland Hills, California a French and American national. On August 3rd, 2018, he was issued an arrest warrant by Mrs. Virginie VAN GEYTE, the vice-president of the district court of Paris (France) for attempted homicide against an ascendant (his father Grégoire LAUTISSIER) on August 20th, 2010 and attempted assassination against his father Grégoire LAUTISSIER and his aunt Frédérique LAUTISSIER (married name VARENNES) on February 17th, 2015.

This request, accompanied by an English translation, is transmitted pursuant to the Extradition Treaty between the United States of America and France, with Agreed Minute, signed on April 23rd, 1996 (the "1996 Treaty") and the Instrument as contemplated by Article 3, paragraph 2 of the Agreement on Extradition between the United States of America and the European Union signed on June 25th, 2003, as to the application of the Extradition Treaty between the United States of America and France signed April 23rd, 1996, signed September 30th, 2004 (the "Instrument").

The Embassy of France would be very grateful to the Department of State for referring this request to the American judicial authorities and for notifying it of their subsequent actions in this regard.

The Embassy of France would be most obliged to the Department of State for asking the American judicial authorities to specify, at the time of the person's release, the length of detention he served for extradition purposes alone.

The Embassy of France avails itself of this opportunity to renew to the Department of State the expression of its highest consideration./.

Washington, DC, February 5th, 2020

**Department of State**
**Mrs. Amber KLUESENER**
**Supervisory Paralegal Specialist**
**Office of The Legal Advisor – Law Enforcement & Intelligence**

**Department of Justice**
**Mr. Thomas Burrows**
**Office of International Affairs**

PARQUET
DU
TRIBUNAL
DE GRANDE
INSTANCE
DE PARIS



# Demande d'extradition aux autorités judiciaires des Etats-Unis d'Amérique

EXT-LAUTISSIER-00003



*Liberté • Égalité • Fraternité*
**RÉPUBLIQUE FRANÇAISE**

MINISTÈRE
DE L'EUROPE ET DES
AFFAIRES ÉTRANGÈRES

DIRECTION DES FRANÇAIS À L'ÉTRANGER
ET DE L'ADMINISTRATION CONSULAIRE
———

SERVICE DES CONVENTIONS,
DES AFFAIRES CIVILES ET DE L'ENTRAIDE JUDICIAIRE
———

MISSION DES CONVENTIONS ET DE L'ENTRAIDE JUDICIAIRE

Affaire suivie par : Anne BERNIER
Téléphone : 01 43 17 90 12 • Télécopie : 01 43 17 97 58
Courriel : anne.bernier@diplomatie.gouv.fr
PJ : 1 document

FAE/SAEJ/CEJ n° 2020- *0052006*

Paris, le **2 8 JAN. 2020**

**Le ministre de l'Europe
et des Affaires étrangères
à

Monsieur l'ambassadeur de France
aux Etats-Unis

WASHINGTON**

 

**Objet : Demande d'extradition** formée par les autorités françaises auprès des autorités américaines, à l'encontre du nommé **Brendan LAUTISSIER**, ressortissant américain né le 7 janvier 1992 à Woodland Hills (Etats-Unis).

    **Réf. :** Dossier n° 25414-A
          Notre courrier n° FAE/SAEJ/CEJ 2019-0336552 du 29 mai 2019

    En complément de notre envoi par courrier cité en référence et à la demande du ministère de la Justice, le Département vous prie de bien vouloir trouver ci-joint, avec les pièces de justice, une demande à destination des autorités américaines en vue de l'extradition du nommé Brendan LAUTISSIER, né le 7 janvier 1992 à Woodland Hills, Californie (Etats-Unis), de nationalité américaine.

    L'intéressé est recherché sur le fondement d'un mandat d'arrêt décerné le 3 août 2018 par Mme Virginie VAN GEYTE, vice-présidente chargée de l'instruction près le tribunal de grande instance de Paris pour des faits de tentative d'homicide sur un ascendant commis le 20 août 2010 à Paris et de tentative d'assassinat commis le 17 février 2015 sur les personnes de Grégoire LAUTISSIER et de Frédérique LAUTISSER épouse VARENNES.

    Cette demande est formée sur le fondement du traité d'extradition bilatéral franco-américain du 23 avril 1996 ainsi que de l'accord d'entraide en matière pénale entre l'Union européenne et les Etats-Unis d'Amérique du 25 juin 2003.

    Le Département vous serait reconnaissant de bien vouloir informer les autorités américaines de ces éléments et leur remettre cette demande dans les meilleurs délais.

    Le Département vous remercie en outre de bien vouloir lui faire connaître la suite que les autorités requises auront réservée à cette demande et d'inviter ces dernières à préciser la durée de la détention subie au seul titre extraditionnel dans leur pays par le susnommé./.

Marc HALTEAU
Chef du pôle entraide judiciaire

EXT-LAUTISSIER-00004

Paris, le 24 janvier 2020

*Paris, January 24th , 2020*

La garde des sceaux,
ministre de la justice/
*The Minister of Justice*
*Keeper of the Seals*

**Référence à rappeler :**
N°25 414-A

à/to

Dossier suivi par :
Caius REHMAN-FAWCETT
Caius.rehman-fawcett@justice.gouv.fr

Monsieur le Minsitre de la Justice
des Etats-Unis d'Amérique/
*The Attorney General of the United States of America*

Je soussigné, Caius REHMAN-FAWCETT, membre du bureau de l'entraide pénale internationale, atteste que les pièces ci-jointes sont produites à l'appui de la demande d'extradition formée auprès du Gouvernement des Etats-Unis d'Amérique à l'encontre de Monsieur Brendan LAUTISSIER, né le 7 janvier 1992 à Woodland Hills (Etats-Unis), de nationalité américaine.

*I, the undersigned, Caius REHMAN-FAWCETT, member of the Office for Mutual Legal Assistance in Criminal Matters, certify that the documents attached hereto are provided in support of the request made to the Government of the Unites Stated of America for the extradition of M. Brendan LAUTISSIER, born on January 7th 1992, in Woodland Hills (United-States), of American nationality.*

P/Le Chef du bureau
de l'entraide pénale internationale
*On behalf of the Head of the Office for Mutual*
*Legal Assistance in Criminal Matters*

Caius Rehman-Fawcett

EXT-LAUTISSIER-00005



**LE PROCUREUR DE LA REPUBLIQUE**

à

**TOUTES AUTORITES JUDICIAIRES COMPETENTES DES ETATS-UNIS D'AMERIQUE**

**DEMANDE D'EXTRADITION**

**O B J E T :** demande d'extradition visant le nommé Brendan LAUTISSIER.

**RÉFÉRENCE : 13EXT18**

        J'ai l'honneur de solliciter formellement des autorités américaines, à l'appui des pièces jointes, l'extradition de Brendan LAUTISSIER, dont l'arrestation provisoire est intervenue le 9 décembre 2019 en Caroline du Nord aux États-Unis.

### I – Identité de la personne :

- Nom : LAUTISSIER Brendan dit WALSH Brendan
- Passeport américain : LAUTISSIER Brendan Christopher Walsh no 465128608, délivré le 5.02.2010 et valable jusqu'au 04.02.2020
- SSN : no 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, délivré en 1992,
- CNI française : 130175S000234 délivrée le 03.01.2013 et valable jusqu'au 02.01.2023
- Passeport français : 12AZ61028 délivré le 02.01.2013 et valable jusqu'au 24.01.2021
- Né le 7 janvier 1992 à Woodland Hills en Californie, Etats-Unis
- Fils de LAUTISSIER Grégoire et de HOPKINS SAIA June (épouse WALSH)
- Sexe : Masculin
- Nationalité : américaine et française
- Adresse en France :
  60 rue Guy Moquet
  75017 PARIS

NE VARIETUR

*[signature]*

Ahmad GHAZLEH

- **Dernière adresse connue: (novembre 2018)**
- 3818 PEMBROKE ROAD
- WINSTON SALEM NORTH CAROLINA 27106

  Adresse précédente
- 2764 PLEASANT ROAD Suite ou apprt 10556
- FORT MILL SOUTH CAROLINA 29708

  Autre adresse
- 71 Hillcrest Drive Laconia – New Hampshire – Etats-Unis

EXT-LAUTISSIER-00006

## II – Les faits :

- date des faits : 20 août 2010 et 17 février 2015
- lieu des faits : Paris 11ème (75) le 20 août 2010 et Chatou (78 Yvelines), le 17 février 2015
- degré de participation : auteur d'une tentative d'homicide sur un ascendant (son père LAUTISSIER Grégoire) le 20 août 2010 et tentative d'assassinat au préjudice de son père LAUTISSIER Grégoire et de sa tante LAUTISSIER Frédérique, épouse VARENNES le 17 février 2015.

Exposé des faits :

## Les faits du 20 août 2010 :

Après un premier dépôt de main courante le 23 août 2010, Grégoire LAUTISSIER déposait plainte, le 27 août 2010, auprès du commissariat du 11ème arrondissement de Paris.

Au cours de sa déposition, il expliquait avoir eu, il y a une vingtaine d'années, une relation sentimentale avec Mme June WALSH (devenue par la suite June HOPKINS SAIA), citoyenne américain mariée à Mark WALSH. De cette union étaient nés deux fils Brendan WALSH-LAUTISSIER né le 7 janvier 1992 en Californie, et Austin WALSH-LAUTISSIER, né le 05 mars 1994 en Californie. Grégoire LAUTISSIER a reconnu ces deux enfants alors que son ex-compagne était enceinte. D'après ses déclarations, June WALSH, enceinte de six mois de leur premier enfant Brendan, est rentrée aux États-Unis, en 1991, annonçant au moment de partir de France, son intention de divorcer de son mari Mark WALSH et de rejoindre Grégoire LAUTISSIER à l'issue. Elle a finalement renoncé à cette séparation pour rester avec son mari et a donné à son enfant Brendan le nom de famille de son mari WALSH. Au printemps 1993, elle est revenue en France en disant à Grégoire LAUTISSIER, toujours selon ses dires, qu'elle avait divorcé et qu'elle souhaitait faire sa vie avec lui. Elle est retombée enceinte assez rapidement en 1993 et est repartie aux Etats-Unis avec Brendan en fin d'année 1993 sans prévenir ni donner d'explications à Grégoire LAUTISSIER. Début d'année 1994, avant la naissance d'Austin, June WALSH aurait annoncé à Grégoire LAUTISSIER sa volonté de ne plus se marier avec lui et de rester avec son époux Mark WALSH.

Grégoire LAUTISSIER précisait n'avoir eu pratiquement aucun contact avec ses enfants depuis 1993 et qu'une reprise de contacts s'était opérée en 2009. En septembre 2009, June WALSH était venue présenter le deuxième fils de leur union Austin. Elle avait fait part, à ce moment là, de difficultés financières à Grégoire, qui aurait accepté de lui verser 1000 dollars par mois jusqu'en juin 2010. L'année suivante, en juin 2010, June WALSH, accompagnée de leur fils aîné Brendan, est revenue en vacances en France. Grégoire LAUTISSIER indiquait avoir laissé à leur disposition son appartement parisien situé 55 bd de Charonne à 75011 PARIS, lui-même étant allé chez sa propre mère durant cette période. La durée de ces vacances a été confirmée par l'ambassade des Etats-Unis : les dénommés LAUTISSIER Brendan et June WALSH sont arrivés en France par la compagnie Air France vol n°337 BOSTON/Charles de Gaule le 15 juin 2010 et ont quitté la France le 25 août 2010 par Air France vol n°332 Charles de Gaule/ BOSTON.

Le 20 août 2010, alors qu'il avait constaté que June HOPKINS SAIA avait pris à son domicile des documents importants (dont son avis d'imposition, ses papiers relatifs à l'impôt sur les grandes Fortunes (ISF) et les actes de donation et de succession suite au décès de son père en octobre 2008) et qu'il en discutait vivement avec elle, il a déclaré que Brendan lui avait tendu deux documents qu'il lui avait demandé de signer (des engagements d'hébergement). Grégoire LAUTISSIER poursuivait son audition en indiquant avoir répondu à son fils qu'il les lirait d'abord et les lui rendrait ensuite tout en continuant à se quereller avec June, il avait alors senti un liquide s'écouler

NE VARIETUR                     Ahmad GHAZLLI

dans son dos et entendu le bruit d'un briquet à deux reprises. Se retournant vers son fils, il disait avoir vu celui-ci un briquet à la main essayant de l'allumer sur lui et comprenant que son fils Brendan tentait de mettre feu à l'essence dont il l'avait aspergé, il racontait lui avoir porté un coup pour qu'il lâche le briquet. Il continuait son récit en expliquant que son frère Antoine LAUTISSIER, revenu de la cuisine, les avait alors séparés mais aussitôt Brendan s'était jeté derrière le canapé où se trouvait sa mère et s'était saisi d'un petit sabre japonais. Brendan LAUTISSIER était immédiatement ceinturé et plaqué au sol par son oncle Antoine LAUTISSIER qui le désarmait selon le récit de la victime Grégoire LAUTISSIER. Sur ce, sur les conseils de son frère Antoine, Grégoire LAUTISSIER se recluait dans sa chambre après avoir néanmoins ôté son tee-shirt imbibé d'essence et s'être lavé. Antoine LAUTISSIER demandait à June et à Brendan de faire leurs valises pour quitter l'appartement, il les accompagnait à l'hôtel IBIS de la Porte de Bercy côté Charenton en réglant quatre nuits d'avance.

Durant ces faits, la victime soulignait l'absence de réaction de la mère de Brendan qui était restée silencieuse « June s'est levée du canapé sans rien dire » mais aussi le mutisme de Brendan qui n'avait pas ouvert la bouche.

Il a également précisé que June voulait que Brendan reste à Paris pour s'inscrire à l'Université Américaine de Paris (ce qui a été vérifié auprès du doyen de l'Université Américaine de Paris) et qu'il était convenu que Brendan serait hébergé au domicile de son père.

Grégoire LAUTISSIER précisait que l'essence dont il avait été aspergé provenait d'une bouteille d'un litre « spécial barbecue » dont il ignorait la provenance. Il rapportait une bouteille de 1000 ml en plastique portant une étiquette mentionnant « liquide d'allumage » de marque LANDMANN. Il ajoutait qu'il n'avait pas d'appareil à barbecue et que ni Brendan ni sa mère n'étaient fumeurs et que le briquet qui avait été utilisé ne lui appartenait pas. Il avait été cassé lors de sa chute et avait été par la suite jeté à la poubelle. Il ignorait également la provenance et la présence à son domicile du sabre qu'il remettait aux enquêteurs. Ce couteau japonais, d'une longueur de 40 cm environ au total, présenté dans un fourreau noir, était muni d'une lame de 27cm. La bouteille comme le sabre japonais ont été placés sous scellés.

Les déclarations de Grégoire LAUTISSIER ont été corroborées par celles de son frère Antoine LAUTISSIER. Ce dernier dans son audition du 30 novembre 2010 (l'intéressé travaillait à l'époque en Indonésie en qualité d'ingénieur) racontait que le jour des faits « on voulait discuter de l'avenir universitaire de Brendan », « on a déjeuné à la Nation et on a poursuivi la discussion chez mon frère », « arrivé à l'appartement, June m'a indiqué vouloir avoir une discussion avec Grégoire sans que je sois là et je lui ai répondu que je restais». Il a raconté comment la discussion s'était envenimée entre June et Grégoire, qu'il était allé vider un cendrier à la cuisine et qu'à son retour, il avait vu son frère debout devant Brendan avec le poing armé, qu'il les avait séparés et qu'au moment où il avait fait asseoir son frère sur le canapé « Brendan s'est précipité derrière l'autre extrémité du canapé d'où il a sorti un couteau japonais qu'il avait déjà dégainé ». « Voyant cela, je l'ai ceinturé par l'arrière et maintenu au sol et je lui ai retiré le couteau des mains, pendant ce temps, June n'a eu aucune réaction. Elle est restée silencieuse et assise». Ce faisant, elle n'avait pas cherché à prévenir Grégoire. Il a relaté aussi avoir vu son frère le tee-shirt trempé et avoir senti une forte odeur d'essence et a précisé avoir retrouvé un burin, dont son frère se servait pour faire des travaux dans sa salle de bains, dans le salon alors qu'il n'avait rien à faire dans la pièce. Il a aussi rapporté un échange avec June durant le trajet à l'hôtel Ibis, June lui ayant demandé si ils allaient intenter une action en justice et ayant prétendu que le bidon d'essence avait été utilisé pour remplir le briquet de Brendan, ce qui lui avait paru étrange puisque Brendan ne fumait pas.

Par ailleurs, les interrogatoires de la mère de la victime Odile CHAMBON, veuve LAUTISSIER et de sa sœur Frédérique LAUTISSIER épouse VARENNES accréditent la version des faits décrite par la victime Grégoire LAUTISSIER.

·NE VARIETUR

Ahmad GHAZLEH

Enfin, un témoin, cité par la victime, M Cyrille HESSE, a déclaré dans la déposition recueillie par les policiers le 11 novembre 2011, être venu voir M Grégoire LAUTISSIER en fin de journée le 20 août 2010. Il a décrit la victime comme « complètement paniqué », avoir senti une forte odeur d'essence, et avoir vu des tâches sur le canapé et sur le mur gauche dans la pièce principale et a confirmé que la victime lui avait déclaré « avoir failli crevé, avoir failli brulé ». Il avait aussi vu le frère de la victime Antoine LAUTISSIER entrer dans l'appartement relatant avoir raccompagné à l'hôtel June et Brendan. Il a également affirmé que les deux frères lui avaient montré la bouteille d'essence que le fils avait renversée sur son père Grégoire et le sabre et qu'ils avaient décrit la scène de la manière suivante : après que Grégoire ait donné un coup de poing à Brendan, celui-ci avait cherché un sabre japonais et qu'Antoine était intervenu.

**Le retentissement psychologique** sur la victime Grégoire LAUTISSIER, sans antécédent psychiatrique, avait été évalué à l'époque soit le 6 septembre 2010 à 5 jours d'Incapacité Totale de Travail par le service des Urgences Medico Judiciaires de l'Hôtel Dieu. Depuis ces événements, la sœur de la victime a indiqué que son frère Grégoire LAUTISSIER était tombé dans une grave dépression, nécessitant un traitement médicamenteux permanent qui avait entraîné une invalidité, état reconnu par l'administration publique. Elle a aussi précisé que son frère Grégoire avait trouvé refuge chez elle et sa mère depuis cette tentative d'homicide à son encontre.

Demeurant introuvable et à la suite du signalement de la présence au printemps 2014 de Brendan LAUTISSIER et de sa mère June HOPKINS SAIA à proximité du domicile de Grégoire LAUTISSIER (qui avait emménagé à Chatou chez sa sœur Frédérique VARENNES), un mandat d'arrêt était délivré le 14 mai 2014 contre Brendan LAUTISSIER. La juge d'instruction lui a d'ailleurs demandé il n'avait pas utilisé son nom de famille WALSH pour pouvoir échapper au mandat d'arrêt international. Ce mandat d'arrêt a été notifié à Brendan LAUTISSIER le 6 mars 2015 par le chef d'établissement de la maison d'arrêt de Bois d'Arcy. Ce premier mandat d'arrêt européen a donc été exécuté.

Interrogé par la juge d'instruction en charge du dossier à la suite de son arrestation le 18 février 2015, Brendan LAUTISSIER a nié les faits de tentative d'homicide sur ascendant du 20 août 2010. Il expliquait à la juge d'instruction que l'origine de la dispute entre son père et sa mère en août 2010 était le refus de son père d'assumer sa paternité notamment au regard des dépenses financières. Il indiquait que sa mère avait quitté son père car celui-ci était violent. Il confirmait qu'il envisageait des études en France à ce moment là et qu'il comptait résider chez son père. Il ne voyait pas de problème à ce que sa mère fasse des photocopies de documents appartenant à son père et disait que ce dernier avait donné son autorisation à la reproduction de documents lui appartenant. Il expliquait que les documents qu'il avait donnés à son père à signer le jour des faits étaient en relation avec son passeport français. Par ailleurs, il expliquait qu'il se pouvait qu'une bouteille de liquide inflammable et un briquet se trouvassent dans l'appartement le 20 août 2010 et qu'il les ait touchés mais il niait les faits qui lui étaient reprochés. Il imputait les déclarations et la plainte de son père à son encontre par son souhait de ne pas faire face à ses responsabilités paternelles. De même il justifiait le témoignage de son oncle par l'emprise de celui-ci sur son père. Par ailleurs, ses explications sur la présence du sabre ont varié. Il affirmait dans un premier temps que le sabre était factice et qu'il s'agissait d'un jouet et niait l'avoir utilisé le 20 août 2010. A la question « vous êtes-vous emparé d'un sabre ? » Il répondait : « Il y avait un sabre mais en fait c'est un jouet. J'aime bien fréquenter les salons japonais. C'est factice, c'est un jouet. ». A la question « Votre père a remis aux enquêteurs un couteau japonais avec une lame de 28 cm et un fourreau noir tacheté de rouge et qui n'est pas du tout une réplique. Qu'en est-il ? » , il répondait tout de suite après « la lame est bien en métal mais elle n'est pas aiguisée ». « Ce n'est donc pas un objet en plastique issu d'une panoplie ? » « non, c'est bien un objet en métal . »

NE VARIETUR

Ahmad GHAZLEH

EXT-LAUTISSIER-00009

Enfin, la juge d'instruction lui a présenté ce jour là deux photos que sa mère avait publiées sur Facebook la veille des faits du 20 août 2010 : la première représentant un tableau de Gérard LAUTISSIER avec la mention « Gérard, l'ignoble, mentir » (le père de Grégoire LAUTISSIER se prénommait Gérard) et la deuxième représentant une chambre avec la mention « la chambre de se venger ». Il a d'abord répondu « pour moi ça n'évoque rien mais je pense qu'une fois que mon père nous a jetés dehors ma mère est fâchée avec mon père ». La juge d'instruction lui a fait remarquer que ces photos avaient été publiées la veille de la dispute soit le 19 août 2010.

La juge d'instruction ayant fait part de son étonnement de ne pas avoir réussi à l'arrêter malgré un mandat d'arrêt international délivré le 14 mai 2014, Brendan LAUTISSIER a également expliqué au cours de cet interrogatoire du 26 mai 2015 qu'il avait voyagé pour voir son frère en Angleterre et à Amsterdam pour son anniversaire entre le 14 mai 2014 et la date de son arrestation le 19 février 2015 en précisant qu'avant 2009, son identité était Brendan WALSH.

### Procédure auprès du juge aux affaires familiales :

Le 15 décembre 2011, le juge aux affaires familiales du TGI de Paris, saisi d'une demande, introduite le 29 mars 2011 par June HOPKINS SAIA épouse WALSH, rendait un jugement fixant la contribution de M. LAUTISSIER à hauteur de 230 euros par mois et par enfant.

### L'enquête sur le décès de Mark WALSH, l'époux de June HOPKINS SAIA

Le 6 décembre 2011, le juge d'instruction était avisé par le conseil de Grégoire LAUTISSIER du décès de Mark WALSH époux de Mme WALSH, qui communiquait des coupures de presse faisant état de la découverte le 18 octobre 2011 de son corps sans vie au domicile familial. L'enquête avait conclu à une mort accidentelle consécutive à un traumatisme crânien à la suite d'une chute d'une échelle située dans un garage.

### Demande d'entraide du juge d'instruction français aux autorités américaines

Le 13 novembre 2012, le juge d'instruction formulait une demande d'entraide aux autorités américaines afin qu'il soit procédé à l'audition de Mme WALSH et de ses fils Brendan et Austin mais aussi afin de recueillir toute information utile sur les circonstances du décès de Mark WALSH.

### Retour de cette demande le 13 novembre 2013 :

Un rapport de police en date du 18 octobre 2011 sur la découverte du corps de M. WALSH faisait apparaître des suspicions sur les circonstances de sa mort . Il avait été découvert allongé sur le dos dans son garage présentant une blessure « significative » à la tête. Une plaie par balle n'était pas exclue compte tenu des éclats de crâne sur le sol. Une échelle était en partie appuyée contre une table. De la matière cérébrale était constatée sur un appareil de type moteur situé sur un banc sous l'échelle. Il était constaté du sang coulé sous le côté gauche ce qui ne paraissait pas cohérent avec l'emplacement du corps. Trois empreintes partielles de pieds étaient visibles dans le sang qui menait vers la porte du garage.

L'enquêteur, en charge de l'audition de Brendan LAUTISSIER, notait un changement d'attitude du jeune homme qui « commençait à bégayer » et à s'exprimer avec une certaine nervosité lorsqu'il le questionnait sur le décès de son beau-père. Brendan LAUTISSIER avait refusé de se soumettre à un test polygraphe (détecteur de mensonge).

NE VARIETUR          Ahmad GHAZLEH

EXT-LAUTISSIER-00010

A la suite du décès de son mari, Mme WALSH a perçu 300 000 dollars issus de deux contrats d'assurance-vie. Les investigations patrimoniales montraient que June et Mark WALSH avaient pris une hypothèque sur leur maison un mois avant le décès de ce dernier. Un mois après le décès de son mari, Mme WALSH changeait de nom sur son compte Facebook en se désignant sous le nom de **June HOPKINS SAIA.**

Le FBI avait également mené des investigations sur la famille WALSH. Interrogé, un voisin de la famille WALSH, faisait part des rumeurs du voisinage qui trouvaient Mme WALSH et ses fils « étranges ».

**L'enquêteur du FBI estimait que les circonstances de la mort de Mark WALSH devaient être « davantage fouillées ».** Il transmettait à ce titre son rapport aux services de police locaux initialement chargés de l'enquête.

<u>**Les faits du 17 février 2015 :**</u> Le 17 février 2015, Grégoire LAUTISSIER et sa sœur Frédérique VARENNES étaient <u>**victimes d'une tentative d'assassinat.**</u>

<u>Tentative d'assassinat sur Frédérique LAUTISSIER, ep VARENNES</u>
Le 17 février 2015 à 19h15, alors qu'elle rentrait à son domicile au 10 allée Edmond Flamand à Chatou (78), Frédérique VARENNES subissait une violente agression. Ainsi, alors qu'elle se trouvait sur le trottoir face au portail de son pavillon, elle recevait un violent coup à l'arrière du crâne, qui lui faisait perdre l'équilibre et se retrouver au sol, face à un individu casqué avec le bas du visage dissimulé par un foulard qui tentait de l'étrangler. Une seconde personne intervenait pour aider le premier agresseur et mettre fin à la résistance de Madame VARENNES (qui avait mordu la main du premier agresseur). Cette dernière subissait une seconde tentative d'étranglement. Elle apercevait derrière son premier agresseur une femme également grimée qui passait un lien à son complice qui essayait de le lui passer autour du cou sans succès. Alertés par les cris de Madame VARENNES, deux passants intervenaient et mettaient ainsi en fuite les deux agresseurs.

<u>Tentative d'assassinat sur Grégoire LAUTISSIER</u>
Grégoire LAUTISSIER, résidant chez sa sœur Frédérique VARENNES, sortait fortuitement du pavillon au même moment et avait constaté que sa sœur gisait gémissante au sol. Elle lui avait alors raconté avoir été agressée par « les Américains ». Parti à leur recherche avec l'aide d'un voisin, il apercevait son ex-compagne et leur fils. Le sachant responsable de l'agression de sa sœur, il lui avait porté un coup de poing au visage. Une bagarre s'en était suivie et il se trouvait alors lui-même pris à parti par les deux agresseurs devant la résidence Séquoïa. La femme essayait de lui crever les yeux en lui enfonçant ses doigts dans les deux yeux et le griffait pendant que l'homme essayait de l'étrangler avec un lien. Là-encore, l'intervention d'un témoin extérieur pour le libérer alors qu'il s'étouffait, obligeaient les assaillants à prendre la fuite. Il était resté au sol « très choqué ». Les agresseurs étaient vus repartir à pied en possession d'une grosse valise.

<u>Identité des assaillants</u>
Grégoire LAUTISSIER déclarait immédiatement après les faits aux enquêteurs avoir réussi à enlever le bonnet de la femme et à dégager l'écharpe qui lui dissimulait le visage et avoir reconnu son ex-compagne June WALSH et avoir constaté que l'autre agresseur n'était autre que son fils Brendan LAUTISSIER. Frédérique VARENNES confirmait ces identités et disait avoir eu immédiatement des soupçons sur ses agresseurs quand elle les avait entendus s'exprimer en anglais. Elle avait d'ailleurs dit à son frère, lorsqu'il était sorti alerté par ses cris et qu'elle était à terre, avoir été agressée par « les américains ». Un descriptif était recueilli par les enquêteurs en arrivant sur place : un homme type caucasien, 35/40 ans, mal rasé, cheveux blonds, plutôt bedonnant et mesurant environ 1m75, porteur d'un manteau ou d'une veste sombre et avec une valise à roulette bleu ou grise. Pour la femme type caucasienne, cheveux blonds et porteuse d'une doudoune bleu ciel. Les deux possédaient un fort accent anglo-saxon et ne s'exprimaient qu'en anglais. Un des

NE VARIETUR          Ahmad GHAZI FH

témoins de la scène. Patrice COISNON ayant sauvé la première victime Frédérique Varennes, avait déclaré, lors de son audition le 19 février 2015, qu'il avait pris l'agresseur C par les épaules (C était agenouillé en train de maintenir les jambes de la victime avec ses mains), l'avait projeté en arrière, celui-ci retombant sur les fesses et « c'est à ce moment là que j'ai aperçu son visage et que j'ai constaté qu'il s'agissait d'une femme plutôt de petite taille, 1m60 à 1m65, corpulence plutôt ronde, porteuse de vêtements sombres et d'une doudoune. Je n'ai pas vu ses cheveux ». Concernant l'agresseur B, il déclarait ne pas avoir vu son visage car « sa tête était couvert d'un vêtement». Un autre témoin Bruno COUZIN, le cycliste arrivé le premier sur les lieux des faits, a déclaré que les deux agresseurs étaient casqués lors de la première agression et qu'ils avaient ôté leur casque lors de la seconde agression. Il déclarait que l'agresseur A tentait d'immobiliser les jambes de C qui se débattait afin de se dégager « J'ai constaté que A était une femme de par son allure féminine et sa physionomie » « A, porteuse de son casque, portait également un passe montagne qui lui couvrait le visage jusqu'au nez, seuls ses yeux étaient visibles » ; puis « A et B se sont mis à discuter dans une langue que j'ai reconnu comme étant de l'anglais ». Puis, plus tard racontant le déroulement de la scène, « A est venue vers moi je lui ai baissé son passe montagne et j'ai pu distinguer le visage d'une femme caucasienne ». Un autre témoin, Jean-Baptiste ASSANI, a raconté arriver sur les lieux de la deuxième tentative d'assassinat celle perpétrée sur la personne de Grégoire LAUTISSIER et avoir vu « un homme de 1m70, enrobé, âgé d'environ 40 ans, mal rasé, porteur d'un bonnet style péruvien de couleur clair, qui se dégageait de l'emprise qu'il avait sur un homme, à savoir un homme, âgé de 50 ans environ, barbu, tuméfié, allongé au sol et gémissant ». « Puis j'ai vu un jeune homme, âgé de 25 ans environ (Bruno COUZIN), qui maintenait une femme su sol, il était allongé sur elle pour faire en sorte qu'elle ne puisse pas se relever et partir ». «Concernant la femme, il s'agissait d'une femme, de 1m60 environ, corpulence moyenne, cheveux blonds mi-long, âgé d'environ 40 à 50 ans. Elle portait un anorak bleu clair. »

<u>Les constatations médico-légales</u> faites par les sapeurs-pompiers et les effectifs du commissariat de police de Saint-Germain-en-Laye intervenus sur le lieu des faits le 19 février 2015, faisaient ressortir pour Madame VARENNES la bouche en sang et des traces rougeâtres sur le cou compatibles avec les gestes d'agression décrits. Le certificat médical constatait un hématome occipital de 2cm de diamètre, un érythème avec dermabrasion linéaire du cou, un œdème de la lèvre gauche, une abrasion de 1cm sur l'arête du nez, des ecchymoses sur la main gauche et une fissure osseuse du pouce gauche. Mme VARENNES était en état de choc et au bord des larmes. M Grégoire LAUTISSIER, hagard, avait de nombreuses ecchymoses au visage et notamment au niveau des deux orbites oculaires ainsi que des dermabrasions linéaires multiples compatibles avec des griffures. Le certificat médical relevait aussi des abrasions linéaires et des érythèmes du cou ainsi qu'un hématome au dos de la main gauche. Les deux victimes étaient transportés à l'hôpital de Poissy (78) et se voyaient délivrer une interruption temporaire de travail de trois (3) jours.

<u>Les constatations matérielles et les conclusions génétiques</u>

Sur le lieu de la première agression, à savoir celle perpétrée sur la personne de Frédérique VARENNES, un bout de gants en latex de couleur noire a été découvert sur le trottoir devant le domicile des victimes (CONSTAT HUIT).
Sur le lieu de la seconde agression, c'est-à-dire dans la résidence Séquoia à Chatou, étaient trouvés éparpillés un câble électrique blanc agrémenté de deux nœuds d'une longueur de 136 cm (CONSTAT UN), une touffe de cheveux arrachée à Grégoire LAUTISSIER (CONSTAT DEUX), un tour de cou en laine (CONSTAT CINQ), un morceau de tissu (CONSTAT QUATRE). Un prélèvement par écouvillon effectué sur les traces rougeâtres sur la bande de tissu constituait le CONSTAT TROIS.
Une paire de gants de couleur noire et bleue a été été découverte dans un sac en tissu de marque Monoprix (FOUILLE WJ NEUF).

NE VARIETUR          Ahmad GHAZI FH

Tous ces éléments étaient tous placés sous scellés et analysés.
Il résultait ainsi du rapport d'expertise génétique que :

- L'ADN de Brendan LAUTISSIER était caractérisé à partir des échantillons suivants:
• l'écouvillon 2 passé sur le câble électrique sous scellé CONSTAT UN;
• l'écouvillon passé sur la trace de sang décelée sur le tour de cou sous scellé CONSTAT CINQ;
• l'écouvillon passé sur l'extrémité des doigts des gants sous scellé FOUILLE WJ NEUF;

- L'ADN de Grégoire LAUTISSIER était caractérisé à partir:
• des 4 bulbes de cheveux extraits de la touffe de cheveux sous scellé CONSTAT DEUX;
• de l'écouvillon passé sur la trace de sang repérée sur la bande de tissu sous scellé CONSTAT QUATRE

-L'ADN de June HOPKINS SAIA était caractérisé à partir de l'écouvillon passé à l'intérieur du bout de gant sous scellé CONSTAT HUIT.

-L'analyse de l'écouvillon passé sur la surface extérieure du bout de gant sous scellé CONSTAT HUIT permettait de mettre en évidence un mélange complexe composé de l'ADN de Frédérique VARENNES et de l'ADN de June HOPKINS SAIA en présence de traces non caractérisables d'autres ADN.

- Les caractéristiques génétiques de mélanges complexes d'au moins trois ADN, compatibles avec la présence de l'ADN de Frédérique VARENNES, étaient mises en évidence à partir des écouvillons 1 et 3 passés sur le câble électrique sous scellé CONSTAT UN. Au regard de la complexité de ces mélanges, aucune autre interprétation n'était possible.

-Aucun ADN nucléaire exploitable n'a pu être caractérisé sur l'écouvillon sous scellé CONSTAT TROIS.

**Ces conclusions démontraient la présence sur les lieux de June HOPKINS SAIA et de Brendan LAUTISSIER et de leurs intentions criminelles.**

Les auditions des témoins :

Plusieurs témoins étaient auditionnés.

**Marc RASCOUSSIER** expliquait qu'en stationnant son véhicule vers 19h dans le parking extérieur de la résidence « Séquoia », il avait aperçu des personnes dont les visages étaient camouflés pénétrer dans un double garage de l'immeuble. Pensant qu'il s'agissait de jeunes qui s'amusaient, il n'avait pas prêté plus attention à eux.

**Patrice COISNON** circulait en deux-roues allée Edmond Flamand lorsque son attention était attirée par un cri de détresse. En s'approchant, il constatait qu'une femme se trouvait au sol agressée par deux individus. Un autre témoin, lui avait demandé de l'aide pour faire lâcher prise aux agresseurs tandis que la victime criait qu'ils étaient en train de la tuer.

Il avait pu, en effet, constater que l'un des deux individus était agenouillée en train de lui maintenir les jambes avec ses mains tandis que le second individu se tenait au-dessus d'elle, du côté de sa tête, les genoux appuyés sur ses épaules et ses mains appuyées sur son cou.
A ce moment-là, il avait projeté en arrière l'individu qui lui maintenait les jambes réalisant alors qu'il s'agissait d'une femme portant une capuche serrée. Elle était tombée sur les fesses et avait sorti de sa poche *« une corde avec un nœud coulant »* qu'elle avait tendu à son complice dont le

NE VARIETUR Ahmad GHAZIEH

visage était masqué par un vêtement. Ce dernier s'était emparé de la corde en échangeant avec elle dans une langue étrangère. Ils avaient ensuite pris la fuite en prenant le temps de récupérer une valise. Il était parti à leur recherche dans la direction de la résidence « Séquoia » et avait découvert sur le trajet qu'un homme avait aussi été agressé par ces personnes.

**Bruno COUZIN** arrivait en vélo lorsqu'il apercevait une femme par terre en train de se faire agresser par deux individus porteurs de casque de moto.

Une femme dont le visage était dissimulé par un passe-montagne immobilisait la victime en lui tenant les pieds tandis que le second agresseur qui se trouvait au niveau de sa tête « *écrasait* » son cou avec l'un de ses genoux.

La victime appelant à l'aide, il avait interpellé les individus en leur demandant de la lâcher. Les deux agresseurs avaient alors commencé à discuter entre eux en anglais. Voyant qu'ils ne lui répondaient pas, il avait tenté en vain de dégager l'individu qui appuyait sur le cou de la victime. Il les avait alors menacés de faire appel à la police mais la dame lui avait rétorqué en anglais qu'il pouvait le faire et que ça ne la dérangeait pas. Il avait alors baissé son passe-montagne lui permettant ainsi de distinguer son visage.

Impuissant, il avait crié à l'aide et c'était à ce moment-là que M. COISNON était arrivé et avait fait appel à la police.

Il avait de nouveau bousculé l'individu qui se tenait au cou de la victime, le déstabilisant suffisamment pour permettre à celle-ci de se dégager de son agresseur qui s'était relevé en tenant entre les mains « *un câble clair doublé de 30 cm environ* ». Il s'était ensuite dirigé pour récupérer une valise posée à proximité, rejoint par sa complice qui s'était interposée pour l'empêcher de porter secours à la victime.

Grégoire LAUTISSIER était alors sorti de chez lui, il lui avait demandé de s'occuper de la victime tandis qu'il reprenait son vélo pour aider M. COISNON à poursuivre les mis en cause en fuite. Ce dernier lui indiquait en revenant sur ses pas, qu'ils s'étaient réfugiés dans la résidence « Séquoia ».
Il avait alors laissé son vélo pour se diriger à son tour vers la seule sortie de la résidence. Il avait alors entendu des râles dans l'allée et vu que l'individu de sexe masculin qui avait agressé Mme VARENNES saignait du nez et qu'il ne portait plus de casque. Il se tenait à califourchon au-dessus de Grégoire LAUTISSIER et était en train de l'étrangler avec un câble tandis que sa complice qui n'était également plus casquée « *cherchait à gêner* » M. LAUTISSIER qui suffoquait et dont un filet de sang s'échappait de la bouche.

M. COUZIN avait cherché à écarter l'individu en vain en martelant avec son poing ses bras et son visage mais ce dernier refusait de lâcher prise et continuait d'étrangler M. LAUTISSIER.

Il avait alors repoussé sa complice en la projetant au sol puis il était revenu à la charge sur l'agresseur en lui portant des coups de genou dans les cotes. Ce dernier finissait enfin par lâcher prise au moment où plusieurs personnes arrivaient. Il s'était ensuite relevée pour récupérer une valise tandis que sa complice ne cessait de « *l'oppresser* ». Il avait fini par la maintenir au sol en attendant l'arrivée des forces de l'ordre mais voyant que son complice revenait vers eux et que les témoins présents pensaient qu'il agressait une femme. Il l'avait laissé s'échapper. Elle avait ensuite pris la fuite avec son comparse tandis qu'il mettait M. LAUTISSIER à l'abri.

M. COUZIN indiquait qu'il était blessé à la main droite et aux deux genoux et qu'il avait été surpris de constater que les agresseurs n'avaient plus les casques de moto sur eux.

NE VARIETUR

Ahmad GHAZLEH

**Jean-Baptiste ASSANI** avait été alerté par des cris au secours alors qu'il se trouvait chez un de ses amis rue des Landes à Chatou. Il était alors sorti du pavillon et en s'engageant sur le chemin d'accès de la résidence « Séquoia » il avait vu un homme enrobé se dégager de l'emprise qu'il avait sur un autre individu, âgé d'une cinquantaine d'années, qui se trouvait allongé au sol, le visage tuméfié et gémissant. Le premier individu avait ramassé des affaires au sol et récupéré une grosse valise noire.

Au même moment, un jeune homme maintenait une femme au sol et l'interpellait en lui demandant d'appeler la police et de retenir l'homme à la valise parce qu'une femme avait été précédemment agressée.
Il avait alors demandé à l'homme enrobé ce qui s'était passé mais ce dernier lui avait répondu dans une langue étrangère. La femme maintenue au sol avait réussi à se dégager et s'était précipité vers l'homme à la valise et ils avaient quitté les lieux ensemble.

**Patrick ROUSSIES** était également alerté par la voix d'un homme appelant *« au secours, aidez-moi !»*. Il sortait immédiatement de son domicile, il apercevait un homme immobile au visage tuméfié ainsi qu'un jeune homme maintenant au sol une femme blonde d'une quarantaine d'années qui parvenait à se dégager et à rejoindre un homme d'environ 30 ans qui tirait une grosse valise à roulettes. Il les avait brièvement suivis avec un voisin alors qu'ils quittaient les lieux en marchant d'un pas rapide.

**Frédérique VARENNES** indiquait aux enquêteurs que son frère était régulièrement menacé par son ex-compagne et son propre fils. D'ailleurs, elle ajoutait qu'au printemps 2014, son mari avait surpris la présence de ces deux personnes dans la rue de son domicile circulant au volant d'un véhicule Peugeot C1 immatriculé CZ 258 BN01. Un mandat d'arrêt international avait alors été émis le 14 mai 2014 par le juge d'instruction, chargé de l'instruction sur la tentative d'homicide sur ascendant dont avait été victime Grégoire LAUTISSIER de la part de son fils Brendan le 20 août 2010.

Le conseil de Grégoire LAUTISSIER avait à l'époque (courrier en date du 12 mai 2014) informé le juge d'instruction des manœuvres d'intimation dont son client faisait l'objet. Sept affiches, lettres et autre attestation de suicide avaient été placardées plusieurs nuits de suite sur la porte de son domicile parisien situé dans le 11ème arrondissement, dont il avait laissé la jouissance à son filleul. Le caractère malveillant des documents remis étaient manifestes. Il était notamment inscrit sur l'une de ses affiches *« Grégoire va aux États-Unis mars 30-31, 2014 essayer de tuer la mère de ses fils encore ! »*, celles-ci semblaient dans leur ensemble accuser Grégoire LAUTISSIER et ses complices de vouloir attenter à la vie de la mère de ses fils, il était à de multiples reprises qualifié de *« monstre »*, *« coupable »*, promis à la *« prison »* et *« l'enfer »*. Sur une autre affiche on pouvait lire « sauter du balcon » ou un autre document était intitulé « Lettre de suicide » qui commençait par « Moi, Grégoire LAUTISSIER, étant sain d'esprit, souhaite être tenu responsable de mes nombreuses atrocités ».

**<u>L'inscription de Brendan LAUTISSIER et sa mère June HOPKINS SAIA au Fichier des Personnes Recherchées a permis leur interpellation alors qu'ils tentaient de quitter la France le 18 février 2015 pour se rendre au Royaume-Uni par la Police de l'Air et des Frontières de Coquelles (62).</u>**

Entendus, June HOPKINS SAIA et son fils Brendan LAUTISSIER ont contesté les faits et ont essayé de renverser les rôles.

<u>L'audition de Brendan LAUTISSIER</u>

Il racontait qu'à la suite du décès de son beau-père survenu en 2011 *« à cause du diabète »*, sa mère avait fait le choix de venir s'installer, courant 2012, en France où les frais de scolarité étaient moins

NE VARIETUR

Ahmad GHAZLEH

élevés qu'aux États-Unis. Ils avaient dans un premier temps vécu dans des hôtels avant d'occuper l'appartement dans lequel ils résidaient toujours. Il avait profité de sa présence en France pour obtenir une CNI et un passeport français.

À son installation, sa « priorité » était de découvrir la réalité sur son père et les menaces pesant sur sa famille. Pour ce faire, il avait, en février 2013, déposé devant la porte de son appartement un petit lecteur MP3 doté d'un micro camouflé ans un mouchoir papier.

**Il affirmait comme sa mère disposer d'une douzaine enregistrements audio sur son ordinateur démontrant que son père projetait de se rendre aux États-Unis pour «casser le cou à sa mère» et « la jeter d'un immeuble » en faisant croire à un accident. Il reconnaissait que ne comprenant pas très bien le français c'était sa mère qui lui avait traduit les conversations enregistrées.**

Il l'avait ainsi accompagnée à Chatou (78) pour avoir une discussion avec Mme VARENNES et lui demander de mettre un terme à ses menaces, mais cette dernière avait violemment réagi en apprenant qu'ils étaient en possession de preuves compromettantes et elle avait porté un coup de poing au menton de sa mère qui avait riposté en la repoussant. Sa tante était tombée en arrière en se cognant la tête, il s'était alors agenouillé près d'elle pour l'aider mais voyant que celle-ci tentait de se relever pour se battre il l'avait maintenue au sol pour protéger sa mère.

Un voisin était alors intervenu l'incitant à lâcher prise. Il avait tenté de quitter les lieux avec sa mère pour éviter que la situation ne s'envenime, mais son père les avait pourchassés et l'avait frappé d'un coup de poing au visage avant de lui asséner plusieurs autres coups. Sa mère s'était interposée en l'attaquant au niveau des yeux et il avait fini par tomber en arrière. Plusieurs voisins et amis de son père les avaient rejoints pour en découdre aussi, n'étant pas venu pour se battre il avait pris la fuite avec sa mère.

Il ignorait la provenance du câble électrique découvert sur le lieu des faits ainsi que celle du bout de gant de latex déchiré. Le cache-col saisi était en revanche bien le sien.

Il contestait toute tentative d'étranglement sur son père ou sur sa tante.

L'audition de June HOPKINS SAIA
La mère de Monsieur Brendan LAUTISSIER, June HOPKINS SAIA a reconnu qu'elle s'était rendue avec son fils le 17 février 2015 devant le domicile de Mme VARENNES pour l'attendre de retour de son travail pour s'entretenir avec elle. Elle expliquait qu'elle entendait lui demander d'arrêter de la menacer elle et ses fils. Elle voulait l'avertir qu'elle détenait des preuves du projet qu'elle (Mme VARENNES) avait orchestré avec son frère Grégoire et d'autres membres de leur famille pour les éliminer. June HOPKINS SAIA a reconnu disposer d'enregistrements sonores sur son ordinateur provenant de dispositifs d'écoute qu'elle avait placés sur le palier de l'appartement de son ex-compagnon, Grégoire LAUTISSIER et a précisé être revenue une quinzaine de fois pour assurer la maintenance et le remplacement de ces dispositifs d'écoute. Elle admettait avoir été énervée face à l'attitude de Frédérique VARENNES qui avait refusé de lui parler, l'avoir poussée la faisant chuter. Elle reconnaissait néanmoins qu'elle portait bien un casque de moto mais expliquait que c'était pour se protéger de Frédérique VARENNES qui planifiait de la tuer pour « faire plaisir à son frère ». Elle admettait cependant que celle-ci ne s'était jusqu'alors jamais montrée violente à son égard l'accusant néanmoins d'être une sociopathe comme le reste de sa famille. Elle reconnaissait porter des gants tout comme son fils. Elle ajoutait qu'elle n'avait jamais maintenu les jambes de Mme VARENNES alors qu'elle se trouvait au sol et n'avait remis aucun lien à Brendan. La présence de l'ADN de son fils sur le câble saisi par les enquêteurs était fortuit.
Avant d'admettre avoir poussé Frédérique VARENNES, June HOPKINS SAIA avait expliqué lors de ses premières déclarations en garde à vue, que Mme VARENNES s'étant retournée brusquement

NE VARIETUR

Ahmad GHAZIEH

était tombée toute seule par terre, que son fils avait voulu lui toucher le visage pour la rassurer. Apeurée et paniquée, Mme VARENNES avait porté un coup de pied au niveau du menton de Mme WALSH et avait mordu la main de son fils. Puis un homme s'était approché d'eux en demandant ce qui se passait. La mère de Brendan LAUTISSIER avait répondu que Mme VARENNES avait fait un malaise. L'homme leur avait demandé de s'écarter et avait dit qu'il allait appeler la police.

Autres éléments : Écoutes, enregistrements audiovisuels et repérages, exploitations téléphoniques

Lors de la fouille du sac à main de Mme HOPKINS SAIA avait été découvert un post-it avec des mentions manuscrites s'apparentant à des immatriculations et modèles de véhicule. Après recherches, il apparaissait que les 4 références rapportées correspondaient à deux véhicules au nom de l'époux de Mme VARENNES, un véhicule au nom de Grégoire LAUTISSIER et le dernier au nom de son père Gérard LAUTISSIER .

Au cours de sa garde à vue, Mme HOPKINS SAIA avait indiqué avoir placé à plusieurs reprises des dispositifs de captation audiovisuelle et sonores dans une grille d'aération à côté de la porte d'entrée de l'appartement de Grégoire LAUTISSIER. Sur place, M. POTIN, le gardien de l'immeuble remettait aux enquêteurs trois appareils de ce type découverts dans le conduit d'aération situé sur le palier dudit appartement. Le gardien précisait avoir vu à cet étage à de nombreuses reprises une femme blonde accompagnée d'un jeune homme aux cheveux longs et les avoir surpris en train d'installer leurs dispositifs sur une grille d'aération. Il s'était contenté à chaque fois de les mettre dehors sans prévenir M. LAUTISSIER ni les services de police.

Le service régional de l'informatique et des traces technologiques de la DRPJ remettait un rapport sur l'analyse des téléphones de Mme HOPKINS SAIA et de son fils Brendan. Il établissait notamment que le téléphone de ce dernier comportait un sous dossier «VIDEOS» dont le contenu s'apparentait à des repérages du domicile de Mme VARENNES et de son véhicule ainsi que des enregistrements audiovisuels de l'environnement du domicile parisien de Grégoire LAUTISSIER.

Une perquisition était réalisée dans l'appartement parisien occupé par Mme HOPKINS SAIA et Brendan LAUTISSIER.

Il y était notamment découvert un feuillet supportant des mentions manuscrites « *Greg, vous êtes un meurtrier ! Maintenant vous essayer de tuer de nouveau ( ...) »*, ainsi qu'un autre feuillet sur lequel figurait les adresses de Mme VARENNES et de Grégoire LAUTISSIER.

Dans le placard de la chambre de Brendan, il était trouvé deux combinaisons noire et une perruque d'homme et un pistolet à billes. Sous le lit de Mme HOPKINS SAIA, il était découvert une housse noire contenant une grande pelle de jardin.

La perquisition se poursuivait dans la cave dans laquelle était saisie une valise contenant du matériel de type militaire (veste de l'armée et filet de camouflage), divers outils (une scie, une hache, une machette, des lunettes de protection, des gants, un rouleau de cordelette et du matériel de captation vidéo et audio similaire à celui remis par M. POTIN, le gardien de l'immeuble de Frédérique VARENNES à Chatou).

\*\*\*

Les témoignages concordants de Marc RASCOUSSIER, Patrice COISNON, Bruno COUZIN, Jean-Baptiste ASSANI, Patrick ROUSSIES corroboraient les déclarations de Mme Frédérique VARENNES et de Grégoire LAUTISSIER sur les faits et les deux tentatives d'assassinat commises par June HOPKINS SAIA et Brendan LAUTISSIER. Ces témoignages circonstanciés attestent des gestes d'étranglement sans équivoque sur les victimes, notamment à l'aide « d'une corde », étant

NE VARIETUR                    Ahmad GHAZLEH

rappelé qu'un câble électrique a été retrouvé sur le lieu des faits après la fuite des agresseurs, supportant non seulement l'ADN de Mme VARENNES, mais également celui de Monsieur Brendan LAUTISSIER. Ces témoignages ainsi que les discordances entre les versions sur les faits de Brendan LAUTISSIER et de June HOPKINS SAIA montrent que les deux suspects ont menti sur un certain nombre de points au cours de leurs différentes auditions (Mme June HOPKINS-SAIA a d'ailleurs reconnu avoir menti lors d'une deuxième audition). <u>Les constatations médico-légales et les résultats de l'expertise génétique concordent et correspondent à</u> la description précise des faits tels que retenus dans la procédure. **Tous ces éléments attestent de la présence de Monsieur Brendan LAUTISSIER sur le lieu des faits et corroborent les gestes criminels décrits par les victimes et par les témoins de la scène.**

**L'enquête policière ainsi que celle menée par la juge d'instruction ont permis de démontrer que Brendan LAUTISSIER avait tenté de tuer son père Grégoire LAUTISSIER le 20 août 2010 (tentative d'homicide sur ascendant) et que Mme June HOPKINS SAIA et son fils Brendan LAUTISSIER ont volontairement et de façon préméditée tenté de porter atteinte à la vie de Mme Frédérique VARENNES et de Mr Grégoire LAUTISSIER (tentatives d'assassinat) le 19 février 2015.**

### III – Les qualifications :

Les faits ci-dessus exposés, ceux du 20 août 2010 et du 17 février 2015 constituent les infractions suivantes : préciser les qualifications et indiquer les textes

- TENTATIVE D'HOMICIDE SUR UN ASCENDANT (SON PÈRE LAUTISSIER Grégoire) LE 20 AOÛT 2010
- TENTATIVE D'ASSASSINAT DE SON PÈRE LAUTISSIER Grégoire ET DE SA TANTE LAUTISSIER Frédérique, ÉPOUSE VARENNES LE 17 FÉVRIER 2015

Faits prévus et réprimés par les articles 121-4, 121-5,132-71-1,221-3 al 1, 221-1, 221-4, 221-8, 221-9, 221-9-1 et 221-11 du Code pénal.

Le mandat d'arrêt délivré par un juge d'instruction est prévu par les articles 122, 123 et 131 du code de procédure pénale.

### IV – La procédure :

Une information judiciaire a été ouverte par le parquet de Paris du chef de tentative d'homicide sur un ascendant le 24 juin 2011.

Le 13 novembre 2012, le juge d'instruction formulait une demande d'entraide aux autorités américaines afin qu'il soit procédé à l'audition de Mme WALSH et de ses fils Brendan et Austin mais aussi afin de recueillir toute information utile sur les circonstances du décès de Mark WALSH.

Le 12 mai 2014, le conseil de Grégoire LAUTISSIER informait le juge d'instruction des manœuvres d'intimidation dont son client faisait l'objet. Sept affiches, lettres et autre attestation de suicide avaient été placardées plusieurs nuits de suite sur la porte de son domicile parisien au 55, bd Beaumarchais à Paris 11 dont il avait laissé la jouissance à son filleul. D'autre part, le mari de sa sœur avait surpris à la même période Mme WALSH et son fils Brendan circulant dans la rue de son domicile à Chatou au volant d'un véhicule Peugeot C1 immatriculé CZ 258 BN01.

Le 14 mai 2014, le juge d'instruction décernait un mandat d'arrêt international à l'encontre de Brendan LAUTISSIER.

NE VARIETUR

Ahmad GHAZLEH

EXT-LAUTISSIER-00018

Le 20 février 2015, le parquet de Versailles ouvrait une information judiciaire à l'encontre de June HOPKINS SAIA et de Brendan LAUTISSIER du chef de tentative d'assassinat au préjudice de Grégoire LAUTISSIER et de sa sœur Frédérique LAUTISSIER épouse VARENNES.

Les faits de février 2015 sont à rapprocher des premiers faits de tentative d'homicide sur ascendant en date du 20 août 2010 et ont ainsi été joints à la procédure initiale de 2010. Par ordonnance du 5 juin 2015, le juge d'instruction de Versailles se dessaisissait du dossier au profit du juge d'instruction de Paris, en charge de l'instruction du dossier d'information ouvert en 2010 suite à la première tentative d'homicide sur ascendant dont Grégoire LAUTISSIER avait été victime.

Interpellés le 20 février 2015, Brendan LAUTISSIER et June HOPKINS SAIA ont été placés en détention provisoire jusqu'au 19 février 2018, **date à laquelle ils ont été libérés et placés sous contrôle judiciaire. Ne répondant plus aux convocations, le juge d'instruction a émis un mandat d'arrêt à leur encontre le 3 août 2018.** Le Procureur de la République de PARIS a émis et diffusé un mandat d'arrêt européen le 21 décembre 2018. Cette information judiciaire est aujourd'hui suivie par le juge d'instruction Dimitri DUREUX,Tribunal de Grande Instance de Paris.

Localisés aux Etats-Unis, les autorités judiciaires françaises ont fait parvenir aux autorités judiciaires américaines **une demande d'arrestation provisoire pour Brendan LAUTISSIER le 23 avril 2019 et pour June HOPKINS SAIA le 25 juin 2019. A la suite, les deux intéressés ont été arrêtés sur le territoire des Etats-Unis le 9 décembre 2019.**

Il faut également préciser que durant son incarcération June HOPKINS SAIA a tenté de s'évader de la maison d'arrêt des femmes de Versailles dans la nuit du 12 au 13 juillet 2016 en ôtant les barreaux des wc de sa cellule avec des bouteilles d'eau congelées. June HOPKINS SAIA a encore des séquelles dues à de multiples fractures du bassin et du sacrum.

Mme June HOPKINS a indiqué avoir fait un recours devant la CEDH pour elle-même et son fils Brendan LAUTISSIER. Après recherche, aucun dossier n'est enregistré à ce nom dans nos archives. Il en est de même sur le site HUDOC de la Cour européenne, qui répertorie l'ensemble des affaires pendantes ou terminées devant la Cour.

## V –Prescription

En application de l'article 7 du code de procédure pénale, l'action publique pour les faits de tentative d'homicide sur ascendants et tentatives d'assassinat **se prescrit par 20 ans** à compter du jour où l'infraction a été commise depuis la loi du 27 février 2017. Auparavant, avant l'entrée en vigueur de cette loi, l'ancien article 7 prévoyait un délai de prescription de dix ans à compter du jour où le crime avait été commis. Si au moment de l'entrée en vigueur de la loi du 27 février 2017, soit le 1er mars 2017, la prescription n'était pas acquise pour les faits dénoncés, les nouveaux délais de prescription s'appliquent de droit. (art 4 de la loi n°2017-242 du 27 février 2017).

Par ailleurs, le délai de prescription est interrompu par les actes d'enquête et de poursuite (article 9-2 du Code de procédure pénale).

A la date du 10 janvier 2020, l'action publique n'est pas prescrite pour les faits reprochés à Brendan LAUTISSIER exposés dans cette demande d'extradition tant pour les faits du 20 août 2010 que ceux du 17 février 2015. De plus, de nombreux actes comme l'émission d'un mandat d'arrêt sont venus interrompre le délai de prescription de l'action publique. **L'enquête se déroule de manière continue depuis le 24 juin 2011 sous la direction de plusieurs juges d'instruction. Les faits ne sont pas prescrits.**

Ahmad GHAZLEH

NE VARIETUR

La présente demande d'extradition est, en droit français, un acte de recherche du ministère public, acte interruptif de prescription.

***

**La demande d'extradition de Brendan LAUTISSIER est sollicitée sur le fondement du traité bilatéral franco-américain du 23 avril 1996 et de l'accord entre l'Union Européenne et les Etats-Unis d'Amérique du 25 juin 2003.**

Je vous prie de bien vouloir trouver sous ce pli la copie du mandat d'arrêt du juge d'instruction en date du 14 mai 2014, uniquement pour information celui-ci ayant été exécuté en 2015, celle du mandat d'arrêt du juge d'instruction en date du 3 août 2018, la copie du mandat d'arrêt européen en date du 21 décembre 2018, la copie de la demande d'arrestation provisoire du 23 avril 2019, la copie des textes de répression relatifs aux faits reprochés, la copie des traités d'extradition ainsi que la copie des différentes pièces d'identité de Brendan LAUTISSIER.

A PARIS, le 13 janvier 2020

p/**LE PROCUREUR DE LA REPUBLIQUE**
Jean-Marc COQUENTIN
Procureur de la République Adjoint

**liste des pièces jointes :**
- **copie conforme du mandat d'arrêt du juge d'instruction en date du 14 mai 2014 (mandat d'arrêt exécuté)**
- **copie conforme du mandat d'arrêt du juge d'instruction en date du 3 août 2018,**
- **copie conforme du mandat d'arrêt européen en date du 21 décembre 2018,**
- **copie conforme de la demande d'arrestation provisoire du 23 avril 2019,**
- **copie des textes de répression relatifs aux faits reprochés,**
- **copie des traités d'extradition,**
- **copie du passeport américain de Brendan Christopher Walsh LAUTISSIER,**
- **copie de la CNI française de Brendan Christopher LAUTISSIER,**
- **copie du passeport français de  Brendan Christopher LAUTISSIER.**

Ahmad GHAZLEH

NE VARIETUR

# Demande d'extradition aux autorités judiciaires des Etats-Unis d'Amérique Traduction

EXT-LAUTISSIER-00021

| Cour d'Appel de Paris | District Court of Paris |
|---|---|
| Tribunal Judiciaire de Paris | Judicial Tribunal of Paris |

From

| Le Procureur de la République | The Chief Prosecutor |
|---|---|

To

All Relevant Judicial Authorities of the UNITED STATES of AMERICA

EXTRADITION REQUEST

**OBJECT:** Request for extradition against Brendan LAUTISSIER

**REFERENCE: 13EXT18**

 

I am honored to formally address to the American Authorities, in support of the annexed documents, the extradition of Brendan LAUTISSIER, whose preventive arrest took place on December 9, 2019 in North Carolina, The U.S.A.

**I.    Identity of the person:**

Name: Brendan LAUTISSIER aka Brendan WALSH

American Passport: LAUTISSIER Brendan Christopher Walsh no 465128608, delivered 02.05.2010 expires on 02.04.2020

SSN: no 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, delivered in 1992,

French I.D. number 130175S000234 delivered on 01.03.2013, expires 01.02.2023

French passport: 12AZ61028 delivered 01.02.2013, expires 01.24.2021

D.O.B. January 7, 1992 in Woodland Hills in California, U.S.A.

His father: Grégoire LAUTISSIER, his mother: June HOPKINS SAIA (married name WALSH)

Gender: Male

Nationality: American and French

Address in France:

60 rue Guy Moquet

75017 PARIS

**Last known address (November 2018)**
- 3818 PEMBROKE ROAD
- WINSTON SALEM NORTH CAROLINA 27106

Former address
- 2764 PLEASANT ROAD, SUITE or APPARTMENT 10556
- FORT MILLA SOUTH CAROLINA 29708

Other address
- 71 HILLCREST DRIVE LACONIA- NEW HAMPSHIRE-UNITED SATES OF AMERICA

1

Copie certifiée conforme

## II- The Charges:

- Date of the perpetrated acts: August 20, 2010 and February 17, 2015.
- Place of the perpetrated acts: Acts of August 20, 2010 in Paris 11th District (75), Acts of February 17, 2015 in Chatou (78 Yvelines)
- Degree of participation: Perpetrator of the attempted homicide on an ascendant (on his father Grégoire LAUTISSIER) in August 20, 2010 and perpetrator of the attempted murder of which is victim his father Grégoire LAUTISSIER and his aunt Frédérique VARENNES née LAUTISSIER in February 17, 2015.

## Statement of facts:

## The events of August 20, 2010:

August 23, 2010 Grégoire LAUTISSIER filed a police blotter report, he then filed a complaint August 27, 2010 at the police station of the 11th district of Paris.

In his complaint, he explained that he had a love relationship, twenty years ago, with Mrs. June WALSH (Named later on as June HOPKINS SAIA), American citizen married to Mark WALSH. From their union, two sons were born, Brendan WALSH-LAUTISSIER born January 7, 1992 in California and Austin WALSH-LAUTISSIER, born March 05, 1994 in California. Grégoire LAUTISSIER recognized both his children, even before their birth during pregnancy. According to his declarations, June WALSH, left to the U.S.A. as she was six-month pregnant of Brendan, in 1991, she announced while leaving France her will to get divorced from her husband Mark WALSH and to get back to live with Grégoire LAUTISSIER afterwards. She then dropped her decision of separation and decided to stay with her husband, then gave the family name of her husband WALSH to Brendan. In spring 1993, she came back to France announcing to Grégoire LAUTISSIER, as he declared, that she had her divorce and that she wanted to live with him. She then got pregnant again fast in 1993, she left right afterwards, end of 1993, to the United-States with Brendan without prior notice and without any explanation given to Grégoire LAUTISSIER. Beginning 1994, before Austin was born, June WALSH had announced to Grégoire LAUTISSIER her will to drop marriage with him and to stay with her husband Mark WALSH.

Grégoire LAUTISSIER explained that he practically never had any contact with his children since 1993 and that it was in 2009 only that contacts started between them. In September 2009, June WALSH came over to show Austin their second son to his father. Back then, she mentioned to Grégoire that she is going through financial difficulties, Grégoire then started transferring an amount of 1000 dollars on a monthly basis until June 2010. The year after, in June 2010, June WALSH came back for vacation in France with their elder son Brendan. Grégoire LAUTISSIER declared leaving the apartment at his disposal in 55 boulevard de Charonne, 11th District of Paris, taking into consideration that he was present at his mother's house during this period. The duration of this vacation was confirmed with the embassy of the United States: Brendan LAUTISSIER and June WALSH arrived to France on flight n°337 Air France from Boston to Charles de Gaule on June 15, 2010 and left France August 25, 2010 on flight n°332 Air France from Charles de Gaule to Boston.

Copie certifiée

2

Ahmad GHAZLEH

NE VARIETUR

August 20, 2010 Grégoire LAUTISSIER realized that June HOPKINS SAIA had taken important documents from his home (documents including his taxation notice, documents in relation taxes on big fortunes ISF and donation and succession of his father's death in October 2008) and as the discussion with her was getting sharp, Brendan presented to him two documents and asked him to sign them (Undertaking of accommodation). Grégoire LAUTISSIER added that he answered his son that he shall read these documents before giving them back to him. He was still quarrelling with June when he felts a liquid dropping on his back and heard a noise of a lighter clicking twice. He then looked back at his son only to see him holding a lighter and trying to set him ablaze. He understood that his son Brendan tried to set him on fire using gasoline that he sprayed him with. He then dealt a blow towards him in order to make him drop the lighter. He also explained that his brother Antoine LAUTISSIER came back at that moment from the kitchen in order to separate them, but Brendan had already moved to get a small Japanese sword from behind the sofa where his mother was sitting. Brendan LAUTISSIER was immediately grasped around the waist and brought down to the ground by his uncle Antoine LAUTISSIER who disarmed him according to the declarations of the victim Grégoire LAUTISSIER. Based on all of this, and as advised by his brother Antoine, Grégoire LAUTISSIER isolated himself in his room after having removed his tee-shirt soaking with gasoline and washed himself. Antoine LAUTISSIER asked June and Brendan to pack their things to leave the apartment. He then escorted them to IBIS Hotel at Porte de Bercy near Charenton and paid for four nights for them in advance.

The victim highlighted the fact that during these events, Brendan's mother did not show any reaction and remained silent "She stood up leaving the sofa without saying a word", he also highlighted the silence of Brendan who did not say a word.

He also detailed that June wanted Brendan to stay in Paris to enroll in the American University of Paris (this was verified with the Dean of the American University of Paris) and it was agreed that Brendan would be accommodated at his Father's house.

Grégoire LAUTISSIER added that the gasoline which he was sprayed with came from a 1liter bottle "special barbecue" whose origin is unknown for him. He reported that a plastic bottle of 1000 ml depicting a label on which is read "starting fluid" (inflammable liquid) brand label LANDMANN. He added that he does not have any barbecue machine and that neither Brendan nor his mother were smokers, moreover the lighter he used did not belong to him. The lighter was smashed when he fell and was later on thrown in the bin. He also stated that he ignored the presence of the sword in his house and where it came from, he handed it to the investigators. This Japanese knife was 40cm long. It was in a black sheath and a 27 cm blade. The bottle and the sword were both placed under seals.

Grégoire LAUTISSIER's declarations were confirmed by his brother Antoine LAUTISSIER. The latter stated in his hearing November 30, 2010 (knowing that he was working in Indonesia at that time as an engineer) that on the day the events took place "a discussion regarding Brendan's future at university was supposed to happen", "we had lunch in Nation and carried on the discussion at my brother's", "once at the apartment, June told that she would like to have a discussion with Grégoire alone without my presence but I answered her that I am staying." He mentioned how the conversation got stirred between June and Grégoire, that he went at a moment to the kitchen to empty an ashtray only to come back to the room, to hind his brother facing Brendan trying to punch him in the face. He then separated them, and right after he made

EXT-LAUTISSIER-00024

NE VARIETUR

Ahmad GHAZLEH

his brother sit down on the couch "Brendan ran towards the other end of the couch where he grabbed a Japanese knife that he had already unsheathed." "when I saw this, I grabbed him with my arms around his waist from behind and tried to fix him on the ground and succeeded to remove the knife from his hands, meanwhile, June did not show any reaction. She remained silent as she was sitting". Doing so, she did not even warn Grégoire. He also stated seeing his brother with his tee-shirt soaking wet and that a heavy smell of gasoline was in the air. He also stated that he spotted a chisel that his brother used for work in the bathroom and in the living room, this chisel was not supposed to be in that room. He also reported a conversation with June which took place on the way to the Ibis hotel when June asked him if they will be filing a lawsuit pretending that the gasoline can was used to fill Brendan's lighter, which he found strange because Brendan does not smoke.

Moreover, the hearings of the victim's mother Odile CHAMBON widow of LAUTISSIER, and of his sister Frédérique VARENNES née LAUTISSIER substantiate the version as descried by the victim Grégoire LAUTISSIER.

Finally, one witness, named by the victim, Mr. Cyrille HESSE, declared in his statement before the police November 11, 2011 that he passed by to see Mr. Grégoire LAUTISSIER at the end of the day August 20, 2010. He described the victim as "completely in panic" and smelled a strong smell of gasoline, he also saw spots on the couch and on the left wall of the main room, he also confirmed that the victim had declared to him "to have escaped death and to have escaped fire". He had seen also the victim's brother Antoine LAUTISSIER who entered the apartment and mentioned escorting June and Brendan to the hotel. He also affirmed that both brothers showed him the bottle of gasoline that the son had spilled on his father Grégoire in addition to the sword and that they described the scene as follows: After Grégoire punched Brendan, the latter fetched a Japanese sword but Antoine intervened.

Psychological repercussions on the victim Grégoire LAUTISSIER, individual without psychiatric history, was evaluated at that time, September 6, 2010 and was allowed 5 days of complete disability by the Medical Legal Unit at the Hôtel Dieu. Since these events, the victim's sister indicated that her brother Grégoire LAUTISSIER has known a very serious depression which required permanent medical treatment which caused disability, a state recognized by the public administration. She also precised that her brother Grégoire found shelter at her place and her mother since the attempted homicide perpetrated against him.

Both Brendan LAUTISSIER and his mother June HOPKINS SAIA being unfound, taking into account the alert of their presence near the house of Grégoire LAUTISSIER (who had moved to Chatou at his sister's Frédérique VARENNES) in spring 2014, an arrest warrant was issued May 14, 2014 against Brendan LAUTISSIER. The Investigating Judge asked him whether he used his family name WALSH in order to escape the International Arrest Warrant against him. This arrest warrant was notified to Brendan LAUTISSIER March 6, 2015 by the Chief-supervisor of the Prison of Bois d'Arcy. This first European Arrest Warrant was therefore executed.

Brendan LAUTISSIER denied the accusation of attempted homicide on an ascendant perpetrated in August 20, 2010, before the judge in charge of investigation in the case after his arrest February 18, 2015. He explained to the investigating judge that the origin of the dispute between his father and mother in August 2010 was because his father refused to assume paternity especially concerning financial expenses. He also indicated that his mother had left

Copie certifiée conforme

4

Ahmad GHAZLEH

NE VARIETUR

his father because he was violent. He added that he was planning to study in France and to stay at his father's. He did not see anything wrong that his mother made photocopies of documents which are his father's property stating that the latter had given his authorization so that copies can be made from his documents. He stated that the documents which he gave to his father to sign on the day of the events concerned his French passport. Moreover, he stated that it is possible that a bottle of inflammable liquid and a lighter had been present in the apartment August 20, 2010. He stated that the lawsuit filed by his father and his declarations are a way for him to get away from paternal responsibilities. He explained his uncle's statements of witness that they are due to the grip he has on his father. However, his explanations on the presence of the sword varied. At the beginning he affirmed that the sword was a fake one and that it is nothing but a toy, he also denied using it August 20, 2010. Answering the question "Did you take a hold of a sword?" He said: "there was a sword but in fact it was nothing but a toy. I love going to Japanese exhibitions. But it is fake, it's a toy." Answering the question "Your father handed a Japanese knife whose blade is 28cm to the investigators in addition to a black sheath with red spots which are not replicas at all. Any explanation?" He answered right away: "The razor is indeed made of metal, but it was not sharpened". "This means that this is not a plastic object from a panoply?" "No, it is indeed an object made of metal."

Finally, the investigating judge presented to him on that day two photos published by his mother on Facebook the night before the events of August 20, 2010: the first photo depicted a picture of Gérard LAUTISSIER with the note "Gérard, l'ignoble, mentir" (Gérard, despicable, lie) (The father of Grégoire LAUTISSIER's name is Gérard), the second photo depicted a room with a note which read "la chamber de se venger" (the room for revenge). He firstly answered "this does not evoke anything to me but I think that after my father threw us out, my mother was mad at my father". The investigating judge drew his attention to the fact that these photos were posted August 19, 2010, the night before the dispute took place.

The investigating judge expressed to him her surprise because they were not able to arrest him despite the international arrest warrant issued against him May 14, 2014. Brendan LAUTISSIER also explained during this hearing May 26, 2015 that he had been travelling to England to see his brother and to Amsterdam for his birthday between May 14, 2014 and the date of his arrest February 19, 2015 indicating that before 2009 his identity was Brendan WALSH.

### Concerning the Procedure before the Judge for Family Affairs

December 15, 2011, the Judge for Family Affairs of the Judicial Court of Paris received a request submitted March 29, 2011 by June WALSH née HOPKINS SAIA, and issued a decision which fixes the contribution od M. LAUTISSIER to 230 euros per month and per child.

### Concerning the investigations on the death of Mark WALSH, husband of June HOPKINS SAIA

December 6, 2011, the investigating judge was informed by the Grégoire LAUTISSIER's lawyer of Mark Walsh, Mrs. Walsh's husband's death. The lawyer submitted press releases which talked about the discovery October 18, 2011 of his lifeless body at the family house. The investigation had concluded that the death resulted from an accident consequently to skull trauma which was caused by his fall from the ladder in the garage.

Copie certifiée

NE VARIETUR

Ahmad GHAZLEH

Case 1:19-mj-00377-LPA   Document 12-1   Filed 03/13/20   Page 26 of 107

**Concerning the Request for Mutual Legal Assistance issued from the French investigating judge addressed to the American Authorities.**

November 13, 2012, the investigating judge issued a request for mutual legal assistance to the American Authorities in order to hear Mrs. WALSH and her sons Brendan and Austin and to gain useful information related to the circumstances of Mark WALSH's death.

The return of this request November 13, 2013:

A police report dated October 18, 2011 on the discovery of the body of M. WALSH revealed doubts regarding the circumstances of his death. He was discovered laying on his back in his garage with a significant injury in the head. A bullet wound was not excluded taken into consideration the fragments from the skull which were on the ground. A ladder was there partly leaning against a table. Brain matter was discovered on a motor type machine placed on a bench under the ladder. Blood shed was reported on the left side which seems uncoherent with the place where the body was found. Three partial footprints were visible in the blood which led to the door of the garage.

The investigator in charge of questioning Brendan LAUTISSIER, reported a change in his attitude, the young man "started to stutter" and to express himself with a kind of nervousness when asked about the death of his stepfather. Brendan LAUTISSIER refused to sit for a lie detector polygraph test.

After the death of her husband, Mrs. WALSH received 300 000 dollars from two life-insurance contracts. Investigation on the heritage revealed that June and Mark WALSH had mortgaged their house one month before the latter deceased. One month after her husband deceased, Mrs. WALSH changed her name used on Facebook and used the name **June HOPKINS SAIA** instead.

The FBI conducted investigations on the WALSH family. One neighbor of the WALSH family stated that rumors in the neighborhood circulated among the neighbors that everyone found Mrs. WALSH and her sons "strange".

**The FBI's investigator estimated that the circumstances of the death of Mark WALSH have to be "dug up further".** Thus, he transmitted his report to the local police services initially in charge of the investigation in this case.

**Concerning the events of February 17, 2015:** February 17, 2015 Grégoire LAUTISSIER and his sister Frédérique VARENNES were both **victims of attempted murder.**

Concerning the attempted murder on Frédérique VARENNES née LAUTISSIER

February 17, 2015 at 7.15 PM, as Frédérique VARENNES was entering her house, 10 allée Edmond Flamand in Chatou (78), she was victim of a violent attack. As she was on the pavement facing the gate of her villa, she received a violent blow on the back of her head which made her lose her balance and fall on the ground, facing her was an individual wearing a helmet with a scarf hiding the lower part of his face, he tried to strangle her. Another person came to give a hand to the first aggressor and to stop Mrs. VARENNES from resisting (she had bitten the hand of the first aggressor). The victim suffered a second attempt of strangulation. She saw a lady undercover behind her first aggressor who gave a cable-like element to her accomplice

Copie certifiée

Ahmad GHAZLEH

NE VARIETUR

who was unsuccessfully trying to pass it around her neck. Two passersby were alarmed by Mrs. VARENNES' shouts, they intervened which made the two aggressors escape away.

## Concerning the attempted murder on Grégoire LAUTISSIER

Grégoire LAUTISSIER who resided at his sister's Frédérique VARENNES was leaving the house fortuitously only to find his sister moaning on the ground. She told him that she was attacked by "the Americans". He then went to look up their whereabouts with a neighbor, he bumped into his ex-wife and son. As he considered them the ones behind the attack on his sister, he punched his son's face. This was followed by fight where he found himself trapped between the two aggressors in front of Séquoïa residence. The woman was trying to put out his eyes by forcing her fingers into both his eyes while scratching him with her fingernails, meanwhile the man was trying to strangle him with a cable-like element. Again, the intervention of a witness who tried to free him from them as he was suffocating made the attackers escape. He stayed on the ground "very shocked". The aggressors were seen leaving on foot with a big suitcase.

## The Identity of the Attackers

Grégoire LAUTISSIER declared immediately to the investigators after the events that he was able to remove the cap off the woman's head and to clear the scarf off her face only to reveal the face of his ex-wife June WALSH which he recognized formally and to find that the other aggressor was his own son Brendan LAUTISSIER. Frédérique VARENNES confirmed these identities and declared having immediately suspected who were her aggressors the moment when she heard them speak in English. In fact, she had told her brother when he came out of the house alarmed by her shouts as she was on the ground that she was attacked by "the Americans". A description was taken by the investigators once on the scene: A man, Caucasian, 35/40 years old, not properly shaved, blond hair, more or less overweighed, 1m75 of height, wearing a coat or a dark jacket with a blue or grey suitcase with wheels. As for the woman, Caucasian, blond hair, wearing a clear blue jacket. Both of them had a heavy Anglo-Saxon accent and used English only when speaking. One of the witnesses of the scene, Patrice COISNON who saved the first victim Frédérique VARENNES, had declared, during his questioning February 19, 2015 that he grasped the Aggressor C by his shoulders as he was on his knees to stop the victim from moving her legs using his hands. The witness threw aggressor back, the latter fell on their behind "it was then when I noticed the face and saw that the aggressor was a woman with a tight hood that stretched her face. She was a small woman, between 1m60 and 1m65, fat, wearing dark-colored clothes and a jacket. I have not seen her hair." As for aggressor B, he declared not seeing his face because "his head was covered by clothes." Another witness, Mr. Bruno COUZIN the cyclist who arrived first to the events' scene, declared that both aggressors wore helmets during the first attack, however they removed their helmets during the second attack. He declared that Aggressor A was trying to immobilize the legs of C who was trying to fight in order to escape "I noticed that A was a woman from her look feminine look and features" "A who had her helmet on also had a neck scarf which covered her face up to her nose, only her eyes were visible"; then "A and B started discussing in a language which I recognized as English". Later, "A came towards me, I lowered her neck scarf and I was able to clearly see a Caucasian woman's face". Another witness, Jean-Baptiste ASSANI, told that he arrived on the scene during the second attempt of murder which was perpetrated against Grégoire LAUTISSIER. There, he saw "a man 1m70 tall, overweight, unshaven, with a light-colored Peruvian-style bonnet getting free from the grip of another man,

NE VARIETUR

Ahmad GHAZLEH

EXT-LAUTISSIER-00028?

a 50-year-old man to be precise, a bearded swollen man who was lying on the ground and moaning". "Then I saw a young man almost 25-year-old (Bruno COUZIN), who was holding a woman on the ground, he was laying on her to impede her from standing and running away. "As for the lady, there was a lady about1m60 tall, average built, half-long blond hair who is around 40 to 50 years old. She wore a light-blue anorak.

Forensic Medical Opinions which were reported by the fire-brigade and the police station workforce of Saint-Germain-en-Laye who intervened on the scene February 19, 2015, noted that Madame VARENNES had blood on her mouth and reddish marks on the neck which match with the aggressive moves she described. The medical certificate noted the presence of a hematoma in the occipital region diameter 2cm, erythema and linear dermabrasion on the neck, edema on the left of the lip, 1cm abrasion on the bridge of the nose, bruises on the left hand, a cleft bone in the left thumb. Mrs. VARENNES was in a state of shock and close to tears. Mr. Grégoire LAUTISSIER, has a frantic look and presented many bruises on the face especially on his eye sockets in addition to multiple linear dermabrasions compatible with scratches. The Medical Certificate also noted linear abrasions and erythema on the neck in addition to the presence of a bruise on the back and on the left hand. Both victims were transported to the hospital in Poissy (78) and were given three days of incapacity of work.

Material and Genetic Observations

On the scene of the first aggression, perpetrated on Frédérique VARENNES, a piece of black latex glove found on the pavement facing the house of the victims. (CONSTAT HUIT).

On the scene of the second aggression, in the residence Séquoia in Chatou, several objects were found scattered: a white electric cable with two 136cm long knots (CONSTAT UN), a tuft of hair pulled from Grégoire LAUTISSIER (CONSTAT DEUX), a woolen neck scarf (CONSTAT CINQ), a piece of fabric (CONSTAT QUATRE). Swab sampling on the reddish marks on the fabric strip constituted the CONSTAT TROIS.

A pair of black and blue gloves were found in a Monoprix fabric bag (FOUILLE WJ NEUF).

All these elements were placed under seals and were analyzed.

The genetic expertise report also gave the following results:

-The DNA of Brendan LAUTISSIER was characterized through the following samples:

- Swab 2 sampled from the electric cable sealed under CONSTAT UN;
- Swab sampled from the trail of blood found on the neck scarf placed under seal CONSTAT CINQ;
- Swab sampled from the tip of the gloves' fingers placed under seal CONSTAT QUATRE

-The DNA of Grégoire LAUTISSIER was characterized through:

- The four hair bulbs sampled from the hair placed under seal CONSTAT DEUX;
- Swab sampled from the blood found on the piece of fabric placed under seal CONSTAT QUATRE;

-The DNA of June HOPKINS SAIA was characterized through the sampling of swabs from the interior of the piece of glove placed under seal CONSTAT HUIT.

Copie certifiée conforme

8

EXT-LAUTISSIER-00029

- The analysis of the swab sampled from the exterior surface of the piece of glove placed under seal CONSTAT HUIT allowed to reveal a complex mixture of the DNA of Frédérique VARENNES and the DNA of June HOPKINS SAIA all along with the presence of traces of other non-identifiable DNA profiles.

- Genetic characteristics of complex mixture of at least three DNA profiles compatible with that of Frédérique VARENNES were found in swab 1 and 3 sampled from the electric cable placed under seal CONSTAT UN. Having regard to the complexity of these mixtures no interpretation was possible.

- There was no possibility to characterize an exploitable nuclear DNA from the swab placed under seal CONSTAT TROIS.

**These conclusions prove the presence of June HOPKINS SAIA and Brendan LAUTISSIER on the scene and their criminal intentions.**

The examination of witnesses:

Many witnesses were examined.

**Marc RASCOUSSIER** explained that as he was parking his vehicle around 7 PM in the parking outside of the residence "Séquoia", he saw individuals with camouflaged faces enter one double garage in the building. Thinking that these were youngsters having fun he did not give much attention to them.

**Patrice COISNON** was driving a two-wheels on allée Edmond Flamand when he heard a cry of distress. As he approached, he noticed that a woman was on the floor attacked by two individuals. Another witness asked him for help to release the victim from the attackers' grip, meanwhile the victim was screaming that they were trying to kill her.

As a matter of fact, he did notice that one of the two individuals was on his knees holding the victim's legs with his hands whereas the second individual had his knees on her shoulders and his hands around her neck.

At this moment, he threw the first individual back, the one who was holding the victim's legs, it was then when he realized that the individual is actually a lady wearing a tight hood. She fell on her butts and she pulled out from her pocket "a rope with a running knot" that she handed to her accomplice whose face was masked by a piece of clothes. The latter took hold of the rope speaking with her in another language. Then they ran away while taking away with them a suitcase. He went to find their whereabouts in the direction of residence "Séquoia" where he found on the way a man who was aggressed by these persons.

**Bruno COUZIN** was on a bicycle when he saw a woman on the ground getting aggressed by two individuals wearing motorcycle helmets.

A woman whose face was hidden by a neck scarf was immobilizing the victim by holding her feet, meanwhile a second aggressor was at her head's level "smashing" her neck with one of his knees.

As the victim was calling for help, he asked the individuals to let her go. Then, the two aggressors started discussing together in English. When he realized that they were not answering him, he tried in vain to move away the individual who was smashing the victim's

Copyrighted material

9

EXT-LAUTISSIER-00030

Ahmad GHAZLEH

NE VARIETUR

neck. He threatened them to call the police, but the lady replied in English that he may do that and that she does not care. He lowered her neck scarf which allowed him to see her face.

Incapable of doing anything, he started screaming for help at this moment M. COISON had arrived on the scene and had called the police.

He pushed the individual who was holding the victim's neck again, this destabilized him sufficiently to allow the victim to move away from her aggressor who stood up and held in his hands "a clear 30 cm doubled cable". He then went to fetch a suitcase left aside, then went towards his accomplice who stood in between to stop him from helping the victim.

Grégoire LAUTISSIER who had just left the house asked him to take care of the victim and he took the bicycle to help Mr. COISNON to follow the accused persons who had escaped. The latter had told him as he came back to the place that they took shelter in residence "Séquoia" building. Then, he left his bicycle and went to the only exit of the residence. At that moment he heard grumbling noises coming from the driveway, he then saw that the male individual who had aggressed Mrs. VARENNES was bleeding from the nose and had removed his helmet. He was standing astride on top of Grégoire LAUTISSIER and was strangling him using a cable, meanwhile his accomplice who had also removed her helmet "was trying to hinder Mr. LAUTISSIER who was suffocating and who had a line of blood coming out of the mouth.

Mr. COUZIN tried to pull away the individual unsuccessfully by hammering with his fists the individual's arms and face, but the latter refused to let go and kept on strangling Mr. LAUTISSIER.

He then pushed his accomplice making her fall on the ground and came back to tackle the aggressor giving him blows with his knees on the sides of his body. The latter finally let go when many individuals arrived at the place. He stood up to fetch the suitcase meanwhile his accomplice "oppressing him" non-stop. He succeeded by holding her to the ground as they waited for the police forces to arrive but when he saw that her accomplice was coming towards him and as the witnesses present on the scene thought that he was aggressing a lady, he let her run away. She ran away with her accomplice and he kept Mr. LAUTISSIER away from any further harm.

Mr. COUZIN indicated that his right hand was injured and both his knees too. He was also surprised to notice that the aggressors did not have their motorcycle helmets anymore.

**Jean-Baptiste ASSANI** was alerted by screams for help when he was at a friend's house in rue des Landes in Chatou. He left the house and took the street which leads to the entrance of the residence "Séquoia" where he saw a coated man releasing himself from the grip he had on another individual, who is fifty-years-old and who was lying on the floor with a swollen face and was moaning from pain. The first individual took his things from the ground and fetched a big black suitcase.

At the same time; a young man was holding a woman on the ground and telling her to call the police and to retain the man with the suitcase because a woman had been aggressed.

He asked the coated man about what happened, but the latter replied in a foreign language. The woman held on the ground was able to escape, she went towards the man with the suitcase and left together the place.

EXT-LAUTISSIER-00031

Ahmad GHAZLEH

NE VARIETUR

**Patrick ROUSSIES** was also alerted by a voice of a man calling "help, help me!". He immediately went out of his house, he saw an immobile man with a swollen face and a young man holding down a forty-year-old blond woman on the ground who was able to escape and to join a thirty-year-old man who was pulling a big wheeled suit-case. A neighbor was able to follow them for a while as they were leaving the place rapidly.

Frédériques VARENNES told the investigators that her brother was regularly threatened by his ex-wife and his own son. She added that back in spring 2014, her husband saw these two individuals roaming around in their home's street on board of a Peugeot C1 licensed CZ 258 BN01. An international arrest warrant was issued against them back then May 14, 2014 by the investigating judge in charge of the investigation in the case of attempted homicide on an ascendant on the victim Grégoire LAUTISSIER perpetrated by his son Brendan August 20, 2010.

The lawyer of Grégoire LAUTISSIER had informed back then the investigating judge through a letter in May 12, 2014 of the intimidation maneuvers that his client was subject of. Seven posters, letters and other attestation of suicide where plastered several nights in a row on the door of his Parisian house in the 11th district which he bequeathed to his godson. The malevolent content of these documents was obvious. One of the posters read "Grégoire go to United States March 30-31, 2014 try to kill the mother of his sons again!". These posters seemed as a whole to accuse Grégoire LAUTISSIER and his accomplices trying to take the life of the mother and her sons, he was described on multiple occasions as "a monster", "culprit", promised of "prison" and "hell". On another poster it was possible to read "jump from balcony", another document was titled "Suicide letter" which started with "I, Grégoire LAUTISSIER, being sane, would like to be rendered responsible of many of my own atrocities".

**Brendan LAUTISSIER and his mother June HOPKINS SAIA were both registered in the FPR (Wanted Persons' File) which allowed to arrest them by the Air and Borders Police of Coquelles (62) as they were trying to leave France February 18, 2015 to the United-Kingdom.**

Questioned, June HOPKINS SAIA and her son Brendan LAUTISSIER denied the accusations and tried to turn the tables on their accusers.

The hearing of Brendan LAUTISSIER

He stated that following the death of his stepfather in 2011 "*because of diabetes*", his mother decided to come and live in France in 2012 where school fees are less high than in the United-States. They first lived in hotels before moving to the apartment in which they were still living. He added taking advantage of his presence in France to obtain a French Nation ID card and a French passport.

After moving in, he set "*a priority*" to himself to discover the reality of his father and the threats that were weighing on the family. For this reason, he had put in February 2013, at the entrance door of his apartment a small MP3 player which consisted of a micro hidden in a tissue paper.

**He also claimed as did his mother possessing around twelve recordings on his computer which show that his father was planning to go to the United-States to "break his mother's neck" and "to throw her from a building" to let it appear like an accident. He admitted not**

Ahmad GHAZLEH

NE VARIETUR

**understanding French very well and that it was his mother who translated the recorded conversations for him.**

That he escorted her to Chatou (78) to have a discussion with Mrs. VARENNES to ask her to stop all these threats, but the latter reacted violently when she knew that they had incriminating evidence in their possession and punched his mother in the chin who riposted by pushing her away. His aunt fell down backwards and hurt her head, he then went down on his knees to help her but he realized that she was trying to stand up again to fight so he held her down on the ground to protect his mother.

A neighbor intervened and asked him to let her go. He tried to leave the place with his mother to avoid that things get worse, but his father tracked them down and punched him in the face before giving him several blows. His mother stood in between and attacked his eyes, which caused him to fall backwards. Several neighbors and friends of his father came over to fight but since he was not there to fight, he ran away with his mother.

He was unaware of the presence of the electric cable which was unveiled on the scene and that of the piece of torn latex glove. The seized scarf is indeed his.

He denied attempting to strangle his father and aunt.

The hearing of June HOPKINS SAIA

Brendan LAUTISSIER's mother, June HOPKINS SAIA admitted going in February 17, 2015 in front of the house of Mrs. VARENNES with her son to wait for the latter's return from work in order to talk to her. She explained that she wanted to ask her to stop threatening her and her sons. She also wanted to warn her that she had proofs of the presence of a project orchestrated by her (Mrs. VARENNES) with her brother Grégoire LAUTISSIER and other members of their family to eliminate them. June HOPKINS SAIA admitted having audio recordings on her computer originating from taping devices which she put on the apartment's threshold of her ex-husband Grégoire LAUTISSIER. She added that she came over around fifteen times to make sure that these devices are operating and to replace them. She recognized being angry facing the attitude of Frédérique VARENNES who refused to talk to her, who pushed her and caused her to fall. However, she admitted wearing a motorcycle helmet explaining that it was to protect herself from Frédérique VARENNES who was planning to kill her *"to make her brother happy"*. She also admitted that the latter has never shown any violent behavior before towards her but that she is a sociopath as the rest of the family. She admitted that she and her son were both wearing gloves. She denied holding Mrs. VARENNES legs as she was lying the ground and denied handing any cable-like element to Brendan. The presence of her son's DNA on the seized cable is accidental.

Before admitting pushing Frédérique VARENNES, June HOPKINS SAIA explained during her first declarations, in custody at the police station, that Mrs. VARENNES turned around suddenly and fell on the ground, her son wanted to touch her face to ease her down. But Mrs. VARENNES was scared and panicking, she kicked Mrs. WALSH's chin and bit her son's hand. A man approached them and asked them what was happening. Brendan LAUTISSIER's mother answered him that Mrs. VARENNES had a discomfort. The man asked them to move away and said that he was going to call the police.



Copie certifiée conforme

NE VARIETUR

Ahmad GHAZLEH

Case 1:19-mj-00377-LPA   Document 12-1   Filed 03/13/20   Page 33 of 107

<u>Concerning other elements: wiretapping, audio or video taping, tracking, telephone activity operations</u>

During the search in Mrs. HOPKINS SAIA's handbag, a post-it note was discovered with handwritten notes about car licenses and car models. Once researches were done, it has been revealed that the 4 references which were written matched with two vehicles registered under the name of Mrs. VARENNES, one vehicle registered under the name of Grégoire LAUTISSIER and one last vehicle registered under the name of his father Gérard LAUTISSIER.

During her custody at the police station; Mrs. HOPKINS SAIA indicated that she had put on several occasions devices to collect audiovisual elements in addition to taping devices in an aeration grid near the entrance door of the apartment of Grégoire LAUTISSIER. Mr. POTIN, the building's janitor handed the investigators three devices which correspond and found in the aeration pipe on the landing of the said apartment. The janitor indicated having seen on several occasions a blond woman escorted by a young man with long hair on that floor and that he surprised them as they were putting their devices in the aeration grid. He asked them to leave every time he saw them without informing Mr. LAUTISSIER nor the police.

The Service Regional de l'Informatique et des Traces Technologiques of the DRPJ (Regional Service for Computer and Technology Traces of the Regional Directorate of Judiciary Police) submitted a report concerning the analysis of the phones of Mrs. HOPKINS SAIA and her son Brendan. They mainly determined that his phone contained a sub-folder "VIDEOS" which consisted of content related to tracking the house of Mrs. VARENNES and her car in addition to audiovisual recordings of the surrounding's of the Grégoire LAUTISSIER's Parisian home.

The police searched the Parisian apartment where Mrs. HOPKINS SAIA and Brendan LAUTISSIER were staying.

In this apartment, the police mainly discovered sheets of paper on which was handwritten "Greg, you are a killer! Now you try to kill again (…)", another sheet of paper was discovered with the addresses of Mrs. VARENNES and Grégoire LAUTISSIER on them.

In the closet of Brendan's room, two black jumpsuits were discovered, a man wig and a BB gun. Under the bed of Mrs. HOPKINS SAIA a black cover was discovered and a big garden shovel.

The search of the apartment also included the basement where a suitcase containing military-like materials was discovered (army jacket and a camouflage net), diverse tools (a saw, an axe, a machete, goggle, gloves, roll of cords, audio and video collector device similar to the one handed by Mr. POTIN, the janitor of Mrs. Frédérique VARENNES' building in Chatou).

\*\*\*

<u>The matching testimonies of Marc RASCOUSSIER, Patrice COISNON, Bruno COUZIN, Jean-Baptiste ASSANI, Patrick ROUSSIES corroborate the declarations of Mrs. Frédérique VARENNES and Grégoire LAUTISSIER concerning the events and the two attempted murders committed by June HOPKINS SAIA and Brendan LAUTISSIER.</u> These detailed testimonies testify the unequivocal strangulation that the individuals were victim of, particularly using "a rope", noting that an electric cable was found in the scene of the events after the aggressors ran away, holding only the DNA of Mrs. VARENNES and that of Mr. Brendan LAUTISSIER.

Copie certifiée conforme

NE VARIETUR

Ahmad GHAZLEH

These testimonies and the discrepancy between the different versions concerning the events of Brendan LAUTISSIER and June HOPKINS SAIA show that the two suspects lied on several number of elements during their hearings (Mrs. HOPKINS SAIA admitted lying during her second hearing). <u>Forensic Medical opinions and the genetic expertise both march and correspond</u> with the precise description given of the events as stated by the proceedings. **All these elements attest the presence of Mr. Brendan LAUTISSIER on the scene where the crime took place and corroborate the criminal acts described by the victims and the witnesses of the events.**

**The investigation conducted by the police and that conducted by the investigating judge both allowed to determine that Brendan LAUTISSIER had tried to kill his father Grégoire LAUTISSIER in August 20, 2010 (attempted homicide on an ascendant) and that Mrs. HOPKINS SAIA and her son Brendan LAUTISSIER willingly and after premeditation attempted to take away the life of Mrs. Frédérique VARENNES and that of Mr. Grégoire LAUTISSIER (attempted murder) in February 19, 2015.**

### III- The Qualifications:

Having exposed the aforementioned crimes, crime of August 20, 2010 and crime of February 17, 2015 which constitute the following offenses: Precising the qualifications and indicating the legal texts

- <u>Attempted homicide on an ascendant (his father LAUTISSIER Grégoire) August 20, 2010</u>
- <u>Attempted murder on his father Grégoire LAUTISSIER and his aunt Frédérique VARENNES née LAUTISSIER, February 17, 2015</u>

Offenses set out and punished by articles 121-4, 121-5, 132-71-1, 221-3 subp.1, 221-1, 221-4, 221-8, 221-9, 221-9-1, and 221-11 of the Criminal Code.

The arrest warrant issued by the investigating judge set out by articles 122, 123 and 131 of the Code of Criminal Procedure.

### IV-The proceedings

Judicial investigation was open by the prosecution services of Paris for offenses of attempted homicide on an ascendant in June 24, 2011.

November 13, 2012, the investigating judge issued a request for mutual legal assistance to the American Authorities in order to proceed with the hearing of Mrs. WALSH and her sons Brendan and Austin and to have further information concerning the circumstances surrounding the death of Mark WALSH.

May 12, 2014, Grégoire LAUTISSIER's lawyer informed the investigating judge of the intimidating maneuvers his client was going through. Seven posters, letters and a Suicide Note were posted on several nights in a row at the door of his Parisian house 55, boulevard Beaumarchais in the 11th District of Paris which he had bequeathed to his godson. On another hand, his sister's husband surprised Mrs. WALSH and her son Brendan, during this same period, as they were roaming around in the street where his house is located in Chatou driving a Peugeot C1 vehicle licensed CZ 258 BN01.

Copie certifiée

14

Ahmad GHAZLEH

NE VARIETUR

May 14, 2014, the investigating judge issued an international arrest warrant against Brendan LAUTISSIER.

February 20, 2015, the prosecution services od Versailles opened a judicial investigation against June HOPKINS SAIA and Brendan LAUTISSIER for the offenses of attempted murder of which is victim Grégoire LAUTISSIER and his sister Frédérique VARENNES née LAUTISSIER.

The offenses of February 2015 are related to the first offenses of attempted homicide on an ascendant of August 20, 2010, therefore they were linked to the initial proceedings of 2010. By order issued in June 5, 2015, the investigating judge of Versailles handed over the case file to the investigating judge of Paris in charge of the investigation open in 2010 following the first attempted homicide on an ascendant of which Grégoire LAUTISSIER was victim.

After being arrested in February 20, 2015, Brendan LAUTISSIER and June HOPKINS SAIA were placed in temporary detention until February 19, 2018 when they were liberated and placed under probation (judicial supervision). Having not replied to the judge's summons, the investigating judge issued an arrest warrant against them in August 3, 2018. The District Attorney of Paris issued and published a European Arrest Warrant in December 21, 2018. This judicial investigation is placed in the hands of investigating judge Dimitri DUREUX today at the Judicial Court of Paris.

Once their location found in the United States, the French Legal Authorities addressed a **request for temporary arrest to the American Legal Authorities against Brendan LAUTISSIER in April 23, 2019 and June HOPKINS SAIA in June 25, 2019, following which the two requested persons were arrested on the territory of the United States in December 9, 2019.**

Should also note that during their imprisonment, June HOPKINS SAIA tried to break free from Versailles Penitentiary for Women the night of July 12-13 2016 by removing the bars of her cell using frozen water bottles. June HOPKINS SAIA is still suffering from damages caused by multiple broken bones in her pelvis and sacrum.

Mrs. June HOPKINS SAIA indicated having filed an appeal before the CEDH The European Court of Human Rights for her and her son Brendan LAUTISSIER. However, after researches have been conducted, no file whatsoever has been found in her name in our archives. No file was found either on the HUDOC database of the European Court which lists the pending and finished cases appearing before court.

### V- Statutory limitation period

In application of article 7 of the French Code of Criminal Procedure, public prosecution for attempted homicide against an ascendant and attempted murder are time-**barred after 20 years** from the day when the offense was committed, since the adoption of the law of February 27, 2017. Before this law came into force, the former article 7 stipulated a ten-year time limit counting from the day the crime was committed provided that during this period no investigation or prosecution acts whatsoever were carried out. If at the time the law of February 27, 2017 entered into force in March 1, 207, limitation period was not barred for the reported offenses, new limitation period is applied. (art.4 law n°2017-242 of February 27, 2017).

NE VARIETUR

Ahmad GHAZLEH

Limitation period is suspended by acts of inquiry and prosecution (article 9-2 of the Code of Criminal Procedure).

In January 10, 2020, prosecution was not barred by limitation regarding the offenses of which Brendan LAUTISSIER is accused and detailed in this request for extradition based on the offenses of August 20, 2010 and February 17, 2015. Moreover, several acts such as issuing an Arrest Warrant interrupted the limitation period of the prosecution. As a matter of fact, the investigation is continuously running since June 24, 2011 under the direction of several judges. Thus, the offenses are not barred by limitation.

This request for extradition is, according to the French law, an act of search of the Ministry of Justice which is an interrupting act of limitation period.

\*\*\*

**The request for the extradition of Brendan LAUTISSIER is issued based on the bilateral treaty between France and the US signed in April 23, 1996 and the agreement between the European Union and the United States of America signed June 25, 2003.**

Please find annexed the copy of the arrest warrant issued by the investigating judge in May 14, 2014, for information purpose only taking into consideration that this warrant was executed in 2015. Please find annexed the arrest warrant issued by the investigating judge in August 3, 2018, the copy of the European Arrest Warrant of December 21, 2018, the copy of the request for temporary arrest of April 23, 2019, the copy of the applicable legal texts, the copy of the Extradition Treaty and the copy of the documents of identity of Brendan LAUTISSIER.

PARIS, January 13, 2020

DISTRICT ATTORNEY

Jean-Marc COQUENTIN

Deputy Chief Prosecutor

Annexed documents:

- Certified copy of the arrest warrant issued by the investigating judge in May 14, 2014 (executed arrest warrant)
- Certified copy of the arrest warrant issued by the investigating judge in August 3rd, 2018
- Certified copy of the European arrest warrant issued in December 21, 2018,
- Certified copy of the request for temporary arrest in April 23, 2019,
- Copy of the applicable legal texts concerning the offenses,
- Copy of the Extradition Treaties
- Copy of the American passport of Brendan Christopher Walsh LAUTISSIER,
- Copy of the national identity card od Brendan Christopher LAUTISSIER,
- Copy of the French passport of Brendan Christopher LAUTISSIER.



NE VARIETUR

Ahmad GHAZLEH

Case 1:19-mj-00377-LPA   Document 12-1   Filed 03/13/20   Page 37 of 107

P A R Q U E T
D U
T R I B U N A L
D E G R A N D E
I N S T A N C E
D E P A R I S

■

# Mandat d'arrêt de Madame Virginie GEYTE, Vice-président chargé de l'instruction en date du 14 mai 2014
# Traduction en langue anglaise

EXT-LAUTISSIER-00038

Cour D'Appel de Paris
Tribunal de Grande Instance de Paris     INTERNATIONAL ARREST WARRANT
Cabinet of Judge Virgine VAN GEYTE
Vice-President in charge of investigation
Prosecution Services Case Registration n°103360816
Cabinet Case Registration n°2224/11/50

## Republic of France- In the Name of the French People

We, Mrs. Virginie VAN GEYTE, Vice-President in charge of investigation at Tribunal de Grande Instance de Paris.

Regarding the investigation with:

**Mr. WALSH-LAUTISSIER Brendan**
D.O.B. 07th of January 1992 in California (UNITED STATES of AMERICA) of LAUTISSIER Grégoire and HOPKINS June.
Resident in 71 HILLCREST DRIVE LACONIA-NEW HAMPSHIRE. UNITED STATES of AMERICA.

Accused of:

Attempted homicide on an ascendant,

Acts which were perpetrated in Paris 11th district on the 20th of August 2010, on the national territories and not barred by limitation

As outlined and punished by Articles 121-4, 121-5, 221-4, 221-8, 221-9, 221-9-1 and 221-11 of the Criminal Code.

Having regard to the indictments of Mr. The District Attorney on the 29th of April 2014;

Having regard to Articles 122, 123, 131 et seq. of the Code of Criminal Procedure;

We order and send for every Officer or Agent working for the Judicial Police, for every agent of the Public Force, in compliance with the law, to look for and present before us or before the District Attorney of the place where the arrest would take place, the aforementioned person object of this Warrant after having placed her in jail in Paris or in the place where her arrest would occur.

We urge the Chief-supervisor of the said jail to receive and keep this person having regard to an arrest warrant until otherwise ordered.

We demand from every person with public authority who shall read this Arrest Warrant to commit to assist, if needed, in order to execute this warrant.

In witness whereof, this Warrant is signed by Us, the Judge of investigation and sealed with our stamp.

NE VARIETUR

Issued by the Cabinet of the Investigation Judge on the 14th of May 2014

This Warrant was shown to and notified to the person mentioned herein who received a copy delivered by me. On

Ahmad GHAZLEH

P A R Q U E T
D U
T R I B U N A L
D E  G R A N D E
I N S T A N C E
D E  P A R I S

■

# Mandat d'arrêt de Mme Virginie GEYTE, Vice-président chargé de l'instruction en date du 03 août 2018

EXT-LAUTISSIER-00040

COUR D'APPEL
DE PARIS

TRIBUNAL
DE GRANDE INSTANCE
DE PARIS

CABINET
de Mme Virginie VAN GEYTE
Vice-Président chargé de
l'instruction

# MANDAT D'ARRET INTERNATIONAL

## REPUBLIQUE FRANCAISE - AU NOM DU PEUPLE FRANCAIS

PARQUET N° . 103360816 .
CABINET N° . 2224/11/50 .



Le mandat ci-contre a été exhibé et notifié à la personne y désignée et copie lui en a été délivrée par moi

Le



Nous, Mme Virginie VAN GEYTE, Vice-Président chargé de l'instruction au Tribunal de Grande Instance de Paris;

Vu l'information concernant :
**M. LAUTISSIER Brendan**
dit WALSH Brendan

*né le 07 Janvier 1992 à Woodland Hills - CALIFORNIE (ETATS-UNIS)*
*de LAUTISSIER Grégoire et de HOPKINS June*

mise en examen des chefs de :
Tentative d'homicide sur un ascendant
Faits commis à Paris 11 le 20 août 2010, en tout cas sur le territoire national et depuis temps n'emportant pas prescription.
Faits prévus et réprimés par les articles 121-4, 121-5, 221-4, 221-8, 221-9, 221-9-1 et 221-11 du Code Pénal

Réquisitoire introductif du 20 février 2015 (dossier Versailles)
Tentative d'assassinat, fait commis le 17 février 2015 à Chatou, au préjudice de Monsieur LAUTISSIER Grégoire et de Mme Frédérique LAUTISSIER épouse VARENNES
Faits prévus et réprimés par les articles 121-5, 221-3 al 1, 221-1, 132-71-1, 221-3 al,221-8, 221-9, 221-9-1 et 221-11 du code pénal

Vu les réquisitions de M. le Procureur de la République en date du 31 juillet 2018 ;

Vu les articles 122, 123, 131 et suivants du Code de procédure pénale ;

Mandons et ordonnons à tous officiers ou agents de la police judiciaire et à tous agents de la force publique, en se conformant à la loi, de rechercher et de conduire devant nous ou devant le procureur de la République du lieu de son arrestation la personne sus-visée, après l'avoir le cas échéant conduite à la maison d'arrêt de Paris ou celle de son lieu d'arrestation.

Enjoignons au Surveillant-Chef de ladite maison d'arrêt de la recevoir et détenir en état de mandat d'arrêt jusqu'à ce qu'il en soit autrement ordonné.

Requérons tout dépositaire de la force publique auquel le présent mandat sera exhibé de prêter main forte pour son exécution en cas de besoin.

En foi de quoi le présent mandat a été signé par Nous, Juge d'Instruction, et scellé de notre sceau.

Fait en notre Cabinet, le 3 août 2018
LE JUGE D'INSTRUCTION

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

EXT-LAUTISSIER-00041

P A R Q U E T
   D U
T R I B U N A L
D E  G R A N D E
I N S T A N C E
D E  P A R I S

# Mandat d'arrêt de Mme Virginie GEYTE, Vice-président chargé de l'instruction en date du 03 août 2018 Traduction en langue anglaise

**PARIS COURT OF APPEAL**

# INTERNATIONAL ARREST WARRANT

**PARIS HIGH COURT**

**FRENCH REPUBLIC – IN THE NAME OF THE FRENCH PEOPLE**

OFFICE of
Ms. Virginie VAN GEYTE
Judge, Vice-President in
charge of judicial
investigation

I the undersigned, Ms. Virginie VAN GEYTE, Judge, Vice-President in charge of judicial investigation at the Paris High Court (*Tribunal de grande instance de Paris*);

Case reference at the
prosecution office:
103360816

Having regard to the investigation on the case of:
**Mr. LAUTISSIER Brendan**
alias WALSH Brendan

*born on January 7, 1992, in Woodland Hills – CALIFORNIA (USA)*
*son of LAUTISSIER Grégoire and HOPKINS June*

Case reference at the
investigating judge's
office: 2224/11/50

charged with the following offenses:
- Homicide attempt against an ascendant
Offense committed in the 11th arrondissement of Paris on August 20, 2010, on national territory and not covered by statute of limitation.
Offense defined and sanctioned by Sections 121-4, 121-5, 221-4, 221-8, 221-9, 221-9-1 and 221-11 of the French Penal Code

[Seal: Prosecution office,
Paris High Court]

[Hand-written: "Received,
Prosecution Office,
on 8/8/18"]
[illegible signature]

[Stamp: Bernard BELOTTE,
Vice-prosecutor]

Request by the prosecutor to the judge to open an investigation, filed on February 20, 2015 (case opened in Versailles)
Assassination attempt, offense committed on February 17, 2015, in Chatou (France), against Mr. LAUTISSIER Grégoire and Ms. Frédérique LAUTISSIER married name VARENNES
Offense defined and sanctioned by Sections 121-5, 221-3 para. 1, 221-1, 132-71-1, 221-3 para. [sic], 221-8, 221-9, 221-9-1, and 221-11 of the French Penal Code

The present warrant was
issued and summoned upon
the person identified on it,
who also received a copy

On

Having regard to the conclusions submitted by the Prosecutor of the Republic on July 31, 2018;

Having regard to Sections 122, 123, 131 and seq. of the French Criminal Procedure Code;

[Stamp: Certified true copy
of the original,
Court Clerk]
[Initials + illegible signature]

I Hereby order all judicial police officers and agents as well as all members of law enforcement bodies, in compliance with the law, to search for and lead the above-identified person to appear before us or before the competent Prosecutor of the Republic in the place of arrest, and if applicable, after having taken him to a pre-trial detention center of Paris or the equivalent center in the place of arrest.

Hereby urge the Senior Prison Supervisor of the said detention center to receive him and detain him in application of the arrest warrant until further decision has been made.

Hereby request all members of security forces having received the present arrest warrant to assist in executing it, where necessary.

Copie certifiée conforme

In witness thereof, the present warrant was signed and sealed by the investigating judge.

[illegible signature]
[Stamp: Paris High Court]
Signed in our office, on August 3, 2018
The Judge in charge of judicial investigation

*Certified translation, certified true to the original document in French language.*
*Translated by Grace Shalhoub, M.A., Sworn Translator*
*accredited by the Paris Court of Appeal, France*
*Signed on* May 21, 2019 *under No.* QH1019-18

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
QH1019-18
près la cour d'appel de Paris

EXT-LAUTISSIER-00043

P A R Q U E T
D U
T R I B U N A L
D E  G R A N D E
I N S T A N C E
D E  P A R I S

■

# Mandat d'arrêt européen en date du 21/12/2018

EXT-LAUTISSIER-00044



Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
GSN 2019-18
p.2
près la cour d'appel de Paris

**Liberté • Égalité • Fraternité**
**RÉPUBLIQUE FRANÇAISE**
## COUR D'APPEL DE PARIS
## TRIBUNAL DE GRANDE INSTANCE DE PARIS

**MANDAT D'ARRÊT EUROPÉEN**

**[A030]** Le présent mandat a été émis par une autorité judiciaire compétente. Je demande que la personne mentionnée ci-dessous soit arrêtée et remise aux autorités judiciaires aux fins de l'exercice de poursuites pénales ou de l'exécution d'une peine ou d'une mesure de sûreté privative de liberté.

a) Renseignements relatifs à l'identité de la personne recherchée :

**[A006]** Nom patronymique : **LAUTISSIER**

**[A007]** Prénom(s) : **Brendan**

**[A008]** Nom d'usage (pour les femmes mariées ), s'il y a lieu :

**[A011]** Alias, s'il y a lieu : **dit WALSH Brendan**
**Passeport américain : LAUTISSIER Brendan Christopher Walsh**

**[A012]** Sexe : **Masculin**

**[A013]** Nationalité : **américaine/française**

**[A009]** Date de naissance : **7 janvier 1992**

**[A010]** Lieu de naissance : **Woodland Hills (Californie - ETATS UNIS)**

**[A061]** Résidence et/ou adresse connue : **71 Hillcrest Drive Laconia - New Hampshire- Etats Unis**

**[M083]** La ou les langues que la personne recherchée comprend (si connu): Ignoré

**[A058]** Traits distinctifs/description de la personne recherchée :

**[A059 et A060]** Photo et empreintes digitales de la personne recherchée, si elles sont disponibles et s'il est possible de les communiquer, ou les coordonnées de la personne à contacter afin d'obtenir ces informations ou un profil A.D.N. (si ces données peuvent être communiquées, mais n'ont pas été incluses) : **Photo de l'intéressé**

b) Décision sur laquelle se fonde le mandat d'arrêt européen :

**[A031 et A032]** Mandat d'arrêt ou décision judiciaire ayant la même force : **Mandat d'arrêt décerné le 3 août 2018 par Mme Virginie VAN GEYTE, vice-président chargé de l'instruction au tribunal de grande instance de Paris, en vue de poursuites pénales**

**[A033]** Type : **Mandat d'arrêt art 131 CPP**

**[A035 et A036]** Jugement exécutoire : **néant**

Copie certifiée conforme

Copie certifiée conforme

EXT-LAUTISSIER-00045

**[A037]** Référence :

c) Indications sur la durée de la peine :

1 **[A034]** Durée maximale de la peine ou mesure de sûreté privatives de liberté qui peut être prononcée pour l'infraction/les infractions commise(s) :

**Réclusion criminelle à perpétuité**

2 **[A038]** Durée de la peine ou mesure de sûreté privatives de liberté infligée :

**[A039]** Peine restant à purger :

**[M083]** d) Indiquez si l'intéressé a comparu en personne au procès qui a mené à la décision:

1. ☐ Oui, l'intéressé a comparu en personne au procès qui a mené à la décision.

2. ☐ Non, l'intéressé n'a pas comparu en personne au procès qui a mené à la décision.

3. Si vous avez coché la case du point 2, veuillez confirmer si:

☐ 3.1 a) l'intéressé a été cité à personne le.... (jour/mois/année) et a ainsi été informé de la date et du lieu fixés pour le procès qui a mené à la décision, et s'il a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU

☐ 3.1 b) l'intéressé n'a pas été cité à personne, mais a été informé officiellement et effectivement par d'autres moyens de la date et du lieu fixés pour le procès qui a mené à la décision, de telle sorte qu'il a été établi de manière non équivoque que l'intéressé a eu connaissance du procès prévu, et a été informé qu'une décision pouvait être rendue en cas de non-comparution ;

OU

☐ 3.2 ayant eu connaissance du procès prévu, l'intéressé a donné mandat à un conseil juridique, qui a été désigné soit par l'intéressé soit par l'État, pour le défendre au procès, et a été effectivement défendu par ce conseil pendant le procès ;

OU

☐ 3.3 l'intéressé s'est vu signifier la décision le …. (jour/mois/année) et a été expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

☐ l'intéressé a indiqué expressément qu'il ne contestait pas la décision ;

Copie certifiée conforme

Copie certifiée conforme

EXT-LAUTISSIER-00046

OU

☐ l'intéressé n'a pas demandé une nouvelle procédure de jugement ou une procédure d'appel dans le délai imparti ;

OU

☐ 3.4 l'intéressé n'a pas reçu personnellement la signification de la décision, mais

– il la recevra personnellement sans délai après la remise, et

– lorsqu'il l'aura reçue, il sera expressément informé de son droit à une nouvelle procédure de jugement ou à une procédure d'appel, à laquelle l'intéressé a le droit de participer et qui permet de réexaminer l'affaire sur le fond, en tenant compte des nouveaux éléments de preuve, et peut aboutir à une infirmation de la décision initiale, et

– il sera informé du délai dans lequel il doit demander une nouvelle procédure de jugement ou une procédure d'appel, soit ...jours.

4. Si vous avez coché la case du point 3.1 b), 3.2 ou 3.3 ci-dessus, veuillez indiquer comment la condition concernée a été remplie :

*Copie certifiée conforme*

e) Infraction(s) :

[M083] Le présent mandat se rapporte au total à **1 infraction**

[A042, A 043, A044 et A045] Description des circonstances dans lesquelles la ou les infractions ont été commises, y compris le moment (la date et l'heure), le lieu ainsi que le degré de participation de la personne recherchée à l'infraction ou aux infractions :

Auteur des faits commis à Paris 11ème, le 20 août 2015 ,

Le 27 août 2010, Monsieur Grégoire LAUTISSIER déposait plainte auprès du commissariat du 11ème arrondissement de Paris. Son fils Brendan WALSH-LAUTISSIER né le 7 janvier 1992 en Californie, avec lequel il entretenait des relations épisodiques, était venu à son domicile parisien pour les vacances avec sa mère June en juin 2010. Le 20 août 2010, alors qu'il avait constaté la disparition à son domicile de documents importants et en discutait avec June HOPKINS, il avait alors senti un liquide s'écouler dans son dos et entendu le bruit d'un briquet à deux reprises. Il avait constaté que son fils Brendan tentait de mettre feu à l'essence dont il l'avait aspergé et lui portait un coup pour l'arrêter. Ce dernier s'étant muni d'un petit sabre japonais, il était désarmé par Antoine LAUTISSIER, son oncle. Brendan LAUTISSIER et sa mère quittaient les lieux. Demeurant introuvable, un mandat d'arrêt était délivré le 14 mai 2014 contre Brendan LAUTISSIER.
Le 17 février 2015, Grégoire LAUTISSIER et sa soeur Frédérique VARENNES étaient victimes d'une tentative d'homicide. Ils reconnaissaient Brendan LAUTISSIER et sa mère June HOPKINS SAIA comme étant leurs agresseurs. Ceux-ci étaient interpellés alors qu'ils tentaient de quitter la France le 18 février 2015. Ils ont contesté l'intégralité des faits.
Détenus depuis le 20 février 2015, ils ont été libérés le 19 février 2018. Ils n'ont pas respecté leurs contrôle judiciaire et ne répondent plus aux convocations.

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

*Copie certifiée conforme*

EXT-LAUTISSIER-00047

**[A040 ET A041]** Nature et qualification juridique de la ou des infractions et dispositions légales applicables :

**- Tentative d'homicide sur un ascendant**

*Faits prévus et réprimés par les articles 121-4, 121-5, 221-4, 221-8, 221-9, 221-9-1 et 221-11 du code pénal*

---

**[M083]** I. Cocher le cas échéant, s'il s'agit d'une ou des infractions suivantes punies en France d'une peine d'une durée égale ou supérieure à 3 ans telles qu'elles sont définies par le droit français :

- ☐ Participation à une organisation criminelle
- ☐ Terrorisme
- ☐ Traite des êtres humains
- ☐ Exploitation sexuelle des enfants et pornographie infantile
- ☐ Trafic illicite de stupéfiants et de substances psychotropes
- ☐ Trafic illicite d'armes, de munitions et d'explosifs
- ☐ Corruption
- ☐ Fraude, y compris la fraude portant atteinte aux intérêts financiers des Communautés européennes au sens de la convention du 26 juillet 1995 relative à la protection des intérêts financiers des Communautés européennes
- ☐ Blanchiment du produit du crime
- ☐ Faux monnayage, y compris la contrefaçon de l'euro
- ☐ Cybercriminalité
- ☐ Crimes et délits contre l'environnement, y compris le trafic illicite d'espèces animales menacées et le trafic illicite d'espèces et d'essences végétales menacées
- ☐ Aide à l'entrée et au séjour irréguliers
- ☐ Homicide volontaire, coups et blessures graves
- ☐ Trafic illicite d'organes et de tissus humains
- ☐ Enlèvement, séquestration et prise d'otage
- ☐ Racisme et xénophobie
- ☐ Vols commis en bande organisée ou avec arme
- ☐ Trafic illicite de biens culturels, y compris antiquités et oeuvres d'art
- ☐ Escroquerie
- ☐ Extorsion
- ☐ Contrefaçon et piratage de produits
- ☐ Falsification de documents administratifs et trafic de faux
- ☐ Falsification de moyens de paiement

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
GSH2019-18
près la cour d'appel de Paris

Copie certifiée conforme

EXT-LAUTISSIER-00048

- ☐ Trafic illicite de substances hormonales et autres facteurs de croissance
- ☐ Trafic illicite de matières nucléaires et radioactives
- ☐ Trafic de véhicules volés
- ☐ Viol
- ☐ Incendie volontaire
- ☐ Crimes et délits relevant de compétence de la Cour pénale internationale
- ☐ Détournement d'avion/navire
- ☐ Sabotage

**II.** [A044] Description complète de l'infraction ou des infractions qui ne relèvent pas des cas visés au point I ci-avant :

**- Tentative d'homicide sur un ascendant**

Les faits d'août 2010
Le 20 août 2010, alors qu'il avait constaté la disparition à son domicile de documents importants et en discutait avec June HOPKINS, Grégoire LAUTISSIER avait alors senti un liquide s'écouler dans son dos et entendu le bruit d'un briquet à deux reprises. Il avait constaté que son fils Brendan tentait de mettre feu à l'essence dont il l'avait aspergé et lui portait un coup pour l'arrêter. Ce dernier s'étant muni d'un petit sabre japonais, il était désarmé par Antoine LAUTISSIER, son oncle, le commencement d'exécution étant ainsi caractérisé et la tentative n'a manqué son effet qu'en raison de circonstances indépendantes de la volonté de son auteur. Brendan LAUTISSIER et sa mère quittaient les lieux.

Les faits du 17 février 2015
Mme HOPKINS SAIA June, dite WALSH June, a participé avec son fils Brendan LAUTISSIER, selon les informations recueillies par les enquêteurs et le juge d'instruction, à l'agression de Mme Frédérique VARENNES (sœur de M Grégoire LAUTISSIER) et de Grégoire LAUTISSIER. Au moment où Mme VARENNES rentrait à son domicile le 17 février 2015 à Chatou (78)à 19h15, elle recevait un violent coup à l'arrière du crâne et perdait l'équilibre. Elle se retrouvait au sol face à un individu casqué qui tentait de l'étrangler. La victime apercevait une femme également grimée derrière son agresseur qui passait un lien à son complice. Le commencement d'exécution était ainsi matériellement caractérisé. L'intervention de plusieurs témoins obligeaient les assaillants à quitter les lieux déterminant l'arrêt de l'infraction, indépendamment de la volonté de leurs auteurs. Les auteurs Mme HOPKINS SAIA June et son fils Brendan LAUTISSIER étaient reconnus par Grégoire LAUTISSIER et reconnaissaient partiellement les faits notamment avoir été présents sur les lieux, avoir poussé Mme VARENNES et porté des casques de moto et des gants.

f) [M083] Autres circonstances pertinentes en l'espèce (informations facultatives)
*(NB : il est possible d'inclure ici des remarques sur l'extra-territorialité, les actes interruptifs de prescription et autres conséquences de l'infraction)*

g) **[M083]** Le présent mandat se rapporte également à la saisie et à la remise des objets qui peuvent servir de pièces à conviction.

Le présent mandat se rapporte également à la saisie et à la remise des objets acquis par la personne recherchée du fait de l'infraction :

description des objets (et lieu où ils se trouvent) (s'ils sont connus) :

.

.

---

h) **[M083]** □ L'infraction ou les infractions pour laquelle ou lesquelles ce mandat a été émis est ou sont passibles d'une peine ou mesure de sûreté privative de liberté à caractère perpétuel ou a (ont) eu pour effet une telle peine ou mesure :

LE SYSTÈME JURIDIQUE DE L'ETAT MEMBRE D'ÉMISSION PRÉVOIT UNE RÉVISION DE LA PEINE INFLIGÉE - SUR DEMANDE OU AU PLUS TARD APRÈS 20 ANS - EN VUE DE LA NON-EXÉCUTION DE CETTE PEINE OU MESURE.

ET/OU

LE SYSTÈME JURIDIQUE FRANÇAIS PRÉVOIT L'APPLICATION DE MESURES DE CLÉMENCE AUXQUELLES LA PERSONNE PEUT PRÉTENDRE EN VERTU DE LA LÉGISLATION EN VUE DE LA NON-EXÉCUTION DE CETTE PEINE.

---

i) **[A030]** Autorité judiciaire qui a émis le mandat :

Désignation officielle de l'autorité judiciaire : Procureur de la République près le tribunal de grande instance de Paris

Nom de son représentant : Anne JONCOUX

Fonction (titre) : Substitut du Procureur, Magistrat de l'ordre judiciaire

Référence du dossier : 103360816

Adresse : Tribunal de Paris - Parvis du Tribunal de Paris - 75859 PARIS CEDEX 17

N° de tél. : (Indicatif du pays) (Indicatif de zone / urbain)(...) +33 1 70 60 80 60

N° de télécopie : (Indicatif du pays) (Indicatif de zone / urbain)(...) + 33 1 44 32 78 52

E-mail : extradition.a2.tgi-paris@justice.fr

Coordonnées de la personne à contacter afin de prendre les dispositions pratiques nécessaires à la remise de la personne :
M. Anne JONCOUX, Magistrat de l'ordre judiciaire, ainsi que le service des transfèrements (Direction de l'administration pénitentiaire, madame Rohra GHOLEM) aux numéros suivants :
N° de tél : 00 33 681 49 77 99
N° de télécopie : 00 33 1 79 86 19 77
Boîte structurelle : snt.dap-ems@justice.gouv.fr

Copie certifiée conforme

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

SIGNATURE DE L'AUTORITÉ JUDICIAIRE D'ÉMISSION (PROCUREUR GÉNÉRAL OU PROCUREUR DE LA RÉPUBLIQUE), OU DE SON REPRÉSENTANT

NOM : Anne JONCOUX

FONCTION (TITRE) Substitut du Procureur

DATE : 21 décembre 2018

CACHET OFFICIEL (S'IL EST DISPONIBLE)







## APOSTILLE
### (Convention de La Haye du 5 octobre 1961)

1. *République française* ETATS-UNIS

   Le présent acte public

2. a été signé par............ Néant

3. agissant en qualité de..... Grattier

4. est revêtu du sceau/timbre de. Tribunal de Grande Instance de Paris

   *Attesté*

5. à Paris    2 5 AVR. 2019

6. le.................................

7. par le Procureur général près la Cour d'appel de Paris

8. sous n°..........................  MICHEL ERNOUT

9. Sceau :    PREMIER AVOCAT GÉNÉRAL

   Signature :

*"L'Apostille confirme seulement l'authenticité de la signature, du sceau ou timbré sur le document. Elle ne signifie pas que le contenu du document est correct ou que la République française approuve son contenu"*



Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
GST 2019-18
p.8
près la cour d'appel de Paris

EXT-LAUTISSIER-00051

P A R Q U E T
D U
T R I B U N A L
DE  GRANDE
IN S T A N C E
DE  PARIS



# Mandat d'arrêt européen en date du 21/12/2018
# Traduction en langue anglaise

French Republic

[French moto: Liberty, Equality, Fraternity]

**PARIS COURT OF APPEAL – COUR D'APPEL DE PARIS**
**PARIS HIGH COURT – TRIBUNAL DE GRANDE INSTANCE DE PARIS**

**EUROPEAN ARREST WARRANT**

[A030] This warrant has been issued by a competent judicial authority. I request that the person mentioned below be arrested and surrendered for the purposes of conducting a criminal prosecution or executing a custodial sentence or detention order.

a) Information regarding the identity of the requested person:

| | | |
|---|---|---|
| [A006] | Name: | **LAUTISSIER** |
| [A007] | Forename(s): | **Brendan** |
| [A008] | Maiden name, where applicable: | |
| [A011] | Aliases, where applicable: | **alias WALSH Brendan** |
| | **American passport: LAUTISSIER Brendan Christopher Walsh** | |
| [A012] | Sex: | **Male** |
| [A013] | Nationality: | **American/French** |
| [A009] | Date of birth: | **January 7, 1992** |
| [A010] | Place of birth: | **Woodland Hills (California – UNITED STATES)** |
| [A061] | Residence and/or known address: | **71 Hillcrest Drive Laconia – New Hampshire – United States** |
| [M083] | Language(s) which the requested person understands (if known): unknown | |
| [A058] | Distinctive marks/description of the requested person: unknown | |

[A059 and A060] Photo and fingerprints of the requested person, if they are available and can be transmitted, or contact details of the person to be contacted in order to obtain such information or a DNA profile (where this evidence can be supplied but has not been included):
**Photo of the requested person**

b) Decision on which the warrant is based:

[A031 and A032] Arrest warrant or judicial decision having the same effect: **Arrest warrant issued on August 3, 2018, by Ms. Virginie VAN GEYTE, investigating judge, Vice-President in charge of judicial investigation at the Paris High Court, in view of criminal prosecution**

[A033] Type: **Arrest warrant pursuant to Section 131 of the French Criminal Procedure Code**

[A035 and A036] Enforceable judgment: **NONE**

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

[stamp: Certified true copy
[illegible signature]
The registrar
[Seal: Paris High Court]

EXT-LAUTISSIER-00053

[A037] Reference:

c) Indications on the length of the sentence:

1 [A034] Maximum length of the custodial sentence or detention order which may be imposed for the offense(s):

**Life imprisonment**

2 [A038] Length of the custodial sentence or detention order imposed:

[A039] Remaining sentence to be served:

[M083] d) Indicate if the person appeared in person at the trial resulting in the decision:

1. □ Yes, the person appeared in person at the trial resulting in the decision.

2. □ No, the person did not appear in person at the trial resulting in the decision

3. If you have ticked the box under point 2, please confirm the existence of one of the following:

□ 3.1a. the person was summoned in person on ... (day/month/year) and thereby informed of the scheduled date and place of the trial which resulted in the decision and was informed that a decision may be handed down if he or she does not appear for the trial;

OR

□ 3.1b. the person was not summoned in person but by other means actually received official information of the scheduled date and place of the trial which resulted in the decision, in such a manner that it was unequivocally established that he or she was aware of the scheduled trial, and was informed that a decision may be handed down if he or she does not appear for the trial;

OR

□ 3.2. being aware of the scheduled trial, the person had given a mandate to a legal counsellor, who was either appointed by the person concerned or by the State, to defend him or her at the trial, and was indeed defended by that counsellor at the trial;

OR

□ 3.3. the person was served with the decision on ... (day/month/year) and was expressly informed about the right to a retrial or appeal, in which he or she has the right to participate and which allows the merits of the case, including fresh evidence, to be reexamined, and which may lead to the original decision being reversed, and

□ the person expressly stated that he or she does not contest this decision;

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

[stamp: Certified true copy
[illegible signature]
The registrar
[Seal: Paris High Court]

EXT-LAUTISSIER-00054

OR

           □ the person did not request a retrial or appeal within the applicable time frame;

OR

    □ 3.4. the person was not personally served with the decision, but

-    the person will be personally served with this decision without delay after the surrender, and

-    when served with the decision, the person will be expressly informed of his or her right to a retrial or appeal, in which he or she has the right to participate and which allows the merits of the case, including fresh evidence, to be re-examined, and which may lead to the original decision being reversed, and

-    the person will be informed of the timeframe within which he or she has to request a retrial or appeal, which will be ...... days.

4. If you have ticked the box under point 3.1b, 3.2 or 3.3 above, please provide information about how the relevant condition has been met:

---

    d)   Offenses:

[M083] This warrant relates to a total of **1 offense**.

[A042, A 043, A044 and A045] Description of the circumstances in which the offense(s) was(were) committed, including the time, place and degree of participation in the offense(s) by the requested person:

Perpetrator of the offense committed on August 20, 2015, in the 11th district of Paris,

On August 27, 2010, Mr. Grégoire LAUTISSIER filed a police report with the police station in the 11th district of Paris. His son, Brendan WALSH-LAUTISSIER, born on January 7, 1992, in California, with whom he had had little or episodic contact, came in June 2010 to his house in Paris to spend the holidays together with his mother named June. On August 20, 2010, having noticed that some important documents went missing from his home and whilst he was discussing the same with June HOPKINS, he felt a liquid being poured on his back and heard the sound of a lighter being struck twice. He understood that his son Brendan was attempting to set alight the fuel he had showered him with. Mr. Grégoire LAUTISSIER hit him to make him stop. His son was holding a small Japanese sword, but was disarmed by his uncle, Antoine LAUTISSIER. Brendan LAUTISSIER and his mother left. As he remained unfound, an arrest warrant was issued on May 14, 2014, against Brendan LAUTISSIER.

On February 17, 2015, Grégoire LAUTISSIER and his sister Frédérique VARENNES were victims of an attempted homicide. They identified their aggressors as being Brendan LAUTISSIER and his mother June HOPKINS SAIA. The latter were arrested as they were trying to leave France on February 18, 2015. They disputed the facts.

They were held in detention starting February 20, 2015, and were released on February 19, 2018. Since, they have not complied with the judicial supervision measures pending trial and no longer responded when summoned.

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu

EXT-LAUTISSIER-00055

[stamp: Certified true copy
[illegible signature]
The registrar
[Seal: Paris High Court]

**[A040 and A041]** Nature and legal classification of the offence(s) and the applicable statutory provision/code:

**- Attempted homicide against an ascendant**

*Offences defined and sanctioned by Sections 121-4, 121-5, 221-4, 221-8, 221-9, 221-9-1, and 221-11 of the French Penal Code*

---

**[M083]** I. If applicable, tick one or more of the following offences punishable in France by a custodial sentence or detention order of a maximum of at least 3 years as defined by French law:

- ☐ Participation in a criminal organization
- ☐ Terrorism
- ☐ Trafficking in human beings
- ☐ Sexual exploitation of children and child pornography
- ☐ Illicit trafficking in narcotic drugs and psychotropic substances
- ☐ Illicit trafficking in weapons, munitions and explosives
- ☐ Corruption

- ☐ Fraud, including that affecting the financial interests of the European Communities within the meaning of the Convention of 26 July 1995 on the protection of European Communities' financial interests
- ☐ Laundering of the proceeds of crime

- ☐ Counterfeiting of currency, including the euro
- ☐ Computer-related crime
- ☐ Environmental crime, including illicit trafficking in endangered animal species and in endangered plant species and varieties
- ☐ Facilitation of unauthorized entry and residence
- ☐ Murder, grievous bodily injury
- ☐ Illicit trade in human organs and tissue
- ☐ Kidnapping, illegal restraint and hostage-taking
- ☐ Racism and xenophobia
- ☐ Organized or armed robbery;
- ☐ Illicit trafficking in cultural goods, including antiques and works of art
- ☐ Swindling
- ☐ Extortion
- ☐ Counterfeiting and piracy of products
- ☐ Forgery of administrative documents and trafficking therein
- ☐ Forgery of means of payment

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
68619-18
P-5
près la cour d'appel de Paris

[stamp: Certified true copy
[illegible signature]
The registrar
[Seal: Paris High Court]

- ☐ Illicit trafficking in hormonal substances and other growth promoters
- ☐ Illicit trafficking in nuclear or radioactive materials
- ☐ Trafficking in stolen vehicles
- ☐ Rape
- ☐ Arson
- ☐ Crimes within the jurisdiction of the International Criminal Court
- ☐ Unlawful seizure of aircraft/ships
- ☐ Sabotage

II.    [A044] Full descriptions of offense(s) not covered by section I above:

**- Attempted homicide against an ascendant**

Offense committed in August 2010
On August 20, 2010, having noticed that some important documents went missing from his home and whilst discussing the same with June HOPKINS, Grégoire LAUTISSIER felt a liquid being poured on his back and heard the sound of a lighter being struck twice. He understood that his son Brendan was attempting to set alight the fuel he had poured on him. Mr. Grégoire LAUTISSIER hit him to make him stop. His son was holding a small Japanese sword, but was disarmed by his uncle, Antoine LAUTISSIER. The attempt is deemed to have been committed as it was demonstrated by a beginning of execution and failed to achieve the desired effect solely through circumstances independent of the perpetrator's will. Brendan LAUTISSIER and his mother left the house.

Offense committed on February 17, 2015
According to the evidence collected by the police investigators and the investigating judge, Ms. June HOPKINS SAIA, alias June WALSH, played a role in the aggression of Ms. Frédérique VARENNES (sister of Mr. Grégoire LAUTISSIER) and of Grégoire LAUTISSIER, together with her son Brendan LAUTISSIER. On February 17, 2015, in Chatou (Yvelines department, France) at 7:45 p.m., as she was on her way home, Ms. VARENNES was hit hard on the back of her head and lost balance. She found herself lying on the ground and facing an individual wearing a helmet and attempting to strangle her. The victim also perceived a woman with her head covered, standing behind her aggressor, and handing a rope to her accomplice. The attempt is deemed to have been committed as it was demonstrated by a beginning of execution. The presence of multiple eye witnesses obliged the aggressors to leave the site, and thus put an end to the attempt through circumstances independent of the perpetrators' will. The perpetrators, Ms. HOPKINS SAIA June and her son Brendan LAUTISSIER, were identified by Grégoire LAUTISSIER and partially corroborated the material facts, namely the fact that they were present on site, struck Ms. VARENNES and that they were wearing motorcycle helmets and gloves.

f) [M083] Other circumstances relevant to the case (optional information)
*(NB: This could cover remarks on extraterritoriality, interruption of periods of time limitation and other consequences of the offense)*

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

[stamp: Certified true copy
[illegible signature]
The registrar
[Seal: Paris High Court]

EXT-LAUTISSIER-00057

g) **[M083]** This warrant pertains also to the seizure and handing over of property which may be required as evidence.

This warrant pertains also to the seizure and handing over of property acquired by the requested person as a result of the offence:

description of the property (and location) (if known):

.
.

h) **[M083]** □ The offence(s) on the basis of which this warrant has been issued is(are) punishable by/has(have) led to a custodial life sentence or lifetime detention order or can result in such sentence of order:

THE LEGAL SYSTEM OF ISSUING MEMBER STATE ALLOWS FOR A REVIEW OF THE PENALTY OR MEASURE IMPOSED – ON REQUEST OR AT LEAST AFTER 20 YEARS – AIMING AT A NON-EXECUTION OF SUCH PENALTY OR MEASURE.

AND/OR

THE LEGAL SYSTEM OF FRANCE ALLOWS FOR THE APPLICATION OF MEASURES OF CLEMENCY TO WHICH THE PERSON IS ENTITLED UNDER THE LAW OR PRACTICE OF THE ISSUING MEMBER STATE, AIMING AT NON-EXECUTION OF SUCH PENALTY OR MEASURE.

i) **[A030]** The judicial authority which issued the warrant:

Official title of the judicial authority: Prosecutor of the Republic at the High Court of Paris

Name of its representative: Anne JONCOUX

Post held (title):  Deputy Prosecutor, magistrate of the judiciary

File reference: 103360816

Address: Tribunal de Paris – Parvis du Tribunal de Paris – 75859 PARIS CEDEX 17

Tel. No.: (country code) (area/city code) (..) +33 1 70 60 80 60

Fax No. (country code) (area/city code) (…) +33 1 44 32 78 52

E-mail: extradition.a2.tgi-paris@justice.fr

Contact details of the person to contact to make necessary practical arrangements for the surrender:
Mr. [sic] Anne JONCOUX, magistrate of the judiciary, as well as the transfer service (Prison administration, Ms. Rohra GHOLEM) who can be reached at the following numbers:
Tel no.: 00 33 681 49 77 99
Fax no.: 00 33 1 79 86 19 77
E-mail: snt.dap-ems@justice.gouv.fr



Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
G8Hcul9-18

près la cour d'appel de Paris

[stamp: Certified true copy
[illegible signature]
The registrar
 [Seal: Paris High Court]

EXT-LAUTISSIER-00058

SIGNATURE OF THE ISSUING JUDICIAL AUTHORITY (GENERAL PROSECUTOR OR PROSECUTOR OF THE REPUBLIC) OR ITS REPRESENTATIVE

Name: Anne JONCOUX
Post held (title): Deputy Prosecutor
Date: December 21, 2018
Official stamp (if available)

[illegible signature]
[Stamp: Prosecution office
Paris High Court]

Copie certifiée conforme

[stamp: **Certified True Copy**]
[signature] [handwritten: *Court Registrar*]

[Stamp: Prosecution office
Paris High Court]

[Seal: Paris Court of Appeal]

**APOSTILLE**
**(Convention de la Haye du 5 octobre 1961)**

1- *French Republic*                    [*handwritten : UNITED STATES*]

    This public document
2- has been signed by: *N/A*
3- acting as *Court Registrar*
4- bears the seal/stamp of: *Paris High Court*

                        CERTIFIED
5- in Paris, France
6- on *[stamp: April 25, 2019]*
7- by the General Prosecutor for the Paris Court of Appeal
8- No. *9972*
9- Seal/stamp [Stamp: Paris Court of Appeal]
10- Signature [stamp: Michel Lernout, First Advocate General] [illegible signature]

*"This Apostille only certifies the signature, and the seal*
*or stamp it bears. It does not imply that its content is correct*
*or that the French Republic approves this content".*

*Certified translation, certified true to the original in French language.*
*Translated by Grace Shalhoub, M.A., Sworn Translator*
*accredited by the Paris Court of Appeal, France*
*Signed on* May 20, 2019 *under No.* GSH/Vol9-18

[Stamp: Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
GSH/Vol9-18
p.8
près la cour d'appel de Paris]

EXT-LAUTISSIER-00059

PARQUET
DU
TRIBUNAL
DE GRANDE
INSTANCE
DE PARIS

■

# Textes de prévention et de répression
# Version Française

EXT-LAUTISSIER-00060

## TEXTES DU CODE DE PROCÉDURE PÉNALE FRANÇAIS RELATIFS A LA PRESCRIPTION ET AUX MANDATS D'ARRÊT
### et LOI n° 2017-242 du 27 février 2017 portant réforme de la prescription en matière pénale

**Sur la prescription**

**Article 7**

L'action publique des crimes se prescrit par vingt années révolues à compter du jour où l'infraction a été commise.

L'action publique des crimes mentionnés aux articles 706-16,706-26 et 706-167 du présent code, aux articles 214-1 à 214-4 et 221-12 du code pénal et au livre IV bis du même code se prescrit par trente années révolues à compter du jour où l'infraction a été commise.

L'action publique des crimes mentionnés à l'article 706-47 du présent code, lorsqu'ils sont commis sur des mineurs, se prescrit par trente années révolues à compter de la majorité de ces derniers.

L'action publique des crimes mentionnés aux articles 211-1 à 212-3 du code pénal est imprescriptible.

**Ancien Article 7** (Version en vigueur du 5 avril 2006 au 12 août 2011)

Modifié par Loi n°2006-399 du 4 avril 2006 - art. 14 JORF 5 avril 2006
En matière de crime et sous réserve des dispositions de l'article 213-5 du code pénal, l'action publique se prescrit par dix années révolues à compter du jour où le crime a été commis si, dans cet intervalle, il n'a été fait aucun acte d'instruction ou de poursuite.
S'il en a été effectué dans cet intervalle, elle ne se prescrit qu'après dix années révolues à compter du dernier acte. Il en est ainsi même à l'égard des personnes qui ne seraient pas impliquées dans cet acte d'instruction ou de poursuite.
Le délai de prescription de l'action publique des crimes mentionnés à l'article 706-47 du présent code et le crime prévu par l'article 222-10 du code pénal, lorsqu'ils sont commis sur des mineurs, est de vingt ans et ne commence à courir qu'à partir de la majorité de ces derniers.

**Article 4 de la loin° 2017-242 du 27 février 2017 :**

La présente loi ne peut avoir pour effet de prescrire des infractions qui, au moment de son entrée en vigueur, avaient valablement donné lieu à la mise en mouvement ou à l'exercice de l'action publique à une date à laquelle, en vertu des dispositions législatives alors applicables et conformément à leur interprétation jurisprudentielle, la prescription n'était pas acquise.

Copie certifiée conforme

**Article 9-2**

Ahmad GHAZLEH

NE VARIETUR

Le mandat de comparution a pour objet de mettre en demeure la personne à l'encontre de laquelle il est décerné de se présenter devant le juge à la date et à l'heure indiquées par ce mandat.

Le mandat d'amener est l'ordre donné à la force publique de conduire immédiatement devant lui la personne à l'encontre de laquelle il est décerné.

Le mandat d'arrêt est l'ordre donné à la force publique de rechercher la personne à l'encontre de laquelle il est décerné et de la conduire devant lui après l'avoir, le cas échéant, conduite à la maison d'arrêt indiquée sur le mandat, où elle sera reçue et détenue.

Le juge d'instruction est tenu d'entendre comme témoins assistés les personnes contre lesquelles il a été décerné un mandat de comparution, d'amener ou d'arrêt, sauf à les mettre en examen conformément aux dispositions de l'article 116. Ces personnes ne peuvent pas être mises en garde à vue pour les faits ayant donné lieu à la délivrance du mandat.

Le mandat de dépôt peut être décerné à l'encontre d'une personne mise en examen et ayant fait l'objet d'une ordonnance de placement en détention provisoire. Il est l'ordre donné au chef de l'établissement pénitentiaire de recevoir et de détenir la personne à l'encontre de laquelle il est décerné. Ce mandat permet également de rechercher ou de transférer la personne lorsqu'il lui a été précédemment notifié.

### Article 123

Tout mandat précise l'identité de la personne à l'encontre de laquelle il est décerné ; il est daté et signé par le magistrat qui l'a décerné et est revêtu de son sceau.

Les mandats d'amener, de dépôt, d'arrêt et de recherche mentionnent en outre la nature des faits imputés à la personne, leur qualification juridique et les articles de loi applicables.

Le mandat de comparution est signifié par huissier à celui qui en est l'objet ou est notifié à celui-ci par un officier ou agent de la police judiciaire, ou par un agent de la force publique, lequel lui en délivre copie.

Le mandat d'amener, d'arrêt ou de recherche est notifié et exécuté par un officier ou agent de la police judiciaire ou par un agent de la force publique, lequel en fait l'exhibition à la personne et lui en délivre copie.

Si la personne est déjà détenue pour une autre cause, la notification lui est faite comme il est dit à l'alinéa précédent, ou, sur instructions du procureur de la République, par le chef de l'établissement pénitentiaire qui en délivre également une copie.

Les mandats d'amener, d'arrêt et de recherche peuvent, en cas d'urgence être diffusés par tous moyens.

Dans ce cas, les mentions essentielles de l'original et spécialement l'identité de la personne à l'encontre de laquelle il est décerné, la nature des faits qui lui sont imputés et leur qualification juridique, le nom et la qualité du magistrat mandant doivent être précisés. L'original ou la copie du mandat est transmis à l'agent chargé d'en assurer l'exécution dans les délais les plus brefs.

### Article 131

Si la personne est en fuite ou si elle réside hors du territoire de la République, le juge d'instruction, après avis du procureur de la République, peut décerner contre elle un mandat d'arrêt si le fait comporte une peine d'emprisonnement correctionnelle ou une peine plus

Ahmad GHAZLEH

NE VARIETUR

EXT-LAUTISSIER-00062

# TEXTES DU CODE PENAL FRANCAIS
## SUR LES QUALIFICATIONS PENALES APPLICABLES

### Sur la tentative

Article 121-4

Est auteur de l'infraction la personne qui :

1. 1° Commet les faits incriminés ;

2° Tente de commettre un crime ou, dans les cas prévus par la loi, un délit.

Article 121-5

La tentative est constituée dès lors que, manifestée par un commencement d'exécution, elle n'a été suspendue ou n'a manqué son effet qu'en raison de circonstances indépendantes de la volonté de son auteur.

### Sur l'homicide sur un ascendant

Article 221-1

Le fait de donner volontairement la mort à autrui constitue un meurtre. Il est puni de trente ans de réclusion criminelle.

Article 221-4

Le meurtre est puni de la réclusion criminelle à perpétuité lorsqu'il est commis :

1° Sur un mineur de quinze ans ;

2° Sur un ascendant légitime ou naturel ou sur les père ou mère adoptifs ;

3° Sur une personne dont la particulière vulnérabilité, due à son âge, à une maladie, à une infirmité, à une déficience physique ou psychique ou à un état de grossesse, est apparente ou connue de son auteur ;

4° Sur un magistrat, un juré, un avocat, un officier public ou ministériel, un militaire de la gendarmerie nationale, un fonctionnaire de la police nationale, des douanes, de l'administration pénitentiaire ou toute autre personne dépositaire de l'autorité publique, un sapeur-pompier professionnel ou volontaire, un gardien assermenté d'immeubles ou de groupes d'immeubles ou un agent exerçant pour le compte d'un bailleur des fonctions de gardiennage ou de surveillance des immeubles à usage d'habitation en application de l'article L. 271-1 du code de la sécurité intérieure, dans l'exercice ou du fait de ses fonctions, lorsque la qualité de la victime est apparente ou connue de l'auteur ;

Copie certifiée conforme

EXT-LAUTISSIER-00063

4° bis Sur un enseignant ou tout membre des personnels travaillant dans les établissements d'enseignement scolaire, sur un agent d'un exploitant de réseau de transport public de voyageurs ou toute personne chargée d'une mission de service public, ainsi que sur un professionnel de santé, dans l'exercice ou du fait de ses fonctions, lorsque la qualité de la victime est apparente ou connue de l'auteur ;

4° ter Sur le conjoint, les ascendants ou les descendants en ligne directe ou sur toute autre personne vivant habituellement au domicile des personnes mentionnées aux 4° et 4° bis, en raison des fonctions exercées par ces dernières ;

5° Sur un témoin, une victime ou une partie civile, soit pour l'empêcher de dénoncer les faits, de porter plainte ou de déposer en justice, soit en raison de sa dénonciation, de sa plainte ou de sa déposition ;

6° et 7° (abrogés)

8° Par plusieurs personnes agissant en bande organisée ;

9° Par le conjoint ou le concubin de la victime ou le partenaire lié à la victime par un pacte civil de solidarité ;

10° Contre une personne en raison de son refus de contracter un mariage ou de conclure une union.

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables aux infractions prévues par le présent article. Toutefois, lorsque la victime est un mineur de quinze ans et que le meurtre est précédé ou accompagné d'un viol, de tortures ou d'actes de barbarie ou lorsque le meurtre a été commis en bande organisée sur un magistrat, un fonctionnaire de la police nationale, un militaire de la gendarmerie, un membre du personnel de l'administration pénitentiaire ou toute autre personne dépositaire de l'autorité publique, à l'occasion de l'exercice ou en raison de ses fonctions, la cour d'assises peut, par décision spéciale, soit porter la période de sûreté jusqu'à trente ans, soit, si elle prononce la réclusion criminelle à perpétuité, décider qu'aucune des mesures énumérées à l'article 132-23 ne pourra être accordée au condamné ; en cas de commutation de la peine, et sauf si le décret de grâce en dispose autrement, la période de sûreté est alors égale à la durée de la peine résultant de la mesure de grâce.

**Sur l'assassinat**

### Article 221-3

Le meurtre commis avec préméditation ou guet-apens constitue un assassinat. Il est puni de la réclusion criminelle à perpétuité.

Les deux premiers alinéas de l'article 132-23 relatif à la période de sûreté sont applicables à l'infraction prévue par le présent article. Toutefois, lorsque la victime est un mineur de quinze ans et que l'assassinat est précédé ou accompagné d'un viol, de tortures ou d'actes de barbarie ou lorsque l'assassinat a été commis sur un magistrat, un fonctionnaire de la police nationale, un militaire de la gendarmerie, un membre du personnel de l'administration pénitentiaire ou toute autre personne dépositaire de l'autorité publique, à l'occasion de l'exercice ou en raison

de ses fonctions, la cour d'assises peut, par décision spéciale, soit porter la période de sûreté jusqu'à trente ans, soit, si elle prononce la réclusion criminelle à perpétuité, décider qu'aucune des mesures énumérées à l'article 132-23 ne pourra être accordée au condamné ; en cas de commutation de la peine, et sauf si le décret de grâce en dispose autrement, la période de sûreté est alors égale à la durée de la peine résultant de la mesure de grâce.

## Article 132-171-1

Le guet-apens consiste dans le fait d'attendre un certain temps une ou plusieurs personnes dans un lieu déterminé pour commettre à leur encontre une ou plusieurs infractions.

## Sur les peines complémentaires applicables aux personnes physiques

## Article 221-8

Les personnes physiques coupables des infractions prévues au présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction, suivant les modalités prévues par l'article 131-27, soit d'exercer une fonction publique ou d'exercer l'activité professionnelle ou sociale dans l'exercice ou à l'occasion de l'exercice de laquelle l'infraction a été commise, soit, pour les crimes prévus par les articles 221-1, 221-2, 221-3, 221-4 et 221-5, d'exercer une profession commerciale ou industrielle, de diriger, d'administrer, de gérer ou de contrôler à un titre quelconque, directement ou indirectement, pour son propre compte ou pour le compte d'autrui, une entreprise commerciale ou industrielle ou une société commerciale. Ces interdictions d'exercice peuvent être prononcées cumulativement ;

2° L'interdiction de détenir ou de porter, pour une durée de cinq ans au plus, une arme soumise à autorisation ;

3° La suspension, pour une durée de cinq ans au plus, du permis de conduire, cette suspension pouvant être limitée à la conduite en dehors de l'activité professionnelle ; dans les cas prévus par l'article 221-6-1, la suspension ne peut pas être assortie du sursis, même partiellement, et ne peut pas être limitée à la conduite en dehors de l'activité professionnelle ; dans les cas prévus par les 1° à 6° et le dernier alinéa de l'article 221-6-1, la durée de cette suspension est de dix ans au plus ;

4° L'annulation du permis de conduire avec interdiction de solliciter la délivrance d'un nouveau permis pendant cinq ans au plus ;

4° bis L'obligation d'accomplir un stage de sensibilisation aux dangers de l'usage de produits stupéfiants, selon les modalités fixées à l'article 131-35-1 ;

5° La confiscation d'une ou de plusieurs armes dont le condamné est propriétaire ou dont il a la libre disposition ;

6° Le retrait du permis de chasser avec interdiction de solliciter la délivrance d'un nouveau permis pendant cinq ans au plus ;

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

Copie certifiée conforme

EXT-LAUTISSIER-00065

7° Dans les cas prévus par l'article 221-6-1, l'interdiction de conduire certains véhicules terrestres à moteur, y compris ceux pour la conduite desquels le permis de conduire n'est pas exigé, pour une durée de cinq ans au plus ;

8° Dans les cas prévus par l'article 221-6-1, l'obligation d'accomplir, à ses frais, un stage de sensibilisation à la sécurité routière ;

9° Dans les cas prévus par l'article 221-6-1, l'immobilisation, pendant une durée d'un an au plus, du véhicule dont le condamné s'est servi pour commettre l'infraction, s'il en est le propriétaire ;

10° Dans les cas prévus par l'article 221-6-1, la confiscation du véhicule dont le condamné s'est servi pour commettre l'infraction, s'il en est le propriétaire ;

La confiscation du véhicule est obligatoire dans les cas prévus par les 4° et dernier alinéa de l'article 221-6-1 ainsi que, dans les cas prévus par les 2°, 3° et 5° du même article, en cas de récidive ou si la personne a déjà été définitivement condamnée pour un des délits prévus par les articles L. 221-2, L. 224-16, L. 234-1, L. 234-8, L. 235-1, L. 235-3 ou L. 413-1 du code de la route ou pour la contravention mentionnée à ce même article L. 413-1. La juridiction peut toutefois ne pas prononcer cette peine, par une décision spécialement motivée.

11° Dans les cas prévus par les 2° et dernier alinéa de l'article 221-6-1, l'interdiction, pendant une durée de cinq ans au plus, de conduire un véhicule qui ne soit pas équipé par un professionnel agréé ou par construction d'un dispositif d'anti-démarrage par éthylotest électronique, homologué dans les conditions prévues à l'article L. 234-17 du code de la route. Lorsque cette interdiction est prononcée en même temps que la peine d'annulation ou de suspension du permis de conduire, elle s'applique, pour la durée fixée par la juridiction, à l'issue de l'exécution de cette peine.

Toute condamnation pour les délits prévus par les 1° à 6° et le dernier alinéa de l'article 221-6-1 donne lieu de plein droit à l'annulation du permis de conduire avec interdiction de solliciter un nouveau permis pendant dix ans au plus. En cas de récidive, la durée de l'interdiction est portée de plein droit à dix ans et le tribunal peut, par décision spécialement motivée, prévoir que cette interdiction est définitive.

II. – En cas de condamnation pour les infractions prévues à la section 1 du présent chapitre, le prononcé des peines complémentaires prévues aux 2°, 5° et 6° du I est obligatoire. La durée des peines prévues aux 2° et 6° du I est portée à quinze ans au plus.

Toutefois, la juridiction peut, par une décision spécialement motivée lorsque la condamnation est prononcée par une juridiction correctionnelle, décider de ne pas prononcer ces peines, en considération des circonstances de l'infraction et de la personnalité de son auteur.

Article 221-9

Les personnes physiques coupables des infractions prévues par la section 1 du présent chapitre encourent également les peines complémentaires suivantes :

1° L'interdiction des droits civiques, civils et de famille, selon les modalités prévues par l'article

Copie certifiée conforme

EXP. LAUTISSIER-00066

131-26 ;

2° L'interdiction d'exercer une fonction publique, selon les modalités prévues par l'article 131-27 ;

3° La confiscation prévue par l'article 131-21 ;

4° L'interdiction de séjour, suivant les modalités prévues par l'article 131-31.

Article 221-9-1

Les personnes physiques coupables des crimes prévus par la section 1 du présent chapitre encourent également le suivi socio-judiciaire selon les modalités prévues par les articles 131-36-1 à 131-36-13.

Article 221-11

L'interdiction du territoire français peut être prononcée dans les conditions prévues par l'article 131-30, soit à titre définitif, soit pour une durée de dix ans au plus, à l'encontre de tout étranger coupable de l'une des infractions définies à la section I du présent chapitre.





# Textes de prévention et de répression
# Traduction en langue anglaise

EXT-LAUTISSIER-00068

# Applicable Texts from the French Code of Criminal Procedure in relation to Limitations and Arrest Warrants and Law No. 2017-242 of 27 February 2017 Reform of the statute of limitations in criminal cases

## Code of Criminal Procedure

## On limitation

### Article 7

The limitation period for the prosecution of felonies is twenty years from the day of the commission of the felony.

The limitation period of felonies set out in articles 706-16, 706-26 and 706-167 of this code, and in articles 214-1 to 214-4 and 221-12 of the Criminal Code and Book IV a of this code is time-barred by the passing of thirty years from the day of the commission of the felony.

The limitation period for the prosecution of the felonies set out in article 706-47 of this code when committed against minors is thirty years, and only starts to run from their coming of age.

The limitation period for the prosecution of felonies set out in articles 211-1 to 212-3 of the Criminal Code are not time-barred.


### Previous Article 7

(applicable version from April 5th 2006 to August 12th 2011)

Modified by Law n°2006-399 of the 4th of April 2006-art.14 Official Journal April 5th 2006.

Subject to the provisions of article 213-5 of the Criminal Code, prosecution in felony cases is time-barred by the passing of ten years from the day of the commission of the felony if, during this period, no step in investigation or prosecution was taken.

Where such steps were taken, it is time-barred only after the passing of ten years starting from the last step taken. This applies even in respect of those persons who would not have been affected by this investigation or prosecution step.

The limitation period for the prosecution of the felonies set out in article 706-47 of this code and the felony set out in article 222-10 of the Criminal Code when committed against minors is twenty years, and only starts to run from their coming of age.

### Article 4 of Law 2017-242 of 27 February 2017:

The Law must not have the effect of making an offense time-barred if, at the time the Law comes into force, public prosecution had been validly initiated or exercised in relation to that offense.

### Article 9-2

The limitation period of prosecution can be interrupted by:

NE VARIETUR

Ahmad GHAZLEH

1

An arrest warrant is the order given to the law-enforcement authorities to find the person against whom it is made and to bring him before him, having first taken him, if appropriate, to the remand prison mentioned on the warrant, where he will be received and detained.

The investigating judge is required to hear as assisted witnesses any persons against whom there has been issued a subpoena, a summons or an arrest warrant, unless they are placed under judicial examination according to the provisions of article 116. These persons cannot be put in custody for the offences following which the Arrest Warrant was issued.

A committal warrant may be issued against a person who is under judicial examination and who has been the subject of an order placing him in pre-trial detention. It is an order to the prison governor to receive and detain the person against whom it has been made. This warrant also authorises the collection or the transfer of the person concerned, so long as he has been previously notified.

### Article 123

Every warrant specifies the identity of the person against whom it is made; it is dated and signed by the judge who makes it and it bears his seal.

Summonses, committal orders, warrants for arrest and warrants to search for people also mention the type of charges brought against the named person, their legal qualification and the applicable legal statutes.

A subpoena is served by a bailiff to the person against whom it are made, or is served on this person by a judicial police officer or agent, or by an agent of the law-enforcement authorities, who hands him a copy of it.

A summons, an arrest warrant and a warrant to search for a person is served and enforced by a judicial police officer or agent or by an agent of the law-enforcement authorities, who shows the warrant to the person and hands him a copy of it.

If the person has already been detained for another reason, the warrant is served as indicated in the previous paragraph or, on the district prosecutor's instructions, by the prison governor, who also delivers a copy of the warrant.

In urgent cases, summonses, arrest warrants and warrants to search for people may be sent by any possible means.

Where this is the case, the essential information from the original warrant, especially the identity of the person against whom it is made, the type of offences he is charged with and their legal qualification, the name and position of the judge making the warrant must all be specified. The original warrant or its copy is sent as quickly as possible to the agent in charge of enforcing it.

### Article 131

If the person has absconded or if he resides outside the territory of the Republic, the investigating judge may, after hearing the opinion of the district prosecutor, issue an arrest warrant against him if the offence carries a misdemeanour imprisonment penalty or a more serious penalty

Copie certifiée conforme

NE VARIETUR
Ahmad GHAZLEH

EXT-LAUTISSIER-00070

3

# ARTICLES FROM THE FRENCH PENAL CODE
## RELATED TO THE APPLICABLE CRIMINAL OFFENSES

**On attempt**

Article 121-4

The perpetrator of an offense is the person who:

1. 1° commits the criminally prohibited acts;

2° attempts to commit a felony or, in the cases provided for by Statute, a misdemeanor.

Article 121-5

An attempt is committed where, being demonstrated by a beginning of execution, it was suspended or failed to achieve the desired effect solely through circumstances independent of the perpetrator's will.

**On homicide against an ascendant**

Article 221-1

The willful causing of the death of another person is murder. It is punished with thirty years' criminal imprisonment.

Article 221-4

Murder is punished by criminal imprisonment for life where it is committed:

1° against a minor under fifteen years of age;

2° against a natural or legitimate ascendant or the adoptive father or mother;

3° against a person whose particular vulnerability, due to age, sickness or infirmity, or to any physical or psychological disability or to pregnancy, is apparent or known to the perpetrator;

4° against a judge, a juror, a lawyer, a ministerial or a public officer, a member of the *gendarmerie*, a civil servant of the national police, customs authorities, the penitentiary administration or against any other person holding public authority, a fireman (whether professional or volunteer), the accredited warden of a building or group of buildings or an agent carrying out on behalf of the tenant the duty of caring for or watching an inhabited building in pursuance of article L. 127.1 of the French Code of Interior Security, in the exercise or on account of his functions or mission, when the capacity of the victim is known or apparent to the perpetrator;

Copie certifiée conforme

EXT-LAUTISSIER-0007

4°bis against a teacher or a staff member working in an educational or schooling establishment, against a person employed by a public transport network or any other person carrying out a public service mission or against a health professional in the exercise of his duties, where the status of the victim is apparent or known to the perpetrator;

4°ter against the spouse, the ascendants and direct descendants or against any other person who habitually resides in the home of the persons mentioned in 4° and 4°bis, because of the duties carried out by these persons;

5° against a witness, a victim or civil party, either to prevent him from denouncing the action, filing a complaint or making a statement before a court, or because of his report, complaint or statement;

6° and 7° (revoked)

8° by several people acting as an organized gang;

9° by the spouse or the common-law spouse of the victim or the partner of the victim with whom he or she had signed a civil partnership (PACS);

10° against any person because of his or her refusal to enter into marriage or any union whatsoever.

The first two paragraphs of article 132-23 governing the safety period are applicable to the offenses set out under the present article. Nevertheless, where the victim is a minor of fifteen years of age and the murder is preceded by or accompanied by rape, torture or acts of barbarity, or when the murder was committed by an organized group against a judge, a member of the *gendarmerie*, a civil servant of the national police, staff of the penitentiary administration or against any other person holding public authority, in the exercise or on account of his functions or mission, the *Cour d'assises* may by a special decision either increase the safety period up to thirty years, or, where it orders life imprisonment, decide that none of the measures enumerated under article 132-23 shall be granted to the convicted person; where the penalty is commuted, and unless the decree of pardon otherwise provides, the safety period is then equal to the length of the sentence resulting from the pardon.

## On Murder

### Article 221-3

Murder committed with premeditation or ambush is defined as assassination. Assassination is punished by a criminal imprisonment for life.

The first two paragraphs of article 132-23 governing the safety period apply to the offense under the present article. Nevertheless, where the victim is a minor who is under fifteen years of age and the assassination is preceded by or accompanied by rape, torture or acts of barbarity, or when the murder was committed by an organized group against a judge, a member of the *gendarmerie*, a civil servant of the national police, staff of the penitentiary administration or against any other person holding public authority, in the exercise or on

account of his functions or mission, the *Cour d'assises* may by a special decision either increase the safety period to thirty years, or, where it imposes criminal imprisonment for life, decide that none of the measures enumerated under Article 132-23 shall be granted to the convicted person. Where the sentence is commuted, and unless the decree of pardon otherwise provides, the safety period is equal to the length of the sentence resulting from the pardon.

## Article 132-171-1 [sic : Article 132-71-1]

Ambush consists of waiting for one or more people a certain period of time in a certain place in view of committing one or more offenses against them.

## On additional penalties applicable to natural persons

### Article 221-8

Natural persons convicted of the offenses set out under the present chapter also incur the following additional penalties.

1° prohibition, pursuant to the conditions set out under Article 131-27, either to hold public office or pursue the social or professional activity in the exercise of which or on the occasion of the exercise of which the offense was committed, or, for the felonies provided for by articles 221-1, 221-2, 221-3, 221-4 and 221-5, to pursue a commercial or industrial activity, or to manage, administer, control or lead, in any quality whatsoever, directly or indirectly, on his or her behalf or on behalf of a third party, a commercial or industrial activity or a business enterprise. Such prohibitions may apply cumulatively;

2° prohibition to hold or to carry, for a maximum period of five years, a weapon requiring a license;

3° suspension of the driving license for a maximum period of five years; this suspension may be limited to driving outside a professional activity; in the cases provided for by article 221-6-1, this measure may not be suspended, even partially, and may not be limited to driving other than in the exercise of a professional activity; in the cases provided for by paragraphs 1° to 6° and by the last paragraph of article 221-6-1, the maximum period of suspension is ten years;

4° cancellation of the driving license, together with the prohibition, for a maximum period of five years, to apply for the issue of a new one;

4°bis the obligation to complete an awareness-raising course on the dangers of the use of narcotic drugs, in the terms provided for by article 131-35-1;

5° confiscation of one or more weapons belonging to the convicted person or which he has freely available to him;

6° withdrawal of the hunting license, together with a prohibition, for a maximum period of five years, to apply for the issue of a new one;

Copie certifiée conforme

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

EXT-LAUTISSIER-00073

7° in cases provided for by article 221-6-1, the prohibition from driving certain motor vehicles, including those for which a driving license is not required, for a maximum period of five years;

8° in cases provided for by article 221-6-1, the requirement to complete a road safety awareness course, at the offender's expense;

9° in cases provided for by article 221-6-1, the immobilization of the vehicle used by the convicted person in committing the offense, if this vehicle belongs to him, for a period of up to one year;

10° in cases provided for by article 221-6-1, the confiscation of the vehicle used by the convicted person in committing the offense, if this vehicle belongs to him.

The confiscation of the vehicle is mandatory in the cases provided for in the fourth and last paragraphs of article 221-6-1 as well as, in the cases provided for in paragraphs 2, 3 and 5 of the same article, in case of recidivism or if the person already received a final sentence for one of the misdemeanors provided for in <u>articles L. 221-2, L. 224-16, L. 234-1, L. 234-8, L. 235-1, L. 235-3</u> or <u>L. 413-1</u> of the French Traffic Code or received a ticket for the offense referred to in Article L. 413-1. The court may, nonetheless, chose not to impose such measures, by a specially motivated decision.

11° In the cases provided for in the second and last paragraphs of article 221-6-1, the prohibition, for a maximum period of five years, of driving any vehicle that has not been equipped, by an accredited professional or by construction, of a breath alcohol ignition interlock device approved and compliant with the conditions provided for in <u>article L. 234-17</u> of the French Road Traffic Code. When this prohibition is imposed at the same time as the driving license cancellation or suspension penalty, it starts to apply, for the duration set by the court, after serving said penalty.

Any conviction for the misdemeanors provided for by paragraphs 1° to 6° and by the last paragraph of article 221-6-1 results in the automatic cancellation of the driving license with the prohibition to apply for a new license for a maximum period of ten years. In the case of recidivism, the length of the ban is automatically increased to ten years, and the court may, by a specially motivated decision, rule that the ban shall be for life. Copie certifiée conforme

II. - In the case of conviction for the offenses provided for in section 1 of this chapter, the additional penalties provided for in paragraphs 2°, 5° and 6° of I shall be mandatory. The duration of the penalties provided for in paragraphs 2° and 6° of I is increased up to a maximum of fifteen years.

However, the court may, by a specially motivated decision when the sentence is pronounced by a correctional court, chose not to impose such measures, taking into consideration the circumstances of the offense and the personality of the offender.

<u>Article 221-9</u>

Natural persons convicted of the offenses set out under Section 1 of the present chapter also incur the following additional penalties:

Expert Traductrice assermentée
Grace Shalhoub
en langues français-anglais-hébreu
près la cour d'appel de Paris

1° prohibition of civic, civil and family rights, pursuant to the conditions set out under <u>article 131-26</u>;

2° prohibition to hold public office, pursuant to the conditions set out under <u>article 131-27;</u>

3° <u>confiscation set out under article 131-21;</u>

4° <u>area banishment, pursuant to the conditions set out under article 131-31.</u>


<u>Article 221-9-1</u>

<u>Natural persons guilty of the felonies provided for in Section 1 of the present chapter are also liable to socio-judicial probation in the manner set out under articles 131-36-1 to 131-36-13.</u>


<u>Article 221-11</u>

Any alien convicted of any of the offenses set out under Section 1 of the present chapter may be banished from French territory either permanently or for a maximum period of ten years, pursuant to the conditions set out under <u>article 131-10</u>.


Copie certifiée conforme



EXT-LAUTISSIER-00075

P A R Q U E T
   D U
T R I B U N A L
D E  G R A N D E
I N S T A N C E
D E  P A R I S

■

# Copie du traité d'extradition entre la France et les Etats-Unis d'Amérique signé le 23 avril 1996

**TRAITE D'EXTRADITION ENTRE LA FRANCE ET LES ETATS-UNIS D'AMERIQUE
(ENSEMBLE UN PROCES-VERBAL D'ACCORD SUR LA REPRESENTATION),
SIGNE A PARIS LE 23 AVRIL 1996**

Le Président de la République française, Le Président des Etats-Unis d'Amérique,
Rappelant la Convention d'extradition, avec Protocole, entre la République française et les Etats-Unis d'Amérique, signée à Paris le 6 janvier 1909 et la Convention additionnelle d'extradition, signée à Paris le 12 février 1970, avec échange de lettres des 2 et 11 juin 1970, notant que ces conventions sont toujours en vigueur entre le Gouvernement de la République française et le Gouvernement des Etats-Unis d'Amérique jusqu'à l'entrée en vigueur du présent Traité ;
Désireux d'établir une coopération plus efficace entre leurs Etats en vue de la répression de la criminalité et afin de faciliter leurs relations en matière d'extradition par la conclusion d'un traité d'extradition ;
ont résolu de conclure un nouveau Traité d'extradition et à cette fin ont désigné comme plénipotentiaires :
Le Président de la République française : M. Jacques Toubon, garde des sceaux, ministre de la justice ;
Le Président des Etats-Unis d'Amérique : Mme Janet Reno, Attorney général des Etats-Unis d'Amérique,
lesquels, après s'être mutuellement communiqué leurs pleins pouvoirs reconnus en bonne et due forme, sont convenus des articles suivants :

**Article 1er** Obligation d'extrader

Les Etats contractants s'engagent à se livrer réciproquement, selon les dispositions du présent Traité, toute personne qui est poursuivie ou condamnée par les autorités compétentes de l'Etat requérant pour une infraction donnant lieu à extradition.

**Article 2** Infractions donnant lieu à extradition

1. Donnent lieu à extradition les infractions punies selon les lois des deux Etats, d'une peine privative de liberté d'un maximum d'au moins un an ou d'une peine plus sévère. En outre, si l'extradition est demandée pour l'exécution d'un jugement, la partie de la peine restant encore à exécuter doit être d'au moins six mois.
2. Donnent également lieu à extradition les faits constitutifs d'une tentative ou de complicité d'infractions ou d'une participation à une association de malfaiteurs, telles que prévues au paragraphe 1er du présent article.
3. Aux fins du présent article, une infraction donne lieu à extradition :
a) Que les législations des deux Etats contractants classent ou non l'infraction dans la même catégorie ou la décrivent ou non dans des termes identiques ;
b) Indépendamment de la circonstance selon laquelle il s'agit d'une infraction pour laquelle la loi fédérale des Etats-Unis exige la preuve d'un élément tel qu'un transport entre deux Etats, l'utilisation des services postaux, télégraphiques ou d'autres moyens d'échanges entre Etats des Etats-Unis d'Amérique ou avec l'étranger ou les effets sur ces échanges, un tel élément de preuve étant requis à la seule fin d'établir la compétence des juridictions fédérales des Etats-Unis.
4. L'extradition est accordée pour une infraction, donnant lieu à extradition, commise hors du territoire de l'Etat requérant, lorsque la législation de l'Etat requis autorise la poursuite ou prévoit la répression de cette infraction, dans des circonstances analogues.
5. Si la demande d'extradition vise plusieurs faits distincts punis chacun par les législations des deux Etats d'une peine privative de liberté, mais dont certains ne remplissent pas les conditions prévues par les paragraphes 1 et 2, l'Etat requis accorde également l'extradition pour ces derniers.
6. En matière d'impôts directs et indirects, de droits de douane ou de change de monnaies, l'extradition est accordée dans les conditions prévues aux paragraphes 1 et 2 du présent article.

**Article 3** Nationalité

1. L'Etat requis n'est pas tenu d'accorder l'extradition de l'un de ses ressortissants, mais le Pouvoir exécutif des Etats-Unis a la faculté de le faire, discrétionnairement, s'il le juge approprié. La nationalité de la personne réclamée est celle qu'elle possédait au moment de la commission de l'infraction.
2. Si la demande d'extradition est refusée uniquement parce que la personne réclamée est ressortissante de l'Etat requis, celui-ci soumet, sur la demande de l'Etat requérant, l'affaire à ses autorités compétentes pour l'exercice de l'action pénale.

d'acquittement ou de condamnation ayant acquis un caractère définitif, pour l'infraction à raison de laquelle l'extradition est demandée.

2. L'extradition ne peut pas être refusée si les autorités de l'Etat requis ont décidé de ne pas exercer de poursuites contre la personne réclamée, pour les faits à raison desquels l'extradition est demandée, ou de mettre fin à toutes poursuites pénales qu'elles ont engagées contre ladite personne.

**Article 9** Prescription

1. L'extradition est refusée si l'action publique ou la peine sont prescrites selon la législation de l'Etat requis.

2. Les actes effectués dans l'Etat requérant qui ont pour effet d'interrompre ou de suspendre la prescription sont pris en compte par l'Etat requis, dans la mesure où sa législation le permet.

**Article 10** Procédures d'extradition et pièces à produire

1. Toute demande d'extradition est transmise par voie diplomatique.

2. Sont produits à l'appui de chaque demande d'extradition :
a) Les documents, déclarations ou autres types de renseignements qui décrivent la nationalité, la localisation probable de la personne réclamée et son identité de façon à pouvoir établir que la personne recherchée est la personne visée par la poursuite ou le jugement de condamnation ;
b) Un exposé des faits et la chronologie des principaux actes de procédure concernant l'affaire ;
c) Le texte des dispositions légales applicables à l'infraction à raison de laquelle l'extradition est réclamée ;
d) Le texte des dispositions stipulant les peines relatives à l'infraction ; et

3. Lorsqu'une personne est réclamée en vue de poursuites, la demande d'extradition est également accompagnée :
a) Dans le cas d'une demande émanant des Etats-Unis, d'une copie dûment authentifiée du mandat d'arrêt et du document établissant les chefs d'accusation ;
b) Dans le cas d'une demande émanant de la France, de l'original ou d'une copie dûment authentifiée du mandat d'arrêt et de tous renseignements nécessaires qui justifieraient la mise en accusation de la personne si l'infraction avait été commise aux Etats-Unis.

4. Lorsqu'une personne est réclamée parce qu'elle a été déclarée coupable ou parce qu'elle a été condamnée pour l'infraction à raison de laquelle l'extradition est demandée, la demande d'extradition doit aussi être accompagnée :
a) Dans le cas d'une demande émanant des Etats-Unis, si la personne a été condamnée, de l'original ou de la copie dûment authentifiée de la décision définitive de condamnation ou, si la personne a été déclarée coupable mais n'a pas encore été condamnée, d'une déclaration d'une autorité judiciaire confirmant la culpabilité, ainsi que de la copie dûment authentifiée du mandat d'arrêt ;
b) Dans le cas d'une demande émanant de la France, de l'original ou de la copie dûment authentifiée de la décision de condamnation définitive ;
c) Dans tous les cas où une peine a été prononcée, d'une déclaration relative au reliquat de la peine restant à exécuter ;
d) En cas de condamnation par défaut, des documents visés au paragraphe 3.

**Article 11** Admissibilité des documents

Les documents qui accompagnent la demande d'extradition sont reçus et admis comme preuves dans la procédure d'extradition s'ils répondent aux conditions suivantes :
a) Dans le cas d'une demande présentée par les Etats-Unis, s'ils sont transmis par la voie diplomatique ;
b) Dans le cas d'une demande présentée par la France, s'ils sont certifiés par le principal représentant diplomatique ou consulaire des Etats-Unis résidant sur le territoire de la République française, comme il est stipulé par les dispositions en vigueur aux Etats-Unis régissant l'extradition, ou s'ils sont certifiés ou authentifiés d'une autre manière agréée par les dispositions légales des Etats-Unis.

**Article 12** Traduction

Tous les documents soumis par l'Etat requérant doivent être traduits dans la langue de l'Etat requis.

2. L'Etat requis peut ajourner l'extradition à l'encontre d'une personne si des poursuites sont en cours à son encontre ou si elle exécute une peine dans cet Etat. Cet ajournement peut continuer jusqu'à la fin des poursuites contre la personne réclamée et jusqu'à l'exécution définitive de toute peine prononcée.

**Article 17** Demandes d'extradition présentées par plusieurs Etats

Si l'extradition est demandée concurremment par plusieurs Etats, soit pour le même fait, soit pour des faits différents, les autorités compétentes françaises ou le Pouvoir exécutif des Etats-Unis statuent compte tenu de toutes circonstances pertinentes et notamment de l'existence d'un traité à l'appui de la demande, de la gravité et du lieu de commission des infractions, des dates respectives des demandes, de la nationalité de l'individu réclamé et de la victime, des intérêts respectifs des Etats requérants et de la possibilité d'une extradition ultérieure vers un autre Etat.

**Article 18** Saisie et remise de biens

1. Dans la mesure permise par sa législation, l'Etat requis peut saisir et remettre à l'Etat requérant tous articles, documents et pièces à conviction ayant trait à l'infraction pour laquelle l'extradition est accordée. La remise des articles, documents et pièces visés au présent paragraphe peut être effectuée même dans le cas où l'extradition ne peut avoir lieu, par suite du décès, de la disparition ou de l'évasion de la personne réclamée.
2. L'Etat requis peut remettre les objets visés à condition de recevoir les assurances voulues de l'Etat requérant que lesdits objets lui seront restitués le plus tôt possible. Il peut aussi les garder temporairement s'il en a besoin comme pièces à conviction.
3. Les droits des tiers sur de tels objets seront dûment réservés.

**Article 19** Règle de la spécialité

1. La personne extradée en vertu du présent Traité ne sera ni détenue, ni jugée, ni condamnée, ni punie, ni soumise à aucune restriction de sa liberté sur le territoire de l'Etat requérant pour un fait quelconque antérieur à la remise, autre que celui ayant motivé l'extradition, sauf dans les cas suivants :
a) Lorsque l'Etat requis y consent, une demande pourra être présentée à cet effet, accompagnée des pièces énumérées à l'article 10, ainsi que de toute déclaration faite par la personne extradée concernant l'infraction pour laquelle le consentement de l'Etat requis est demandée ; ou
b) Lorsque, ayant eu la possibilité de le faire, la personne extradée n'a pas quitté le territoire de l'Etat requérant dans les trente jours qui suivent son élargissement définitif, ou si elle est retournée sur le territoire de cet Etat après l'avoir quitté.
2. Si la qualification des faits pour lesquels la personne a été extradée a fait l'objet au cours de la procédure d'une modification dans la législation de l'Etat requérant ou si la personne est poursuivie pour des faits qualifiés différemment, cette personne peut être poursuivie ou condamnée dès lors que cette nouvelle qualification :
   a) Est fondée sur les mêmes faits que ceux visés dans la demande d'extradition et dans les pièces jointes ; et
   b) Est punie d'une peine privative de liberté d'un maximum identique ou inférieur à celui prévu pour l'infraction pour laquelle l'extradition a été accordée.

**Article 20** Réextradition vers un Etat tiers

1. Lorsqu'une personne a été remise par l'Etat requis à l'Etat requérant, celui-ci ne doit pas remettre la personne extradée à un Etat tiers pour une infraction antérieure à sa remise, sauf :
a) Si l'Etat requis consent à cette remise ; ou
b) Si la personne extradée, ayant eu la possibilité de le faire, n'a pas quitté le territoire de l'Etat requérant dans les trente jours qui suivent son élargissement définitif ou si elle est retournée sur le territoire de cet Etat après l'avoir quitté.
2. Avant d'accéder à une demande au titre du a du paragraphe 1 ci-dessus, l'Etat requis peut demander la production des documents mentionnés à l'article 10 et toute déclaration faite par la personne extradée relative à l'infraction pour laquelle le consentement de l'Etat requis est demandé.

**Article 21** Transit



## PROCÈS-VERBAL D'ACCORD SUR LA REPRÉSENTATION

Il est convenu que chaque Etat a souhaité accorder à l'autre la meilleure représentation juridique et les meilleurs conseils juridiques possibles (sans frais) dans la mesure où sa Constitution et ses lois l'autorisent.

Dans l'esprit du présent accord, les deux Etats sont convenus de se fournir ces conseils et cette représentation (y compris devant leurs Cours) dans une mesure au moins identique à ce qui est garanti à tout autre Etat dans le cadre des procédures d'extradition existantes actuellement ou dans le futur. Pour les Etats-Unis d'Amérique, le présent accord signifie qu'au minimum cet Etat désignera un conseil juridique chargé d'étudier chaque demande d'extradition présentée par la France en vue de fournir des conseils et des avis à la France concernant les forces et les faiblesses de l'affaire. De plus, dans la mesure où cela est nécessaire et opportun, le conseil juridique travaillera avec les autorités françaises, afin d'améliorer la documentation produite en vue de faire aboutir la demande d'extradition. De même les Etats-Unis d'Amérique s'engagent à représenter la France à toute audience liée à la demande d'extradition ainsi qu'à toute réunion organisée avant ou après les audiences. Enfin, les Etats-Unis d'Amérique s'engagent à représenter la France lors de tout appel ou action en « Habeas Corpus » en rapport avec la demande d'extradition.

Pour la France, l'accord signifie qu'au minimum, la France accepte :

1. D'inclure dans le dossier présenté à la chambre d'accusation tout mémoire ou document transmis par le gouvernement des Etats-Unis à l'appui de sa demande d'extradition, de façon à permettre au gouvernement des Etats-Unis de défendre par écrit, et de manière continue, sa demande d'extradition ;

2. De demander que les Etats-Unis fournissent des informations ou des explications supplémentaires si besoin est ;

3. De communiquer au gouvernement des Etats-Unis une copie du document de transmission de sa demande d'extradition au Parquet général de la chambre d'accusation ;

4. S'efforcer de renvoyer la décision ou l'audience de la chambre d'accusation de façon à permettre au gouvernement des Etats-Unis, si nécessaire, de défendre sa position et de soumettre des mémoires supplémentaires en réponse à l'argumentation orale présentée par la défense à l'audience. Ce renvoi se ferait dans un temps strictement limité et pourrait être décidé automatiquement ou à la demande du Parquet ;

5. De recevoir des communications d'un officier consulaire américain ou d'un fonctionnaire du département américain de la justice chargé de représenter les intérêts des Etats-Unis au cours de la procédure d'extradition. Le nom de ce représentant sera communiqué au ministère de la justice de la République française et, si besoin, au procureur concerné par chaque demande d'extradition ;

6. De donner l'opportunité au représentant désigné des Etats-Unis, et ce dès que la demande d'extradition est présentée, de soumettre par notes au ministère de la justice de la République française, toute information concernant les faits ou le droit, qu'elle estimera nécessaire ;

7. D'indiquer au gouvernement des Etats-Unis, au moyen de notes du ministère de la justice de la République française à l'ambassade des Etats-Unis à Paris, que la demande a été transmise au Parquet concerné ;

8. D'informer l'ambassade des Etats-Unis à Paris de la date de la première audience de la chambre d'accusation ;

9. De donner l'opportunité au représentant des Etats-Unis de transmettre, avant l'audience, une note supplémentaire dans un laps de temps suffisant pour permettre à la partie intéressée d'en être informée et à la note d'être versée au dossier ;

10. De donner la possibilité aux représentants autorisés des Etats-Unis de communiquer dans les meilleurs délais avec le Parquet général par l'intermédiaire du ministère de la justice de la République française, dans la mesure où celui-ci peut le faire, avant l'audience au cours de laquelle sera examinée la demande d'extradition. (cf. note 1)

# ACCORD

## entre l'Union européenne et les États-Unis d'Amérique en matière d'extradition

### INDEX

Préambule

| | |
|---|---|
| Article 1 | Objet |
| Article 2 | Définitions |
| Article 3 | Champ d'application par rapport aux traités bilatéraux d'extradition conclus par les États membres |
| Article 4 | Infractions pouvant donner lieu à extradition |
| Article 5 | Transmission et authentification des documents |
| Article 6 | Transmission des demandes d'arrestation provisoire |
| Article 7 | Transmission de documents à la suite d'une arrestation provisoire |
| Article 8 | Complément d'informations |
| Article 9 | Remise temporaire |
| Article 10 | Demandes d'extradition ou de remise présentées par plusieurs États |
| Article 11 | Procédures d'extradition simplifiées |
| Article 12 | Transit |
| Article 13 | Peine de mort |
| Article 14 | Présence d'informations sensibles dans une demande |
| Article 15 | Consultations |
| Article 16 | Application dans le temps |
| Article 17 | Non-dérogation |
| Article 18 | Futurs traités bilatéraux d'extradition conclus avec des États membres |
| Article 19 | Désignations et notifications |
| Article 20 | Application territoriale |
| Article 21 | Réexamen |
| Article 22 | Entrée en vigueur et dénonciation |

Note explicative

L'UNION EUROPÉENNE ET LES ÉTATS-UNIS D'AMÉRIQUE,

DÉSIREUX de faciliter davantage la coopération entre les États membres de l'Union européenne et les États-Unis d'Amérique,

DÉSIREUX de lutter plus efficacement contre la criminalité afin de protéger leurs sociétés démocratiques respectives et valeurs communes,

DANS LE RESPECT des droits des personnes et de la primauté du droit,

GARDANT À L'ESPRIT les garanties prévues par leurs systèmes juridiques respectifs, qui reconnaissent à une personne extradée le droit à un procès équitable, y compris le droit d'être jugée par un tribunal impartial établi par la loi,

DÉSIREUX de conclure un accord relatif à l'extradition des délinquants,

ONT DÉCIDÉ CE QUI SUIT:

Copie certifiée conforme

## Article 4

### Infractions pouvant donner lieu à extradition

1. Une infraction est considérée comme pouvant donner lieu à extradition si elle est punissable, en vertu du droit de l'État requérant et celui de l'État requis, d'une peine privative de liberté d'une durée maximale de plus d'un an ou d'une peine plus sévère. Une infraction est également considérée comme pouvant donner lieu à extradition si elle constitue une tentative de commettre une infraction pouvant donner lieu à extradition, une conspiration à cet effet ou une participation à une telle infraction. Lorsque la demande porte sur l'application de la peine concernant une personne condamnée pour une infraction pouvant donner lieu à extradition, la durée de la peine privative de liberté restant à purger doit être d'au moins quatre mois.

2. Si l'extradition est accordée pour une infraction pouvant donner lieu à extradition, elle l'est également pour toute autre infraction spécifiée dans la demande si cette dernière infraction est punissable d'une peine privative de liberté d'un an ou moins, pour autant que toutes les autres conditions pour l'extradition soient réunies.

3. Aux fins du présent article, une infraction est considérée comme pouvant donner lieu à extradition:

a) que le droit de l'État requérant et celui de l'État requis classent ou non cette infraction dans la même catégorie ou la décrivent en utilisant la même terminologie;

b) que la législation fédérale des États-Unis exige ou non que soient présents des éléments tels que des transports entre États, l'utilisation de services postaux ou d'autres services intervenant dans le commerce entre États ou avec l'étranger, ces éléments servant uniquement à établir la compétence d'un tribunal fédéral des États-Unis, et

c) dans les affaires pénales liées à la fiscalité, aux droits de douane, au contrôle des changes et au contrôle de l'importation ou de l'exportation de certains produits, que le droit de l'État requérant et celui de l'État requis prévoient ou non les mêmes types de taxes, droits de douane, contrôle des changes ou contrôle de l'importation ou de l'exportation des mêmes types de produits.

4. Si l'infraction a été commise hors du territoire de l'État requérant, l'extradition est accordée sous réserve des autres conditions applicables à cet effet, si le droit de l'État requis prévoit des sanctions pour des faits commis hors de son territoire dans des circonstances analogues. Si le droit de l'État requis ne prévoit pas de sanctions pour des faits commis hors de son territoire dans des circonstances analogues, le pouvoir exécutif de cet État peut, à sa discrétion, accorder l'extradition pour autant que toutes les autres conditions pour l'extradition soient réunies.

## Article 5

### Transmission et authentification des documents

1. Les demandes d'extradition et les pièces justificatives sont transmises par la voie diplomatique, y compris selon les modalités visées à l'article 7.

2. Les documents accompagnés du certificat ou revêtus du cachet du ministère de la justice ou du ministère ou département de l'État requérant chargé des affaires étrangères sont recevables dans les procédures d'extradition de l'État requis sans autre certification, authentification ou autre forme de légalisation.

## Article 6

### Transmission des demandes d'arrestation provisoire

Outre la voie diplomatique, les demandes d'arrestation provisoire peuvent également être transmises directement du ministère de la justice de l'État requérant au ministère de la justice de l'État requis. Il est également possible de transmettre une telle demande en utilisant les services de l'Organisation internationale de police criminelle (Interpol).

## Article 7

### Transmission de documents à la suite d'une arrestation provisoire

1. Si la personne dont l'extradition est demandée est maintenue en détention provisoire par l'État requis, l'État requérant peut s'acquitter de son obligation de transmettre sa demande d'extradition et les pièces justificatives par la voie diplomatique conformément à l'article 5, paragraphe 1, en présentant cette demande et ces pièces à l'ambassade de l'État requis établie dans l'État requérant. Dans ce cas, la date de réception de cette demande par l'ambassade est considérée comme étant la date de réception par l'État requis aux fins de l'application du délai devant être respecté en vertu du traité d'extradition en vigueur afin que la personne puisse être maintenue en détention.

2. Si, à la date de la signature du présent accord, un État membre ne peut, en raison de la jurisprudence constante de son système juridique applicable à cette date, appliquer les mesures visées au paragraphe 1, le présent article ne lui est pas applicable jusqu'au moment où cet État membre et les États-Unis d'Amérique en décident autrement au moyen de l'échange d'une note diplomatique.

## Article 8

### Complément d'informations

1. L'État requis peut demander à l'État requérant de fournir des informations complémentaires dans un délai raisonnable, qu'il précise, s'il juge que les informations communiquées à l'appui de la demande d'extradition pour se conformer aux obligations prévues par le traité d'extradition en vigueur sont insuffisantes.

2. Ce complément d'informations peut être demandé ou fourni directement par les ministères de la justice des États concernés.

Case 1:19-mj-00377-LPA    Document 12-1    Filed 03/13/20    Page 82 of 107

## Article 14

### Présence d'informations sensibles dans une demande

Lorsque l'État requérant envisage de communiquer des informations particulièrement sensibles à l'appui de sa demande d'extradition, il peut consulter l'État requis afin de déterminer dans quelle mesure ces informations peuvent être protégées par ce dernier. Si l'État requis ne peut pas protéger les informations de la manière souhaitée par l'État requérant, celui-ci détermine si ces informations seront ou non néanmoins communiquées.

## Article 15

### Consultations

Si nécessaire, les parties contractantes se consultent pour permettre une utilisation aussi efficace que possible du présent accord, y compris pour favoriser le règlement de tout différend concernant son interprétation ou son application.

## Article 16

### Application dans le temps

1.    Le présent accord s'applique aux infractions commises tant avant qu'après son entrée en vigueur.

2.    Le présent accord s'applique aux demandes d'extradition formulées après son entrée en vigueur. Cependant, les articles 4 et 9 s'appliquent aux demandes pendantes dans un État requis au moment de l'entrée en vigueur de l'accord.

## Article 17

### Non-dérogation

1.    Le présent accord est sans préjudice de la possibilité reconnue à l'État requis par un traité d'extradition bilatéral en vigueur entre un État membre et les États-Unis d'Amérique d'invoquer des motifs de refus se rapportant à une question non régie par le présent accord.

2.    Si les principes constitutionnels de l'État requis ou des décisions judiciaires définitives ayant un caractère contraignant sont de nature à faire obstacle à l'exécution de son obligation d'extradition et que ni le présent accord ni le traité bilatéral applicable ne permettent de résoudre la question, l'État requis et l'État requérant procèdent à des consultations.

## Article 18

### Futurs traités bilatéraux d'extradition conclus avec les États membres

Le présent accord n'empêche pas la conclusion, après son entrée en vigueur, d'accords bilatéraux conformes au présent accord entre un État membre et les États-Unis d'Amérique.

## Article 19

### Désignations et notifications

L'Union européenne notifie aux États-Unis toute désignation effectuée en application de l'article 2, paragraphe 3, et de l'article 10, paragraphe 2, avant l'échange d'instruments écrits entre les États-Unis et les États membres visé à l'article 3, paragraphe 2.

## Article 20

### Application territoriale

1.    Le présent accord s'applique:

a) aux États-Unis d'Amérique;

b) en ce qui concerne l'Union européenne:
   - aux États membres,
   - aux territoires dont un État membre assure les relations extérieures, ou aux pays qui ne sont pas des États membres, à l'égard desquels un État membre a d'autres devoirs dans le domaine des relations extérieures, lorsque cela a été convenu par l'échange d'une note diplomatique entre les parties contractantes dûment confirmée par l'État membre concerné.

2.    Une partie contractante peut mettre fin à l'application du présent accord à un territoire ou un pays faisant l'objet de l'extension prévue au paragraphe 1, point b) moyennant un préavis écrit de six mois donné à l'autre partie contractante par la voie diplomatique, lorsque cela est dûment confirmé entre l'État membre concerné et les États-Unis.

## Article 21

### Réexamen

Les parties contractantes conviennent de procéder à un réexamen commun du présent accord, si nécessaire, et, en tout état de cause, au plus tard cinq ans après son entrée en vigueur. Ce réexamen porte notamment sur la mise en œuvre concrète de l'accord et peut également avoir trait à des questions telles que les conséquences du développement de l'Union européenne en ce qui concerne l'objet du présent accord, y compris l'article 10.

## Article 22

### Entrée en vigueur et dénonciation

1.    Le présent accord entre en vigueur le premier jour qui suit le troisième mois après la date à laquelle les parties contractantes ont échangé les instruments indiquant qu'elles ont mené à bien leurs procédures internes à cet effet. Ces instruments précisent également que les actes visés à l'article 3, paragraphe 2, ont été accomplis.

2.    Chacune des parties contractantes peut à tout moment mettre fin au présent accord en en informant l'autre partie par écrit. Cette dénonciation prend effet six mois après la date de sa notification.

Case 1:19-mj-00377-LPA    Document 12-1    Filed 03/13/20    Page 83 of 107

### Note explicative relative à l'accord entre l'Union européenne et les États-Unis d'Amérique en matière d'extradition

La présente note explicative précise l'interprétation convenue entre les parties contractantes concernant l'application de certaines dispositions de l'accord entre l'Union européenne et les États-Unis d'Amérique en matière d'extradition (ci-après dénommé «l'accord»).

*Concernant l'article 10*

L'article 10 n'entend affecter ni les obligations des États parties au statut de Rome de la Cour pénale internationale, ni les droits des États-Unis d'Amérique en tant que non-partie en ce qui concerne la Cour pénale internationale.

*Concernant l'article 18*

L'article 18 prévoit que l'accord n'empêche pas la conclusion, après son entrée en vigueur, d'accords bilatéraux en matière d'extradition entre un État membre et les États-Unis d'Amérique, qui soient conformes à l'accord.

Si une mesure prévue par l'accord devait créer une difficulté de nature opérationnelle pour un ou plusieurs États membres ou pour les États-Unis d'Amérique, cette difficulté devrait d'abord être réglée, si possible, par le biais de consultations entre l'État membre ou les États membres concernés et les États-Unis d'Amérique ou, le cas échéant, selon les procédures de consultation définies dans l'accord. Si les consultations ne permettaient pas à elles seules de résoudre cette difficulté opérationnelle, il serait conforme à l'accord que les accords bilatéraux qui seraient conclus par la suite entre l'État membre ou les États membres et les États-Unis d'Amérique prévoient un autre mécanisme, applicable sur le plan opérationnel, qui permette d'atteindre les objectifs visés par la disposition au sujet de laquelle la difficulté est apparue.

---



Case 1:19-mj-00377-LPA   Document 12-1   Filed 03/13/20   Page 84 of 107

P A R Q U E T
   D U
T R I B U N A L
D E   G R A N D E
I N S T A N C E
D E   P A R I S

■

# Passeport français
## et
## Carte nationale d'identité
## LAUTISSIER Brendan

EXT-LAUTISSIER-00085



Copie certifiée conforme

EXT-LAUTISSIER-00086



Adresse : 60 RUE GUY MOQUET
PARIS 17E (75)

Carte valable jusqu'au : 02.01.2023
délivrée le : 03.01.2013
par : PRÉFECTURE DE POLICE - PARIS ANTENNE XVII (75)
Signature de l'autorité :

Pour le Préfet de Police et par délégation
Le Directeur de la Police Générale

Cyrille MAILLET - Ad

Copie certifiée conforme





Copie certifiée conforme

EXT-LAUTISSIER-00088



**RÉPUBLIQUE FRANÇAISE**

**Passeport**

R
F

12AZ61028 0

Union européenne
Unión europea / Den europæiske union
Europäische Gemeinschaft / Ευρωπαϊκή Ένωση
European Union / An tAontas Eorpach
Unione europea / Europese unie / União europeia
European union / Europeiska unionen

République française
República francesa / Den franske republik
Französische Republik / Γαλλική Δημοκρατία
The French Republic / Poblacht na France
Repubblica francese / Republiek Frankrijk
República francesa / Ranskan tasavalta
Republiken Frankrike

Passeport
Pasaporte / Pas / Reisepass / Διαβατήριο
Passport / Pas / Passaporto / Paspoort
Passaporte / Passi / pass



Copie certifiée conforme

EXT-LAUTISSIER-00089



Copie certifiée conforme



EXT-LAUTISSIER-00090





Copie certifiée conforme



EXT-LAUTISSIER-00091



Copie certifiée conforme



EXT-LAUTISSIER-00092





Copie certifiée conforme

EXT-LAUTISSIER-00093



Copie certifiée conforme



EXT-LAUTISSIER-00094



Copie certifiée conforme



EXT-LAUTISSIER-00095



Copie certifiée conforme



EXT-LAUTISSIER-00096




Copie certifiée conforme



EXT-LAUTISSIER-00097



Copie certifiée conforme



EXT-LAUTISSIER-00098



Copie certifiée conforme

EXT-LAUTISSIER-00099





Copie certifiée conforme



EXT-LAUTISSIER-00100



Copie certifiée conforme







Copie certifiée conforme

EXT-LAUTISSIER-00102



Copie certifiée conforme





Copie certifiée conforme





## Recommandations importantes

1—Le passeport est la propriété de l'État français. Il est remis à titre personnel et permet à son porteur de voyager librement à l'étranger.

2—Il est interdit d'y effectuer des ratures, surcharges et adjonctions de mentions ou de feuilles supplémentaires, En même, il est interdit d'effectuer toute altération, modification ou intervention dans son composant électronique.

Toute modification entraîne la nullité du passeport et expose son auteur à des poursuites judiciaires.

3—En cas de perte, de vol ou de détérioration, le titulaire doit en informer immédiatement l'autorité administrative ou consulaire compétente la plus proche.

Pendant tout départ à destination de l'étranger, le titulaire doit s'assurer :

Que son passeport a une durée de validité suffisante et s'enquérir auprès des autorités étrangères compétentes des conditions d'entrée et de séjour dans le pays où il se rend.

Il est recommandé de consulter le site internet du ministère des affaires étrangères France-diplomatie.gouv.fr, qui diffuse des informations pays par pays (rubrique «conseils aux voyageurs»).

Les Français désireux de se faire à l'étranger peuvent également se mettre en rapport avec le ministère des affaires étrangères pour obtenir des renseignements sur leur futur pays d'accueil (Maison du Français de l'étranger — renseignements sur le site www.diplomatie.gouv.fr).

Copie certifiée conforme


EXT-LAUTISSIER-00105

P A R Q U E T
    D U
T R I B U N A L
D E  G R A N D E
I N S T A N C E
D E  P A R I S

■

# Passeport Américain

# LAUTISSIER Brendan



PASSPORT
PASSEPORT
PASAPORTE

USA

# UNITED STATES OF AM

Type / Type / Tipo    Code / Code / Código    Passport No. / No. du Passep

P        USA        4651286

Surname / Nom / Apellidos

**LAUTISSIER**

Given Names / Prénoms / Nombres

**BRENDAN CHRISTOPHER WALSH**

Nationality / Nationalité / Nacionalidad

**UNITED STATES OF AMERICA**

Date of birth / Date de naissance / Fecha de nacimiento

**07 Jan 1992**            Sex / S

Place of birth / lieu de naissance / Lugar de nacimiento

**CALIFORNIA, U.S.A.**

Date of issue / Date de délivrance / Fecha de expedición    Authority / Au

**05 Feb 2010**            Unite

Date of expiration / Date d'expiration / Fecha de caducidad   Departm

**04 Feb 2020**

Endorsements / Mentions Spéciales / Anotaciones

**SEE PAGE 27**            U

P<USALAUTISSIER<<BRENDAN<CHRISTOPHER<WAL

*Copie certifiée conforme*